**2024-1566**

---

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

In Re UNITED STATES,
*Defendant-Appellant*

---

Appeal from the United States Court of International Trade in
No. 1:21-cv-00288-SAV, Judge Stephen A. Vaden

---

\*     \*     \*     \*     \*     \*     \*

2024-1504

CVB, INC.,
*Plaintiff-Appellant,*

v.

UNITED STATES,
*Defendant-Appellee,*

BROOKLYN BEDDING, LLC, CORSICANA MATTRESS CO.,
ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC.,
KOLCRAFT ENTERPRISES, INC., LEGGETT & PLATT, INC.,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,
*Defendants-Appellees.*

---

Appeal from the United States Court of International Trade in
No. 1:21-cv-00288-SAV, Judge Stephen A. Vaden

---

**NONCONFIDENTIAL PRINCIPAL BRIEF OF
DEFENDANT-APPELLANT UNITED STATES**

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel for
    Litigation
Telephone (202) 205-3061

JANE C. DEMPSEY
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone (202) 205-3142

Dated: December 2, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF THE ISSUE ................................................................3

STATEMENT OF THE CASE .................................................................3

STATEMENT OF THE FACTS................................................................5

     I.     The Commission's Determinations .........................................5

          A.     Domestic Like Product and Domestic Industry ........................5

          B.     Conditions of Competition.........................................6

          C.     Volume..................................................................10

          D.     Price Effects ...........................................................11

          E.     Impact...................................................................13

     II.    U.S. Court of International Trade Decisions.......................15

          A.     The CIT's Merits Decision ......................................15

          B.     The CIT's BPI Denial Decision................................18

SUMMARY OF THE ARGUMENT.......................................................20

ARGUMENT ......................................................................................21

     I.     Standard of Review ........................................................21

     II.    This Court Should Reverse the CIT's BPI Denial Decision...................................................................22

          A.     The Statute Requires the CIT to Preserve the Confidential Status of Information Treated as BPI by the Commission ...................................................23

**TABLE OF CONTENTS (cont'd)**

B.   The Commission Properly Treated Questionnaire Response Information as BPI Throughout Its Administrative Proceedings .......................................................29

   1.   Individual Information from Company-Specific Questionnaire Responses..................................29

   2.   Aggregate Information Calculated from Questionnaire Response Data.........................................32

C.   The CIT Was Statutorily Required to Preserve the Confidential Status of the Information at Issue .......................35

   1.   The Statute, and Not the Common Law Right of Public Access, Determines Whether Information Should or Should Not Be Disclosed........................................................................36

   2.   The Claim to Confidentiality Was Never Waived...................................................................41

   3.   Bracketed Subject Import Volume and Market Share Information, Calculated Using Questionnaire Response Data, Were Not Publicly Available Information ......................................44

CONCLUSION.........................................................................47

**CONFIDENTIAL MATERIAL BRACKETED**

The material bracketed within the text on pages 5-8, 10-12, and 45 describes sensitive nonpublic information regarding production operations, import and shipment information, and market share, financial, pricing, cost, and sales information from individual domestic producers and importers and was granted confidential treatment by the Commission.  *See* 19 U.S.C. § 1677f(b)(1)(A); 19 C.F.R. § 201.6(a).

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*A. Hirsh, Inc. v. United States*,
657 F. Supp. 1297 (Ct. Int'l Trade 1987) ...........................................................39

*Akzo N.V. v. U.S. Int'l Trade Comm'n*,
808 F.2d 1471 (Fed. Cir. 1986) .......................................................30, 31, 32, 39

*Am. Brass v. United States*,
699 F. Supp. 934 (Ct. Int'l Trade 1988) ............................................................27

*Binh Hoa Le v. Exeter Fin. Corp.*,
990 F.3d 410 (5th Cir. 2021) ............................................................................36

*Brown v. Ala. Dep't of Transp.*,
597 F.3d 1160 (11th Cir. 2010) .........................................................................21

*DAK Americas LLC v. United States*,
517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ....................................................11

*Depuy Synthes Prods., Inc. v. Veterinary Orthopedic Implant, Inc.*,
990 F.3d 1364 (Fed. Cir. 2021) .........................................................................21

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019)......................................................................................40, 41

*Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United States*,
547 F. Supp. 3d 1211 (Ct. Int'l Trade 2021) ....................................................28

*Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce*,
11 CIT 238 (1987) .............................................................................................32

*Isbrandtsen Co. v. Johnson*,
343 U.S. 779 (1952)...........................................................................................38

*Jernberg Forgings Co. v. United States*,
598 F. Supp. 390 (Ct. Int'l Trade 1984) ............................................................27

*Kemira Fibres Oy v. United States*,
858 F. Supp. 229 (Ct. Int'l Trade 1994) ............................................................26

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                 **Page(s)**

*Loper Bright Enters. v. Raimondo*,
  603 U.S. ___, 144 S. Ct. 2244 (June 28, 2024) ...........................................21, 22

*Marubeni Am. Corp. v. United States*,
  35 F.3d 530 (Fed. Cir. 1994) ..............................................................................21

*Matter of Krynicki*,
  983 F.2d 74 (7th Cir. 1992) .................................................................................40

*Monsanto Co. v. United States*,
  698 F. Supp. 285 (Ct. Int'l Trade 1988) ............................................................40

*Monsanto Indus. Chems. Co. v. United States*,
  6 CIT 241 (1983) ...........................................................................................39, 40

*OCP S.A. v. United States*,
  No. 21-219, Order (Ct. Int'l Trade Feb. 29, 2024) (ECF 158) ......................1, 22

*Qwest Commc's Int'l Inc. v. FCC*,
  229 F.3d 1172 (D.C. Cir. 2000) ..........................................................................31

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ............................................................................................40

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ......................................................................................40, 41

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ............................................................................................22

*Timex V.I., Inc. v. United States*,
  157 F.3d 879 (Fed. Cir. 1998) ............................................................................21

*United States v. Texas*,
  507 U.S. 529 (1993) ............................................................................................38

*U.S. Steel Corp. v. United States*,
  730 F.2d 1465 (Fed. Cir. 1984) ..........................................................................27

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                      **Page(s)**

*Wiener v. NEC Elecs., Inc.*,
   848 F. Supp. 124 (N.D. Cal. 1994) ...................................................39

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
   1978 WL 1333 (E.D. Pa. 1978) (unpublished)..................................40

**Statutes**

19 U.S.C. § 1516a(b)(2)(B) .........................................................*passim*

19 U.S.C. § 1677(7)(G)(i)....................................................................6

19 U.S.C. § 1677e(c)(1)(A) ..............................................................38

19 U.S.C. § 1677f...............................................................................19

19 U.S.C. § 1677f(a)(4) .......................................................23, 29, 33

19 U.S.C. § 1677f(b)..........................................................................19

19 U.S.C. § 1677f(b)(1) .....................................................................42

19 U.S.C. § 1677f(b)(1)(A).................................................................23

19 U.S.C. § 1677f(b)(2) .....................................................................24

19 U.S.C. § 1677f(c) ..........................................................................26

19 U.S.C. § 1677f(c)(1) .........................................................24, 25, 26

28 U.S.C. § 1295(a)(5)..........................................................................2

28 U.S.C. § 1581(c) ..............................................................................2

**Legislative Materials**

Omnibus Trade and Competitiveness Act of 1988,
   Pub. L. No. 100-418, 102 Stat. 1107 (1988) .....................................38

Trade Agreements Act of 1979,
   Pub. L. No. 96-39, 93 Stat. 144 (1979) .......................................37, 38

# TABLE OF AUTHORITIES (cont'd)

**Legislative Materials (cont'd)**                                    **Page(s)**

H. Rep. No. 100-576 (Apr. 20, 1988) .......................................................38

S. Rep. No. 96-249 (July 17, 1979) ...................................................27, 39

S. Rep. No. 100-71 (June 12, 1987)...............................24, 26, 28, 32, 38

**Federal Regulatory Materials**

19 C.F.R. § 201.6(a).......................................................................28, 30, 45

19 C.F.R. § 201.6(g) .............................................................................28, 29

19 C.F.R. § 207.7 .........................................................................................29

**U.S. Court of International Trade Rules**

Ct. Int'l Trade Rule 5(g) ..............................................................19, 35, 42

Ct. Int'l Trade Rule 11 ...............................................................................22

**U.S. International Trade Commission Publications**

*An Introduction to Administrative Protective Order Practice in Import
    Injury Investigations*, USITC Pub. 5280 (5th ed. Jan. 2022) .......................33, 34

*Antidumping and Countervailing Duty Handbook*,
    USITC Pub. 4540 (14th ed. June 2015)................................................33, 34, 46

*Mattresses from China*,
    Inv. No. 731-TA-1424 (Final), USITC Pub. 5000 (Dec. 2019) ....................7, 14

## STATEMENT OF RELATED CASES

The Defendant-Appellant the United States, by and through counsel for the U.S. International Trade Commission ("Commission"), identifies the following pending case that may be directly affected by the Court's decision in the pending appeal by the Commission:

1. *OCP S.A. v. United States*, Consol. Court No. 21-219 (Ct. Int'l Trade).

## JURISDICTIONAL STATEMENT

Pursuant to Rule 28(a)(5) of the Rules of this Court, counsel for Defendant-Appellant states that this Court's jurisdiction rests upon the following bases:

(a) The U.S. Court of International Trade ("CIT") possessed jurisdiction to entertain this underlying action pursuant to 28 U.S.C. § 1581(c).

(b) The statutory basis for this Court's jurisdiction to entertain this appeal is 28 U.S.C. § 1295(a)(5).

(c) The CIT sustained the Commission's final affirmative material injury determinations on December 19, 2023 ("Merits Decision"). Subsequently, on January 8, 2024, the CIT denied the parties' joint motion to accord confidential treatment to the business proprietary information ("BPI") contained within the Merits Decision ("BPI Denial Decision").

(d) Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B), the Commission timely filed its appeal challenging the CIT's BPI Denial Decision on March 7, 2024.

## STATEMENT OF THE ISSUE

The Commission appeals the CIT's BPI Denial Decision set out in *CVB, Inc. v. United States*, 681 F. Supp. 3d 1313 (Ct. Int'l Trade 2024). Appx048-066. Although the statute, 19 U.S.C. § 1516a(b)(2)(B), required the CIT to preserve the confidential status of BPI designated as such by the Commission, the court publicly disclosed BPI in its Merits Decision and denied the parties' joint motion to redact and accord confidential treatment to such information. The Commission submits that the issue raised in its appeal is:

> Whether the CIT abused its discretion in denying the parties' joint motion to redact information submitted to the Commission under a promise of confidentiality and determined by the Commission to constitute BPI in accordance with the governing statute and regulations.

## STATEMENT OF THE CASE

In March 2020, seven domestic mattress producers and two unions representing workers at domestic mattress facilities filed a countervailing duty petition covering mattresses from China and antidumping duty petitions covering mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. Appx80000-80001. In May 2021, the Commission issued unanimous affirmative final determinations that an industry in the United States was materially injured by reason of subject imports that the Department of Commerce

("Commerce") determined were subsidized and sold in the United States at less than fair value. Appx124045-124115.[1]

CVB, Inc. ("CVB") a U.S. importer of subject merchandise, appealed the Commission's final determinations to the CIT. In December 2023, the CIT issued its Merits Decision in which it sustained the Commission's determinations. Appx001-047. In its Merits Decision, however, the CIT did not bracket any of the designated BPI. In light of the clear statutory protection afforded to BPI in trade cases, the parties jointly filed a motion respectfully requesting that the CIT retract the public opinion and accord confidential treatment to the BPI. Appx618-672. In January 2024, the CIT issued its BPI Denial Decision in which it denied the parties' joint motion in all respects. Appx052-070.

CVB's appeal of the Merits decision (which was subsequently voluntarily dismissed) and the Commission's cross-appeal of the BPI Denial Decision followed.

---

[1] The public version of the Views and Report is contained in *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, Inv. Nos. 701-TA-645 and 731-TA-1495-1501 (Final), USITC Pub. 5191 (May 2021).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

# STATEMENT OF THE FACTS

## I.     The Commission's Determinations

As discussed above, the Commission determined that an industry in the United States was materially injured by reason of imports of mattresses from the subject countries.

### A.     Domestic Like Product and Domestic Industry

The Commission defined a single domestic like product consisting of all mattresses within the scope of the investigations, and the domestic industry as all domestic producers of that product, except for two producers [ firm name ] and [ firm name ] that were excluded pursuant to the related parties provision because their primary interests were in importation rather than domestic production. Appx124047-124067.

The Commission observed that during the January 2017-September 2020 period of investigation ("POI"), the U.S. mattress market was comprised of a large variety of mattresses, including innerspring (made of a core of densely packed rows of metal springs), non-innerspring (comprised of a single slab or multiple layers of foam), and hybrid mattresses (made of metal springs and one or more layers of foam), with all three types of mattresses packaged and shipped as flat packed mattresses ("FPMs") and packaged in a box ("MiBs").  Appx124052, Appx124080.  The Commission found that notwithstanding the various mattress

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

types, all mattresses consisted of the same basic components:  (1) a core, which

provided the main support system of the mattress; (2) upholstery material

surrounding the core; and (3) ticking, or the cover/outermost layer of fabric

enclosing the core.  Appx124051.

### B.    Conditions of Competition[2]

The Commission found several distinct conditions of competition for the

U.S. mattresses market.  It found that demand for mattresses, which was tied to

housing sales and economic activity, increased over the POI.  Appx124077-

124079.  It observed that while consumption trends differed by mattress type,

overall apparent U.S. consumption increased by [ ### ] percent from 2017 to 2019,

and was [ ### ] percent higher in January to September 2020 ("interim 2020") than

in January to September 2019 ("interim 2019").  The Commission further noted

that notwithstanding declining consumption for FPMs, a majority of responding

domestic producers, importers, and purchasers reported that demand for FPMs was

stable or increasing.  Appx124078.  In addition, FPMs continued to account for a

---

[2] As required by section 771(7)(G)(i) of the Tariff Act, the Commission
cumulated mattress imports from all subject countries after determining that
mattress imports from each subject country were above the applicable three percent
statutory negligibility threshold and the statutory criteria for cumulation were
satisfied (*i.e.*, the petitions were filed on the same day and a reasonable overlap in
competition existed between subject imports and the domestic like product).
Appx124067-124073.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

larger share of apparent U.S. consumption than MiBs throughout the POI.

Appx124078.

Regarding supply, the Commission found that domestic producers and U.S.

importers supplied all types of mattresses packaged as FPMs and MiBs during the

POI. Appx124079-124080, Appx124083. While importers had an economic

incentive to primarily import MiBs rather than FPMs due to their smaller size,

which minimized ocean freight, inland transportation, and warehousing costs,

domestic firms had production facilities located across 36 states allowing them to

operate on a "just-in-time" delivery model for their mattresses.[3] Appx124079-

124080, Appx124108-124109.

The Commission additionally noted a shift in subject import supply in 2019.

It observed that in 2017 and 2018, subject imports from China accounted for over

[ ▦ ] percent of cumulated subject imports in the U.S. market. However, between

2018 and 2019, following imposition of duties on mattresses from China under

section 301 of the Trade Act of 1974 ("section 301 duties") in 2018 and

provisional measures in *Mattresses from China*, Inv. No. 731-TA-1424 (Final),

USITC Pub. 5000 (Dec. 2019) ("*Mattresses I*"), in 2019, subject imports from

---

[3] Most domestic industry shipments (83.7 percent) were produced to order
with an average lead time of five days and most importer shipments (95.2 percent)
were sold from inventory with a similar average lead time of five days.
Appx124087.

China declined precipitously while imports from the other subject countries increased [ ## ] percent.  Appx124081-124082.  This occurred as many Chinese-owned mattress producers switched their production of U.S.-bound exports to facilities in Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam.  Appx124081-124082.

Next, the Commission found that domestically-produced mattresses and subject imports had a moderately high degree of substitutability.  It observed that most responding U.S. producers, importers, and purchasers reported that domestic and subject mattresses were always or frequently interchangeable, and most responding purchasers also reported that mattresses from domestic and subject sources were comparable with respect to all 26 purchasing factors (including with respect to packaging types and ability to ship by common carrier).  Appx124083. While noting that subject imports were more often shipped as MiBs and domestic mattresses more often shipped as FPMs, the Commission found that the domestic industry shipped substantial quantities of both MiBs and FPMs, and that there were substantial volumes of subject imports of FPMs.  Appx124083.  In addition, domestically-produced mattresses and subject imports were sold through the same channels of distribution, primarily to retailers, including brick-and-mortar, online, and omni-channel retailers, with substantial overlap between the top ten customers reported by responding domestic producers and importers.  Appx124087-124088.

The Commission found that MiBs and FPMs competed with each other in the U.S. market.  Appx124083-124086.  As it observed, MiBs and FPMs were produced to the same general specifications, and were functionally interchangeable once unpackaged.  Appx124083-124084.  Sleep studies indicated that packaging was among the least important purchasing factors for consumers, and respondents conceded that consumers cross-shopped between MiBs and FPMs.  Appx124084-124085.  The behavior of retailers and wholesalers who purchased directly from producers or importers reflected this consumer indifference toward mattress packaging.  Eleven of 19 responding purchasers, including many of the largest purchasers, reported purchasing or importing both MiBs and FPMs.  Appx124085-124086.  Further, retailers displayed MiBs and FPMs side-by-side without distinction, online retailers did not offer search filters for packaging type, and only two of 19 responding purchasers ranked packaging as one of the three most important purchasing factors for mattresses.  Appx124085-124086.

The Commission further found that price was an important purchasing factor for mattresses.  Responding purchasers ranked price as one of the three most important purchasing factors more than any other factor except quality, and price was among the most frequently cited factors as being very important, along with factors such as availability, quality, delivery time, and reliability of supply.  Appx124086-124087.  Four purchasers also reported that they usually or always

Business Proprietary Information
Subject to Protective Order Redacted

purchased the lowest priced mattresses, while 16 reported that they sometimes did. Appx124086-124087.

## C.    Volume

The Commission next found that the volume and increase in volume of cumulated subject imports were significant, both absolutely and relative to apparent U.S. consumption.  Subject imports increased from 5.5 million units in 2017 to 7.0 million units in 2018 and 7.8 million units in 2019; their volume was higher in interim 2020 at 7.4 million units than in interim 2019 at 5.3 million units. Appx124090.  As subject imports increased by 40.6 percent over the full years of the POI, they also increased their U.S. shipments and share of apparent U.S. consumption from [ ## ] percent in 2017 to [ ## ] percent in 2019. Appx124090.  The Commission noted that the domestic industry's POI loss in market share ([ ## ] percentage points) was nearly equivalent to the gain in market share by subject imports ([ ## ] percentage points).  Appx124090.  Similarly, a comparison of market share during the 2019 and 2020 interim periods showed that subject imports gained [ ## ] percentage points while the domestic industry lost [ ## ] percentage points.  Appx124090.

## D.    Price Effects

The Commission found that subject imports also had significant price effects.  Examining the pricing data for eight mattress products, subject imports

Business Proprietary Information
Subject to Protective Order Redacted

undersold the domestic like product in [ ## ] of [ ## ] quarterly comparisons, or

in [ ## ] percent of comparisons, at margins averaging [ ## ] percent.[4]  The

quarters with underselling accounted for [ ## ] percent of the reported volume of

subject imports in the pricing data.  Appx124092.  The Commission also collected

purchase cost data for the same pricing product definitions, and these data similarly

indicated that subject imports had a lower price-cost differential in [ ## ] of

[ ## ] quarterly comparisons involving [ ## ] percent of subject import units in

these data, and at price-cost differentials averaging [ ## ] percent.[5]  Appx124092-

124094.

    Reiterating the moderately high substitutability between subject imports and

the domestic like product and the importance of price in purchasing decisions, the

Commission observed that seven purchasers reported that subject imports were

lower priced than the domestic like product, and further that responding purchasers

had reduced their share of purchases of the domestic like product by [ ## ]

percentage points while increasing their share of purchases of subject mattresses by

---

[4] The pricing products were comprised of three mattress products shipped as MiBs, four mattress products shipped as FPMs, and one mattress product that did not specify packaging.  Appx124091-124092.

[5] The Commission uses the term "price data" to refer to U.S. importers' and domestic producers' sales price for shipments to unrelated customers and the term "purchase cost data" to refer to the landed duty-paid ("LDP") value of imports made by U.S. importers for their internal consumption or retail sale.  *See DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2021).

Business Proprietary Information
Subject to Protective Order Redacted

[ **##** ] percentage points between 2017 and 2019.  Appx124094 (n.225).  While

acknowledging that few responding purchasers confirmed switching purchases

from the domestic product to subject imports because of price, the Commission

explained that the questionnaire evidence nonetheless indicated that purchasers at

the wholesale/retail level as well as consumers found price to be an important

factor, that purchasers had shifted purchases from the domestic industry to subject

imports during the POI, and that the pricing data showed subject imports to be

lower-priced.  Appx124094-124095.  Based on the foregoing, the Commission

found that subject imports significantly undersold the domestic like product and

that this significant underselling contributed to subject imports gaining sales and

market share at the domestic industry's expense.  Appx124094-124095.

The Commission further found that the significant and growing quantity of

low-priced subject imports depressed prices to a significant degree.[6]  It noted that

for six of the eight pricing production definitions, domestic producers' prices

declined between the first and last quarters of the POI.  These price declines

occurred as apparent U.S. consumption increased, nonsubject imports' share of that

consumption declined, and the domestic industry's production costs increased.

Appx124095.  The Commission considered arguments that factors other than

---

[6] The Commission also considered whether subject imports had suppressed
prices for the domestic like product to a significant degree, but ultimately did not
reach a conclusion on this issue.  Appx124098 (n.238).

subject imports explained domestic price declines, including declining demand for

FPMs.  It found this argument was inconsistent with domestic price increases for

two of the four FPM pricing products and questionnaire responses indicating that

purchasers did not perceive demand for FPMs to be declining.  Appx124096-

124097.

The Commission concluded that because cumulated subject imports

significantly undersold the domestic like product leading to lost sales and

significant price depression, subject imports had significant adverse price effects.

Appx124098.

### E.    Impact

Finally, the Commission found that cumulated subject imports had a

significant impact on the domestic industry.  Appx124099-124107.  Despite strong

and growing demand in the U.S. market between 2017 and 2019, the domestic

industry experienced declining capacity, production, capacity utilization,

employment, and U.S. shipments.  As significantly increasing volumes of subject

imports undersold the domestic product and depressed domestic prices to a

significant degree, the domestic industry experienced stagnant net sales, revenues,

and gross profits, as well as declining operating income and net income.

Appx124105-124106.  Notwithstanding some improvement in the domestic

industry's performance in 2019, its performance remained below that of 2017, and

increases in performance factors in interim 2020 compared to interim 2019 were less than would be expected during a period of strong demand growth and imposition of the *Mattresses I* antidumping duty order on mattresses from China in December 2019. Appx124106-124107. As the domestic industry continued to lose market share to subject imports, the industry's production and U.S. shipments were flat in interim 2020 compared with interim 2019, while its capacity utilization rate and employment were lower. Appx124107.

The Commission considered respondents' market segmentation arguments, including their claim that the Commission should focus its impact analysis on domestic producers of MiBs, which allegedly competed more directly with subject imports than domestic producers of FPMs. The Commission referred again to the evidence showing that MiBs were interchangeable and competed with FPMs in the U.S. market. Appx124107-124108. The Commission found that given the importance of price to purchasers, purchasers were encouraged to purchase subject imports due to their significantly lower prices instead of domestically-produced FPMs and MiBs. Appx124110-124111.

Although the Commission properly conducted an analysis of the impact of subject imports on the domestic industry as a whole, the Commission nevertheless also considered the impact of subject imports on domestic producers that exclusively produced MiBs. As the Commission found, the domestic MiB

producers' capacity utilization remained low over the POI, despite the industry's substantial investments in MiB capacity and increasing apparent U.S. consumption. Moreover, subject imports depressed domestic MiB prices to a significant degree. Thus, the Commission found that the performance of domestic MiB producers would have been stronger, with greater sales revenues and operating and net income than they achieved during the POI, but for subject import competition. Appx124111-124114.

In addition to allegations of market segmentation between MiBs and FPMs, the Commission considered the effects of demand trends, nonsubject imports, and raw material shortages on the domestic industry so as not to attribute injury from these other factors to the subject imports, but it found that none of these other alleged factors explained declines in the domestic industry's performance during the POI. Appx124112-124113 (n.308), Appx124114 -124115.

Based on all of the foregoing, the Commission determined that an industry in the United States was materially injured by reason of subject mattresses. Appx124115.

## II.    U.S. Court of International Trade Decisions

### A.    The CIT's Merits Decision

In June 2021, CVB filed its appeal to the CIT. Appx082. On December 19, 2023, the CIT issued its decision, in which it sustained the Commission's

affirmative material injury determinations.  Appx001-047.  In doing so, the court

opined that the Commission made certain errors in its findings regarding market

segmentation, but ultimately held that such errors were harmless.  Appx001-042.

Specifically, the CIT, embarking on what amounted to its own fact-finding

exercise, held that, contrary to the Commission's findings, the record showed that

producers and purchasers were specialized in their production and purchases of

MiBs and FPMs, respectively.  The court dismissed the Commission's analysis as

"mathematical obfuscation and statistical chicanery to make the mattress industry

appear less segmented than it is."  Appx024.  The CIT held that the Commission

erred by treating two pairs of companies that merged during the POI as two single

companies that produced both MiBs and FPMs, rather than as four companies that

each specialized in one or the other.  The CIT further assumed that the

Commission intentionally omitted information that many of the companies

producing both mattress types produced more of one kind than the other.

Appx024-030.  According to the CIT, the Commission also failed to provide

"important context" concerning its findings as to the minimal relevance of

packaging in purchasers' decision, and sought to make purchasers seem less

specialized than they were by not informing that almost all of the eleven

purchasers of both MiBs and FPMs purchased more of one packaging type than the

other.  Appx030-035.

-16-

The CIT ultimately ruled, however, that the Commission's "errors" were harmless. Appx035-042. The court held that the Commission's Views provided a substantially supported analysis addressing the harm caused by subject imports to the segment of the domestic industry producing MiBs. The court thus sustained the Commission's alternative finding that domestic MiB producers would have improved their performance even more but for the subject imports displacing domestic industry shipments and depressing domestic prices to a significant degree. The CIT noted, in particular, that domestic MiB producers had excess production capacity at a time when the market for boxed mattresses grew. Appx038. Based on the Commission's discussion of the impact of subject imports on domestic producers of MiBs, the court affirmed the Commission's determination that the domestic industry was materially injured by reason of subject imports. Appx042. In doing so, the CIT further held that, as CVB itself acknowledged, the Commission was not required to conduct a market segmentation analysis. Appx042-045.

## B.    The CIT's BPI Denial Decision

On December 19, 2023, the same day the CIT issued its Merits Decision, the Commission contacted the court's case manager to alert that the opinion contained extensive unredacted BPI.  The case manager, however, responded that in the court's view, the opinion did not contain BPI and that the opinion would "remain posted as-is."  Appx554-555.

The next day, on December 20, 2023, the Commission, with agreement from the other parties, filed a letter with the CIT requesting that it temporarily retract the public opinion to allow the parties the opportunity to confer and submit comments regarding the BPI.  Appx557-558.  Instead of addressing the request, the CIT issued a paperless order directing the parties to file a motion.  Appx092.

On December 22, 2023, the parties jointly filed a motion specifically identifying the BPI contained in the Merits Decision and requesting that the court accord confidential treatment to such information.  Appx559-613.  As the motion detailed, the BPI at issue generally fell into two categories: (1) sensitive information from individual producer and purchaser questionnaire responses that had been submitted to, and treated by the Commission, as confidential; and (2) subject import volume and market share information, calculated from questionnaire response information, which was similarly treated as confidential.  Appx559-613.

On January 8, 2024, the court issued its BPI Denial Decision. Appx048-066. While recognizing that 19 U.S.C. § 1677f(b) governs the Commission's treatment of BPI, the CIT held that information from individual producer and purchaser questionnaire responses were instead public because the questionnaire responses had not been individually bracketed as required by Ct. Int'l Trade Rule 5(g).[7] Notwithstanding that each page of the questionnaire responses contained a "Business Proprietary" stamp and the questionnaire responses were filed with the court under seal as part of the confidential joint appendix, the CIT reasoned that the absence of bracketing for each individual piece of information meant that "any claim to confidentiality was waived long ago." Appx053-054. With respect to subject import volume and market share information, the court held that despite being identified by the Commission as BPI and accordingly bracketed by the Commission and the parties in their brief and other submissions, the information was nonetheless available in public sources and therefore failed to qualify as BPI. The court further held that, in any event, it had "couche{d} its language" through use of words like "roughly," "about," and "at least," such that its references to the

---

[7] Court of Int'l Trade Rule 5(g), which pertains to the serving and filing of pleadings and other papers, states that "{a}ny paper containing confidential or business proprietary information must identify that information by enclosing it in brackets."

bracketed data did not reveal the exact nature of the information.  Appx058-062.

The court thus denied the parties' joint motion in all respects.

## SUMMARY OF THE ARGUMENT

Although this Court should affirm the CIT's Merits Decision, it should

modify the final judgment for the limited purpose of reversing the CIT's BPI

Denial Decision.  During the administrative proceedings, the Commission properly

acted within its statutory and regulatory authority to assure that questionnaire

response information and other sensitive information identifiable to individual

firms would be treated as BPI.  The CIT's disclosure of such information based

upon its stance that the questionnaire responses were not individually bracketed as

required under the court's rules or that similar information was, in the court's view,

publicly available, cannot be squared with the mandatory language of the statute

requiring the court to preserve the confidential status of that information.  19

U.S.C. § 1516a(b)(2)(B).

# ARGUMENT

## I.    Standard of Review

This Court reviews the lower court's refusal to seal or redact for abuse of

discretion.  *See, e.g.*, *Depuy Synthes Prods., Inc. v. Veterinary Orthopedic Implant,*

*Inc.*, 990 F.3d 1364, 1369 (Fed. Cir. 2021).  A lower court abuses its discretion if its

decision rests on a legal error or a clearly erroneous finding of fact.  *See id.* (citing

*Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010)).  The

question of whether the lower court applied the correct legal standard is a question

of law reviewed *de novo*.  *See, e.g., Marubeni Am. Corp. v. United State*s, 35 F.3d

530, 534 (Fed. Cir. 1994).

To determine whether the information at issue should have been treated as

BPI, the Court must consider the applicable statutory provisions.  "{C}ourts use

every tool at their disposal to determine the best reading of the statute and resolve

{any} ambiguity."  *Loper Bright Enters v. Raimondo*, 603 U.S. ___, ___, 144 S. Ct.

2244, 2266 (June 28, 2024).  Beyond the statute's text, the tools of statutory

construction to ascertain Congress's purpose and intent include the statute's

legislative history, the statute's structure, and the canons of statutory construction.

*Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998).  Furthermore,

the Supreme Court continues to recognize that courts should be informed by

agencies' expertise, interpretation and experience with statutes that Congress

entrusted them to administer. *Loper Bright*, 603 U.S. at ___, 144 S. Ct. at 2263,

2267 (citing, *e.g.*, *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944)).

## II.     This Court Should Reverse the CIT's BPI Denial Decision

The CIT's Merits Decision publicly disclosed sensitive proprietary

information that the Commission properly, and consistent with its statutory and

regulatory obligations, treated as BPI throughout its administrative proceedings.

The BPI at issue generally falls into two categories: (1) confidential questionnaire

response information regarding individual U.S. producers' production operations

and U.S. purchaser names; and (2) subject import volume and market share

information, calculated using questionnaire response data.  Appx559-613.  In the

proceedings before the CIT, the parties agreed that the information at issue was

BPI and treated the information as such in their CIT submissions.  Concerned at

what they initially believed to be an oversight by the lower court, the parties jointly

filed a motion identifying and requesting confidential treatment for the specific

BPI discussed in the court's Merits Decision.  The CIT abused its discretion in

denying the parties' joint request.[8]

---

[8] Further exacerbating its error, the CIT subsequently relied upon its BPI
Denial Decision to order counsel for the Commission and other counsel to appear
before it in another case, *OCP S.A. v. United States*, to address the propriety of
Rule 11 sanctions for what the court opined was the Commission's possible
"fail{ure} to heed CVB's warning" on "the law's expectations regarding redaction
of allegedly confidential information" in the remand determinations and remand

**A.    The Statute Requires the CIT to Preserve the Confidential Status of Information Treated as BPI by the Commission**

Congress established a comprehensive statutory scheme regarding the collection and protection of BPI.  This scheme directs the Commission to protect BPI submitted to it during the course of its investigations and additionally requires the CIT to maintain the confidential status of BPI designated as such by the Commission in any ensuing action before the court.

Addressing the Commission's obligations, section 777f(b)(1)(A) unambiguously provides in pertinent part that:

> Except as provided in subsection (a)(4)(A) and subsection (c), information submitted to the administering authority or the Commission which is designated as proprietary by the person submitting the information ***shall not be disclosed*** to any person without the consent of the person submitting the information. . . .

19 U.S.C § 1677f(b)(1)(A) (emphasis added).  In other words, the Commission is prohibited from disclosing information designated as BPI by the submitter, except under the three following circumstances specified by the statute: (1) information that "is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person," 19 U.S.C. § 1677f(a)(4)(A); (2) it is disclosed to interested parties who are parties to a proceeding under a protective

---

record filed in that case.  Consol. No. 21-219, Order at 5 (Ct. Int'l Trade Feb. 29, 2024) (ECF 158).

order, 19 U.S.C. § 1677f(c)(1); or (3) the Commission receives consent of the

person submitting the information.[9]

In protecting information designated as proprietary by submitters in the first

instance, the statute further provides submitters the right to have the submitted

information returned rather than disclosed to the public if the Commission

determines that the request for proprietary treatment is unwarranted:

> If . . . the Commission determines, on the basis of the
> nature and extent of the information or its availability from
> public sources, that designation of any information as
> proprietary is unwarranted, then it shall notify the person
> who submitted it and ask for an explanation of the reasons
> for the designation. Unless that person persuades
> the administering authority or the Commission that the
> designation is warranted, or withdraws the designation,
> the administering authority or the Commission, as the
> case may be, shall return it to the party submitting it. In a
> case in which the administering authority or the
> Commission returns the information to the person
> submitting it, the person may thereafter submit other
> material concerning the subject matter of the returned
> information if the submission is made within the time
> otherwise provided for submitting such material.

19 U.S.C. § 1677f(b)(2).

---

[9] Congress acknowledged that "the bulk of the information collected by the
ITC and on which it bases its decisions consists of confidential business
information submitted by domestic producers, importers, and purchasers," and that
the "best insurance that the ITC will be able to obtain the information it needs for
its investigations is its reputation for strictly maintaining the confidentiality of
information submitted to it."  S. Rep. No. 100-71 at 112, 114 (June 12, 1987).

Congress established this framework to provide protection to information submitted by all sources, many of whom are not parties to the proceeding. But recognizing the due process rights of parties appearing before the Commission, the statute balanced these competing interests for disclosure and protection by providing for disclosure under a protective order:

> (A) In general
>
> Upon receipt of an application (before or after receipt of the information requested) which describes in general terms the information requested and sets forth the reasons for the request, the administering authority or the Commission shall make all business proprietary information presented to, or obtained by it, during a proceeding (except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure) available to interested parties who are parties to the proceeding under a protective order described in subparagraph (B), regardless of when the information is submitted during a proceeding….
>
> *    *    *
>
> (B) Protective order
>
> The protective order under which information is made available shall contain such requirements as the administering authority or the Commission may determine by regulation to be appropriate. The administering authority and the Commission shall provide by regulation for such sanctions as the administering authority and the Commission determine to be appropriate, including disbarment from practice before the agency.

19 U.S.C. § 1677f(c)(1)(A)-(B); *see also Kemira Fibres Oy v. United States*, 858

F. Supp. 229, 234 (Ct. Int'l Trade 1994) (the balance between Commerce's

investigatory needs and a party's need for confidentiality is achieved through

proprietary information safeguards under, *inter alia*, 1677f(c)).[10]

Importantly, the statute extends the robust protection afforded to BPI in the

Commission's proceedings to actions before the CIT.  Specifically, 19 U.S.C.

§ 1516a(b)(2)(B) requires that:

> The confidential or privileged status accorded to any
> documents, comments, or information shall be preserved
> in any action under this section.  Notwithstanding the
> preceding sentence, the court may examine, in camera, the
> confidential or privileged material, and may disclose such
> material under such terms and conditions as it may order.

Thus, the court on appeal must treat as confidential all information that was treated

as confidential in the proceedings before the Commission, unless the submitter

consents to its disclosure.  While the second sentence of the statute allows

disclosure of information under such "terms" and "conditions" as the court may

order, Congress intended that such "terms" and "conditions" are those relating to a

---

[10] Congress recognized the Commission's "legitimate concern that the availability under protective order of domestic firms' closely guarded financial information may have a 'chilling effect' on the willingness of some firms to supply information voluntarily," and therefore authorized the use of "strong sanctions," including disbarment or suspension from practice before the Commission, against any person found in violation of the protective order.  S. Rep. No. 100-71 at 113-14.

protective order.  S. Rep. No. 96-249 at 248 (July 17, 1979) ("Special provision

would be made in subsection (b)(2)(B) for preserving the confidential or privileged

status of any materials contained in this record, including, where the court

determines it would be appropriate, the disclosure of the privileged or confidential

material *only* under the terms of a protective order.") (emphasis added).

      Consistent with this congressional intent, this Court and the CIT have

applied the second sentence of 19 U.S.C. § 1516a(b)(2)(B) as a way to control

access to confidential information by parties to the proceedings and within the

confines of a protective order.  *See, e.g.*, *U.S. Steel Corp. v. United States*, 730

F.2d 1465 (Fed. Cir. 1984) (determining whether the CIT erred in denying in-

house counsel access to confidential information under a protective order); *Am.

Brass v. United States*, 699 F. Supp. 934 (Ct. Int'l Trade 1988) (deciding whether

plaintiffs were entitled to access to certain proprietary information under a proper

protective order); *Jernberg Forgings Co. v. United States*, 598 F. Supp. 390 (Ct.

Int'l Trade 1984) (deciding plaintiffs' motion for discovery of confidential

information under a judicial protective order).  Importantly, although the court may

disclose BPI under such terms and conditions as it may order, such disclosure

would still preserve the proprietary status of the information.

      It is within this statutory framework that the Commission promulgated rules

defining the information that constitutes confidential business information and

concerning the submission and protection of such information.[11]  In particular,

Commission Rule 201.6(a) defines the information that constitutes confidential

BPI.  First, the information must be:

> {I}nformation which concerns or relates to the trade
> secrets, processes, operations, style of works, or apparatus,
> or to the production, sales, shipments, purchases, transfers,
> identification of customers, inventories, or amount or
> source of any income, profits, losses or expenditures of
> any person, firm, partnership, corporation, or other
> organization, or other information of commercial
> value. . . .

19 C.F.R. § 201.6(a).  Second the disclosure of such information must be:

> {L}ikely to have the effect of either (1) "impairing the
> Commission's ability to obtain such information as is
> necessary to perform its statutory functions," or (2)
> "causing substantial harm to the competitive position of
> the person, firm, partnership, corporation, or other
> organization from which the information was obtained,"
> unless the Commission is required by law to disclose such
> information.

*Id*.  Commission Rule 201.6(g) also provides that in the event that any business

information submitted to the Commission is not entitled to confidential treatment,

the submitter is permitted to withdraw the submitted information within five days

of the denial of confidential treatment, unless the information is the subject of a

---

[11] Congress granted the Commission "broad authority to frame such regulations as are necessary to ensure maximum possible access to information without impeding the ITC's ability to complete its investigations within the tight time limits for investigation provided by statute."  S. Rep. No. 100-71 at 113.

Freedom of Information Act ("FOIA") request, or judicial discovery proceedings.[12]

19 C.F.R. § 201.6(g). In addition, Commission Rule 207.7 provides for the limited

disclosure of BPI to authorized applicants under an administrative protective order.

19 C.F.R. § 207.7.

### B. The Commission Properly Treated Questionnaire Response Information as BPI Throughout Its Administrative Proceedings

The Commission properly treated information from questionnaire responses

as BPI, and the CIT was statutorily required to preserve the confidential status of

that information. 19 U.S.C. § 1516a(b)(2)(B).

### 1. Individual Information from Company-Specific Questionnaire Responses

The information contained in questionnaire responses submitted by domestic

producers, U.S. importers, foreign producers, and purchasers in the underlying

investigations met the statute's definition of non-disclosable BPI, *i.e.*, data

"designated as proprietary by the person submitting the information" that can be

"associated with, or otherwise be used to identify, operations of a particular

person." 19 U.S.C. § 1677f(a)(4)(A)-(B). Indeed, each page of the questionnaire

responses was stamped as containing "business proprietary" information.

Moreover, the responses were individual in nature as they were firm-specific and

---

[12] It is only if the information in question is not withdrawn in the five day period, that it may be treated as public information. 19 C.F.R. § 201.6(g).

contained granular and detailed data spanning several years with respect to a firm's "processes, operations, style of works, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, or amount or source of any income, profits, losses, or expenditures." 19 C.F.R. § 201.6(a); *see, e.g.*, Appx89656-89699.

In addition to falling within the delineated category of non-disclosable BPI, the questionnaire response data also satisfied the needs addressed by Commission Rule 201.6(a) to protect information, the disclosure of which was likely to have the effect of "impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained." 19 C.F.R. § 201.6(a).

As this Court has recognized, the submission of sensitive company-specific data through questionnaires is an integral part of the Commission's investigative process, *see Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986), and the Commission has historically treated questionnaire information as BPI. In turn, the trade bar has understood and developed expectations, which they have relayed to their clients, about the strict protections that the Commission will

afford to such information.[13]  In these investigations, 53 domestic producers, 49

U.S. importers, 16 foreign producers, and 22 purchasers, many of which were not

parties to the investigations, voluntarily submitted questionnaire responses.

Appx124046, Appx124094.  In doing so, the responding firms certified to allowing

disclosure of the information requested *only* to authorized applicants under the

protective order.  *See, e.g.*, Appx89475, Appx89478.

Disclosure of questionnaire response information, which was submitted by

firms under the expectation that their information would be kept confidential,

therefore raises legitimate concerns that information could fall into a competitor's

hands.  Indeed, the questionnaire responses contained substantial amounts of

sensitive data with respect to the specific product being investigated.  The

disclosure of such sensitive information therefore "undoubtedly ha{s} a chilling

effect on the parties' willingness to provide the confidential information essential

to the Commission's fact finding processes." *Akzo N.V.*, 808 F.2d at 1483.[14]

---

[13] Firms are entitled to rely on the reasonable expectation of consistent
proprietary treatment. *See Qwest Commc's Int'l Inc. v. FCC*, 229 F.3d 1172, 1184
(D.C. Cir. 2000) (in submitting certain data, the company "was entitled to rely on
the {FCC}'s announced policy and precedent on how it would handle confidential
audit information" and "similarly entitled to assurances that the unprecedented
disclosures would be consistent with the standards that the {FCC} has set for
itself").

[14] Congress also recognized the "burden imposed on the ITC by the strict
investigatory deadlines, particularly in preliminary 45-day investigations," and that
the "best insurance that the ITC will be able to obtain the information it needs for

Disclosure of questionnaire responses also has the likely effect of causing substantial harm to the competitive position of the firms involved. This Court discussed the potential dangers in revealing confidential material, stating that "{o}bviously, where confidential material is disclosed to . . . a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased." *Id.*; *see also Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce*, 11 CIT 238, 243 (1987) (recognizing the irreparable harm that could come from the inadvertent or advertent use of confidential information, stating that "caution must be, and is, the guidepost in dealing both with sensitive information and the sensitivities of those who obtain access to it"). Consequently, this Court had endorsed the Commission's conservative position in the "optimum shielding of business information." *Akzo*, 808 F.2d at 1483.

In light of the foregoing, the Commission properly treated the information contained in the questionnaire responses as BPI.

## 2. Aggregate Information Calculated from Questionnaire Response Data

Likewise, the Commission properly treated subject import volume and market share information, calculated using the confidential import and U.S. shipment data reported by U.S. producers and U.S. importers in their questionnaire

---

its investigations is its reputation for strictly maintaining the confidentiality of information submitted to it." S. Rep. No. 100-71 at 113-14.

responses, as BPI and appropriately bracketed such information in its Views and

Staff Report.  Appx124079, Appx124081-124082, Appx124228-124229,

Appx124259-124260.

As discussed above, the statute prohibits the Commission from disclosing

information designated as BPI by the submitter, except if it "is disclosed in a form

which cannot be associated with, or otherwise be used to identify, operations of a

particular person," 19 U.S.C. § 1677f(a)(4).  To minimize risk of inadvertent

disclosure of BPI of a particular firm, the Commission not only treats individual

questionnaire response information as BPI, but it also follows its longstanding

policies regarding data aggregated from information provided in the questionnaire

responses.  These policies are set forth in the Commission's publicly available

handbooks, *Antidumping and Countervailing Duty Handbook*, USITC Pub. 4540

(14th ed. June 2015) ("AD/CVD Handbook") and *An Introduction to*

*Administrative Protective Order Practice in Import Injury Investigations*, USITC

Pub. 5280 (6th ed. Jan. 2022) ("APO Handbook").[15]

Page 13 of the Commission's APO Handbook states:

> The Commission has established criteria as to when it will
> treat as proprietary aggregate business information – that
> is, information that pertains collectively to more than one
> company.  Aggregate business information pertaining to

---

[15] The AD/CVD Handbook and APO Handbook are available on the
Commission's website at: www.usitc.gov/trade_remedy/documents/handbook.pdf
and www.usitc.gov/publications/701_731/pub5280.pdf.

> fewer than three companies generally is treated as proprietary. Information pertaining to three or more companies generally is treated as publishable, unless two companies account for more than 90 percent of the data, or unless one company accounts for more than 75 percent of the data.

The Commission provides the same guidance on page II-26 of its AD/CVD Handbook. The rationale for this practice is straightforward. For data derived from the information of two firms, each of those firms would be able to back out its own information from the total shown, thereby revealing the confidential information held by their sole competitor. For information involving three or more firms, one of which is individually dominant (accounting for more than 75 percent of the data) or two of which are jointly dominant (accounting for more than 90 percent of the data), revealing the total data would enable a firm to back out its own data and deduce close estimates of commercial information about competitors.

The Commission consistently applies these guidelines across all investigations, and it did so in these underlying investigations. For at least one time period in the series of data collected, a dominant U.S. importer accounted for over 90 percent of mattress imports from nonsubject countries and several subject countries, including China. *See, e.g.*, Appx124224-124230. While the Commission publicly disclosed the total volume of cumulated subject imports, it bracketed information with respect to the volume of subject imports from China, subject imports from each of the other subject countries, and nonsubject imports.

Doing otherwise would have allowed the dominant importer of each of those datasets to back out its data and deduce information regarding its competitors. Appx124081-124082, Appx124228-124229.

For the same reasons, the Commission bracketed market share information. Appx124079, Appx124259-124260.  In particular, the Commission bracketed market shares of nonsubject imports because, as noted above, one dominant importer accounted for over 90 percent of nonsubject imports.  As a consequence, the Commission also had to bracket market shares of subject imports and the domestic industry because that information, had they been public, could have been subtracted from total apparent U.S. consumption to arrive at nonsubject import market shares.

## C.    The CIT Was Statutorily Required to Preserve the Confidential Status of the Information at Issue

The CIT was statutorily required to preserve the confidential status of the questionnaire response information treated as BPI by the Commission.  19 U.S.C. § 1516a(b)(2)(B).  In holding otherwise, the CIT erred in three ways:  (1) the court relied upon the common law right of public access to judicial records rather than the clear statutory language requiring the court to preserve the confidential status of information treated as BPI by the Commission during its proceedings; (2) the court incorrectly held that because the questionnaire responses were not individually bracketed in accordance with Ct. Int'l Trade Rule 5(g), the claim to

-35-

confidentiality was waived; and (3) the court incorrectly held that bracketed

information regarding subject import volume and market shares were available

from public sources and did not qualify as BPI.  Appx048-066.

> **1.**   **The Statute, and Not the Common Law Right of Public Access, Determines Whether Information Should or Should Not Be Disclosed**

In guiding its consideration of the joint parties' request for confidential

treatment of BPI, the CIT erroneously applied the common law right of public

access to judicial records articulated in *Binh Hoa Le v. Exeter Finance Corp.*, 990

F.3d 410, 417 (5th Cir. 2021).  *See* Appx050-052 ("Even when the parties agree to

secrecy, courts are 'duty-bound to protect public access to judicial proceedings and

records.'") (quoting *Binh Hoa*).

The CIT's reliance upon *Binh Hoa*, however, is misplaced.  *Binh Hoa*

involved a protective order under which private parties to a breach of contract

action labeled documents as confidential for "no discernable reason other than both

parties wanted it that way."  990 F.3d at 417.  Criticizing the district court's

agreement to the parties' requested protective order, the U.S. Court of Appeals for

the Fifth Circuit discussed the right of public access to judicial proceedings.  That

court particularly admonished the parties' failure to cite any authority for sealing

the documents.  *See id.* at 420.  In stark contrast to the protective order in *Binh

Hoa*, the administrative protective order at issue in these investigations was

implemented pursuant to clear statutory authority.  As discussed, Congress

developed a comprehensive scheme balancing protection of BPI with meaningful

access to parties appearing before the Commission only through a protective order.

Although, as noted by the CIT, transparency is certainly an important

touchstone of our judicial system, Congress clearly intended to foreclose public

disclosure of information properly treated as BPI during the Commission's

administrative proceedings, unless such protections are waived by the submitters of

that information.  Indeed, beyond the statute's provisions, the relevant legislative

history regarding the release of BPI in antidumping and countervailing duty

investigations underscores Congress's intent to shield BPI from disclosure except

to parties under a protective order.

Congress first allowed for the release of confidential information in trade

remedy investigations under a protective order in 1979.  In doing so, however, the

statute's language contemplated that BPI would generally not be released.  Trade

Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144, 187 ("1979 Act")

("Except as provided {herein}, information submitted to . . . the Commission

which is designated as confidential by the person submitting it shall not be

disclosed to any other person . . . without the consent of the person submitting it.").

Congress provided for only limited and discretionary release of confidential

information under the protective order, stating:

> Upon receipt of an application, which describes with particularity the information requested and sets forth the reasons for the request, the administering authority and the Commission may make confidential information submitted by another other party to the investigation available under a protective order . . . .

*Id*. at 188 (codified in then-section 1677e(c)(1)(A)). In 1988, Congress, recognizing the difficulties that the failure to release confidential information created for parties to the ITC's investigation, amended this provision to broaden disclosure, but hinged on the guarantee that confidential information could only be disclosed under the cover a protective order. S. Rep. No. 100-71 at 111-112 (June 12, 1987); *see also* H. Rep. No. 100-576 at 622-623 (Apr. 20, 1988). These amendments continue to form the basis of present law, as set forth in 19 U.S.C. § 1677f. *See* Omnibus Trade and Competitiveness Act of 1988, § 1332(2), Pub. L. No. 100-418, 102 Stat. 1107, 1207-09 (1988).

Additionally, Congress intended that protection of BPI under the protective order would extend to proceedings before the court. 19 U.S.C. § 1516a(b)(2)(B) ("The confidential or privileged status accorded to any documents, comments, or information shall be preserved in any action under this section."); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.") (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). As the CIT

explained in *A. Hirsh, Inc. v. United States*, 657 F. Supp. 1297 (Ct. Int'l Trade

1987), "Congress included in the Trade Agreements Act of 1979 . . . a '{s}pecial

provision . . . for preserving the confidential or privileged status of any materials

contained in th{e} record'" to guard against the irreparable harm caused by a

competitor obtaining an unfair business advantage through use of confidential

information during the judicial review process. *Id*. at 1300 (quoting S. Rep. No.

96-249 at 248).

Thus, "{c}onsistent with congressional concern over confidentiality, caution

is the necessary approach when ordering disclosure." *Id.* at 1300 (citing, *inter alia*,

*Akzo*, 808 F.2d at 1483 and *U.S. Steel*, 730 F.2d at 1467). This is especially so

where the due process rights of parties to the investigation are fully addressed by

allowing their counsel to have access to all BPI under a protective order. As one

district court noted in denying access to such BPI to a private plaintiff:

> The Department {of Commerce} and the U.S.
> International Trade Commission rely heavily on
> proprietary information submitted by both U.S. and
> foreign parties in order to conduct their antidumping duty
> investigations. Permitting private plaintiffs access to
> proprietary information and documents submitted during
> the course of those agencies' antidumping proceedings
> would create a powerful disincentive for those parties to
> provide the agencies with submitted proprietary
> information in future antidumping investigations.

*Wiener v. NEC Elecs., Inc.*, 848 F. Supp. 124, 127 (N.D. Cal. 1994) (citing

*Monsanto Indus. Chems. Co. v. United States,* 6 CIT 241, 243 (1983) ("Release of

such requested sensitive confidential documents . . . without compelling reasons surely dampens the propensity of foreign producers to divulge confidential information in future trade cases.")); *see also Monsanto Co. v. United States*, 698 F. Supp. 285, 289 (Ct. Int'l Trade 1988) (holding that "{t}here is no absolute right to a public version of questionnaire responses containing ranged numerical data for all items of information"); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 1978 WL 1333, at *3 (E.D. Pa. 1978) (rejecting private plaintiffs' request for access to confidential documents submitted by a non-party to the Commission during the Commission's antidumping investigation).

The CIT's additional reliance upon *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), as support for its BPI Denial Decision is also misplaced.[16]  Appx051. These cases analyzed the protection of certain classes of information under different statutes instead of the applicable statutory scheme for trade investigations. *Food Marketing*, 588 U.S. at 430, 434-35 (addressing "commercial or financial

---

[16] The CIT also cites to *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 595 (1980), and *Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992), but those cases are not pertinent.  *See* Appx062, Appx065.  *Richmond Newspaper* involved defendant's request that his criminal trial for murder be closed to the public and *Krynicki* addressed the parties' request that the whole appeal – briefs, record, and oral argument – be sealed.  The parties here never made any such request.  Rather, their request for confidential treatment was narrowly tailored and focused only on BPI covered by the statute.

information" under FOIA); *Ruckelshaus*, 467 U.S. at 1010-13 (addressing "trade secret" under the Federal Insecticide, Fungicide, and Rodenticide Act).  In any event, *Food Marketing* supports an opposite proposition to disclosure here, holding that the class of business or commercial information entitled to statutory protection should not be construed narrowly.  Indeed, in that case, the Supreme Court rejected appellant's arguments that the "commercial or financial information" language contained in exemption 4 to FOIA should be interpreted as requiring a showing that release of information would lead to substantial competitive harm.  *See Food Marketing*, 588 U.S. at 439.  The Supreme Court held that the statute nowhere added such a limitation and  "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."  *Id.* at 439-440.  Reversing the judgment of the court of appeals, the Supreme Court ultimately held that certain data from individual grocery retailers constituted "confidential" commercial information exempt from disclosure.  *Id.*

## 2.     The Claim to Confidentiality Was Never Waived

In addition to being improperly guided by the common law right of public access to judicial records to justify its disclosure of the BPI at issue, the CIT erroneously held that the "claim to confidentiality" for producer and purchaser

questionnaire responses was waived because the questionnaire responses, which were filed with the CIT under seal as part of the confidential joint appendix, were not individually bracketed pursuant to Ct. Int'l Trade Rule 5(g).  Appx053-057.

The statute makes clear that waiver occurs only when submitters of the BPI consent to the information's disclosure.  19 U.S.C § 1677f(b)(1).  Here, notwithstanding that the questionnaire responses were not individually bracketed, none of the submitters of the BPI at issue ever waived their claim to the information's confidentiality.  To the contrary, and pursuant to the Commission's customary and longstanding treatment of questionnaire responses as BPI, U.S. producers, importers, purchasers, and foreign producers submitted their responses in confidence, with the expectation that their information would be kept private. As previously noted, each page of  the questionnaire contains a "Business Proprietary" stamp and each responding firm certified to the disclosure of BPI contained within a questionnaire response only to authorized individuals.  *See, e.g.*, Appx89656-89699.  Additionally the questionnaire responses were filed under seal with the CIT as part of the confidential joint appendix.  Appx560.

The CIT reasons that "{s}ome of the information to which the Motion to Retract objects was discussed in open court at oral argument."  Appx057.  The portion of the argument transcript to which the CIT cites, however, reflects the court's discussion regarding only two U.S. producers, Elite and Leggett & Platt,

that were represented by petitioners' counsel at the hearing, and no discussion with

respect to BPI regarding the other 11 U.S. producers and 13 U.S. purchasers

disclosed in the court's Merits Decision. Appx442. And while petitioners'

counsel to Elite and Leggett & Platt could certainly consent to disclosure of their

clients' BPI, the exact nature of the information discussed at argument regarding

these companies differed significantly from the granular information contained in

the CIT's Merits Decision, and for which the parties jointly requested confidential

treatment. *Compare* Appx442 and Appx564-567.

Perplexingly, with respect to the names of responding U.S. purchasers,

which the Merits Decision disclosed within the context of information provided in

their questionnaire responses, the CIT acknowledged that the index to the

confidential joint appendix individually bracketed their names. Appx054-055.

Yet, the CIT refused to preserve their confidentiality, relying upon its flawed view

that bracketing was of "no consequence" because the index had inserted a blank

space in between the brackets as opposed to the insertion of the purchaser's name

(*i.e.*, [ __ ]). The court reasoned that the blank space in place of the company name

was "crucial" because the court would not be able to locate the place where the

Commission supposedly designated the company name as confidential. Appx054-

055. The CIT overlooks, however, that CVB rectified this inadvertent bracketing

issue after the court raised it at oral argument. After argument and pursuant to the

court's order, CVB submitted a supplemental joint appendix under seal containing *all* U.S. purchaser questionnaire responses, properly bracketing each purchaser's name in the confidential index, and clearly indicating on the cover and on each following page, "Business Proprietary Information Contained Throughout Entire Document."  Appx090 (docket entry 73), Appx423-434, Appx124571-125358. The court's reasoning, in any event, fails to appreciate that the confidentiality of the information was never waived, and the statute itself protected this information from being publicly disclosed.

### 3. Bracketed Subject Import Volume and Market Share Information, Calculated Using Questionnaire Response Data, Were Not Publicly Available Information

Finally, the CIT erroneously held that bracketed information regarding subject import volumes and market shares were publicly reported by other sources and consequently did not qualify for confidential treatment.  Appx058-060.  Citing to a handful of non-record news articles, the CIT refused to "redact information as confidential that some of the responding parties themselves have freely provided to the press."  Appx059-060.

The CIT misapprehends that unlike the "market trends and market share" publicly reported by the cited news articles, the bracketed import volume and market share information contained in the Commission's Views and Report were uniquely calculated using specific BPI reported by individual U.S. producers and

Business Proprietary Information
Subject to Protective Order Redacted

U.S. importers in their questionnaire responses.  As explained above, while

aggregate in nature, the Commission treated the information as BPI because there

was one dominant U.S. importer that accounted for over 90 percent of mattress

imports from nonsubject countries and for mattress imports from several of the

subject countries, including China.  While somewhat similar information may have

been publicly reported by the cited news articles, this public information did not

reflect the tailored information derived from confidential questionnaire responses

that constituted BPI relied upon by the Commission.

The CIT's additional explanation that "{e}ven if information is confidential

or business proprietary, the Court's use of approximations appropriately

summarizes the information without revealing exact figures," should also be

rejected.  Appx060-062.  Some of the CIT's use of numerical characterizations to

"summarize" numerical data, however, represented the same protected statistical

data in alternative numeric fashion (*e.g.*, [ percentage ] in place of [ ## ] percent),

thereby directly revealing the protected information.  Appx564-567.  It is precisely

this reason that the Commission generally does not disclose any statistical BPI,

except to discuss non-numerical trends in the data.  19 C.F.R. § 201.6(a) (stating

that "{n}onnumerical characterizations of numerical confidential business

information (e.g., discussion of trends) will be treated as confidential business

information only at the request of the submitter for good cause shown"); *see also*

AD/CVD Handbook at II-26 ("In no case will the Commission disclose individual company data, although it may discuss trends in individual company data as well."). Couching language through use of words like "roughly," "about," and "at least" to refer to the BPI, as the CIT did, also does not alter the fact that the alternative numerical figures utilized by the CIT disclosed the confidential information bracketed by the Commission. Appx061-062. In sum, none of the CIT's explanations justifies disclosure of the BPI at issue.

To be clear, the Commission has an interest in presenting information and argument in a public manner. It holds a public hearing to receive testimony and argument, independently researches publicly available information concerning the product, producers, and market trends that it adds to the public record, and releases public versions of its Staff Report and Views. The Commission, however, must safeguard confidential BPI as required by the statute, and the CIT must preserve the confidential status of that information. The CIT abused its discretion in denying the parties' joint motion to accord confidential treatment to the BPI at issue. In addition to impacting the Commission's ability to collect questionnaire responses, the nonconsensual disclosure of questionnaire response information that was understood to be BPI deprived the submitters of information of protections afforded by Congress, including the ability to have that information returned rather than disclosed. The CIT's BPI Denial Decision should therefore be reversed.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this

Court modify the CIT's final judgment for the limited purpose of reversing the

CIT's BPI Denial Decision.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Jane C. Dempsey*
Jane C. Dempsey
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Tel:  (202) 205-3142
Jane.Dempsey@usitc.gov

*Counsel for Defendant-Appellant*
*United States*

December 2, 2024

## CERTIFICATE OF COMPLIANCE WITH CONFIDENTIALITY REQUIREMENTS

This brief complies with the limitations and requirements related to confidential information set forth in Fed. Cir. R. 28(d). This brief contains 25 words (including numbers) marked as confidential, as identified and described in the Table of Contents.

/s/ Jane C. Dempsey
Jane C. Dempsey
Attorney for Defendant-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC 20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov

Dated: December 2, 2024

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(b). The brief contains 9,926 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.


/s/ Jane C. Dempsey
Jane C. Dempsey
Attorney for Defendant-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov


Dated:  December 2, 2024

## CERTIFICATE OF SERVICE

I, Jane C. Dempsey, hereby certify on this 2nd day of December 2024 that true and correct copies of the attached **NONCONFIDENTIAL PRINCIPAL BRIEF OF DEFENDANT-APPELLANT UNITED STATES** were served upon the following via secure electronic transfer to counsel of record.

/s/ Jane C. Dempsey
Jane C. Dempsey
Attorney for Defendant-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov