**ANDREW J. DHUEY**
**ATTORNEY AT LAW**
**456 BOYNTON AVENUE**
**BERKELEY, CA 94707**

(510) 528-8200                                                    ajdhuey@comcast.net

21 January 2025

Hon. Kimberly A. Moore, Chief Circuit Judge
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

*[RECEIVED stamp: JAN 22 2025 — United States Court of Appeals For the Federal Circuit]*

    Re:   *In re United States*, No. 24-1566
          Offer to appear as *amicus curiae* to defend the CIT decision
          under review, *pro bono publico*

Dear Chief Judge Moore:

    I am writing with regard to an appeal pending before the Court: *In re United States*, No. 24-1566. The government is appealing an order by CIT Judge Stephen A. Vaden denying an unopposed, joint motion of the parties to redact certain business proprietary information from the merits opinion in CIT case No. 1:21-cv-00288. As Judge Vaden explained in his opinion, he grounded his decision primarily on the public interest in the transparency of judicial decision-making: "Transparency is a touchstone of our judicial system. Only information that is truly confidential may be concealed from the public." *CVB, Inc. v. United States*, 681 F. Supp. 3d 1314, 1323 (Ct. Int'l Trade 2024) (copy of opinion enclosed).

    I am on the CIT roster of *pro bono* counsel. I have reviewed the docket in this case on appeal, and it appears that no party has or will defend Judge Vaden's decision before this Court. The two *amicus* briefs (enclosed) fully support the government's position in favor of redactions. For that reason, I would like to offer to appear as *amicus curiae* to defend the decision under review, arguing on behalf of the public interest in judicial transparency. If the Court were to appoint me for this role, my work would be *pro bono publico*, and I would cover the associated filing and travel expenses.

    You authored the majority opinions in two VEOA cases where I appeared *pro bono* on behalf of the disabled veterans: *Gingery v. Dep't of Defense*, 550 F.3d 1347 (Fed. Cir. 2008); *Marshall v. Dep't of Health & Human Servs.*, 587 F.3d 1310 (Fed. Cir. 2009). You were also on the *en banc* rehearing panel in which I argued for the patentee in *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272 (Fed. Cir. 2014).

Should the Court find it helpful, I would be delighted to accept the assignment to argue in defense of the CIT decision under review here. It would be in the public's interest and the interest of justice for the Court to decide this appeal with the benefit of a rebuttal to the unanimous view of the government and both *amici* bar associations. *See, e.g., Cardinal Chem. Co. v. Morton Int'l*:

> The lack of adversariness was frankly acknowledged at oral argument. . . . *Amici* likewise all weighed in on the single side in this case, one of them even identifying its submission as "in support of petitioners & respondents." Brief for Federal Circuit Bar Association as *Amicus Curiae*. While this harmony is heartwarming and even (since it reduces the number and length of briefs) environmentally sound, it may encourage us to make bad law. [¶] In the past, when faced with a complete lack of adversariness, we have appointed an *amicus* to argue the unrepresented side.

508 U.S. 83, 103-04 (1993) (Scalia, J., concurring).

Respectfully submitted,

Andrew J. Dhuey

Email copies w/o enclosures sent to:

Jane Dempsey, Esq.
Office of the General Counsel, United States International Trade Commission
Jane.Dempsey@usitc.gov

George C. Summerfield, Jr., Esq.
george.summerfield@klgates.com
(*Amicus* Counsel for International Trade Commission Trial Lawyers Association)

Deanna Tanner Okun, Esq.
dtokun@polsinelli.com
(*Amicus* Counsel for Customs and International Trade Bar Association)

🅐 Neutral
As of: January 20, 2025 7:10 PM Z

# CVB, Inc. v. United States

United States Court of International Trade

January 8, 2024, Decided

Court No. 1:21-cv-00288 (SAV)

## Reporter

681 F. Supp. 3d 1314 *; 2024 Ct. Intl. Trade LEXIS 1 **; SLIP OP. 2024-2

CVB, INC., Plaintiff, v. UNITED STATES, Defendant, and BROOKLYN BEDDING, LLC, et al., Defendant-Intervenors.

**Prior History:** CVB, Inc. v. United States, 675 F. Supp. 3d 1324, 2023 Ct. Intl. Trade LEXIS 189, SLIP OP. 2023-184 (Ct. Int'l Trade, Dec. 19, 2023)

**Disposition:** Denying the Defendant's Joint Motion to Retract the Court's Public Slip Opinion and Accord Confidential Treatment to Alleged Business Proprietary Information Contained Therein.

## Core Terms

confidential, mattress, Retract, proprietary information, bracketed, parties, questionnaires, imports, designation, company name, https, confidential information, Purchaser, percent, bit, proprietary, objects, oral argument, approximations, redaction, public access, slip opinion, Transparency, pages, publicly, records, courts, label

## Case Summary

### Overview

HOLDINGS: [1]-Court declined to retract the names of companies that responded to the U.S. International Trade Commission's questionnaires in its public slip opinion because the Commission failed to abide by Ct. Int'l Trade R. 5(g) when designating

information as confidential or business proprietary; [2]-Court also declined to retract numerical approximations which were properly bracketed under Rule 5(g) because the information was publicly available, and the court's approximations did not closely track the Commission's figures.

### Outcome

Motion denied.

## LexisNexis® Headnotes

International Trade Law > US Court of International Trade

### HN1[⬇] International Trade Law, US Court of International Trade

Ct. Int'l Trade R. 5(g) governs filings containing confidential or business proprietary information. Rule 5(g)'s mandate is as clear as it is broad: Any paper containing confidential or business proprietary information must identify that information by enclosing it in brackets. The rule serves three purposes. First, the rule protects confidential and business proprietary information by clearly identifying it for the parties and the Court. Second, the rule promotes transparency and public access to judicial records by requiring parties to designate precisely what information is

Page 2 of 11

681 F. Supp. 3d 1314, *1314; 2024 Ct. Intl. Trade LEXIS 1, **1

confidential. Parties cannot protect information en masse by stamping a label atop every page. Instead, they must excise only that information which is truly confidential, allowing the public to view everything else. Rule 5(g). Finally, the rule promotes judicial efficiency by providing the Court with one record it examines to adjudicate the case. Bracketing allows the Court to look at one place to see the entire record the agency considered and know what portion of that record the parties claim is confidential without having to move back and forth between different sources.

Administrative Law > ... > Freedom of Information > Defenses & Exemptions From Public Disclosure > Commercial Information & Trade Secrets

International Trade Law > US International Trade Commission Proceedings > Investigations

**HN2[⭳] Defenses & Exemptions From Public Disclosure, Commercial Information & Trade Secrets**

The Court's rules do not define what constitutes confidential or business proprietary information. 19 U.S.C.S. § 1677f(b) governs the U.S. International Trade Commission's treatment of business proprietary information. Information submitted to the Commission which is designated as proprietary by the person submitting the information shall not be disclosed to any person without the consent of the person submitting the information. 19 U.S.C.S. § 1677f(b)(1)(A). Information is neither confidential nor business proprietary if it is publicly available. Confidential information is information that is private or secret. Information that is public knowledge cannot be a trade secret.

Administrative Law > ... > Freedom of Information > Defenses & Exemptions From Public Disclosure > Commercial Information & Trade Secrets

Governments > Courts > Court Records

**HN3[⭳] Defenses & Exemptions From Public Disclosure, Commercial Information & Trade Secrets**

Merely claiming information is confidential does not make it so. Were that true, a party could designate anything it wanted as confidential. Even when the parties agree to secrecy, courts are duty-bound to protect public access to judicial proceedings and records. Where the parties lack any incentive to defend the public's right of access, the Court must balance that right with the need for confidentiality. Transparency — not secrecy — is the default rule.

Governments > Courts > Court Records

**HN4[⭳] Courts, Court Records**

Counsel and the parties are responsible for complying with the Court's rules and orders regarding the redaction of sensitive information.

Administrative Law > ... > Freedom of Information > Defenses & Exemptions From Public Disclosure > Commercial Information & Trade Secrets

International Trade Law > US Court of International Trade

Administrative Law > ... > Freedom of Information > Defenses & Exemptions From Public Disclosure > Foreign Policy & National Defense

Page 3 of 11

681 F. Supp. 3d 1314, *1314; 2024 Ct. Intl. Trade LEXIS 1, **1

**HN5[⬇]  Defenses & Exemptions From Public Disclosure, Commercial Information & Trade Secrets**

Ct. Int'l Trade R. 5(g) does not allow parties to designate information as confidential by labelling an entire page. Indeed, even Government officials classifying a document for national security reasons must indicate which portions are classified and which portions are unclassified.

Governments > Courts > Court Records

**HN6[⬇]  Courts, Court Records**

Courts may not use administrative burden to justify denying public access to judicial records.

Governments > Courts > Authority to Adjudicate

Governments > Courts > Court Records

**HN7[⬇]  Courts, Authority to Adjudicate**

Legal arguments and judicial decisions are meant to be public because American courts are not private tribunals summoned to resolve disputes confidentially at taxpayer expense. This is especially true when the courts resolve disputes to which the Government is a party, affecting the entire citizenry. Like a student taking a math test, courts are expected to show their work. The public does not and should not accept final answers to complicated questions on faith alone. Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law.

Governments > Courts > Court Records

International Trade Law > US International Trade Commission Proceedings > Investigations

International Trade Law > US International Trade Commission Proceedings > Judicial Review

**HN8[⬇]  Courts, Court Records**

Neither administrative agencies nor the court can hide from scrutiny by censoring information. Citizens can only hold their Government accountable if they know what that Government is doing. Because We the People are not meant to be bystanders, the default expectation is transparency — that what happens in the halls of government happens in public view. What happens in the halls of government is presumptively open to public scrutiny. Though the U.S. International Trade Commission may be an independent agency, it is not immune to legal and democratic accountability. 19 U.S.C.S. §§ 1330, 1333(g). The Constitution governs all branches of the Government — even the administrative state.

Governments > Courts > Authority to Adjudicate

Governments > Courts > Court Records

**HN9[⬇]  Courts, Authority to Adjudicate**

Transparency is a touchstone of the judicial system.

**Counsel:** [**1] Geoffrey M. Goodale, Duane Morris, LLP, of Washington, DC, for Plaintiff CVB, Inc. With him on the briefs were Andrew R. Sperl, Nathan J. Heeter, and Lauren E. Wyszomierski, Duane Morris, LLP, and Stephen G. Larson, Robert C. O'Brien, and Paul A. Rigali, Larson LLP, of Los Angeles, CA.

Page 4 of 11

681 F. Supp. 3d 1314, *1314; 2024 Ct. Intl. Trade LEXIS 1, **1

Jane C. Dempsey, Office of the General Counsel, United States International Trade Commission, of Washington, DC, for Defendant United States. With her on the briefs were Dominic Bianchi, General Counsel; Andrea C. Casson, Assistant General Counsel for Litigation; and Brian R. Soiset, Attorney-Advisor.

Mary Jane Alves, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenors Brooklyn Bedding, LLC; Corsicana Mattress Company; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises, Inc.; Leggett & Platt, Inc.; the International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO. With her on the briefs were Yohai Baisburd and Sydney Reed.

**Judges:** Before: Stephen Alexander Vaden, Judge.

**Opinion by:** Stephen Alexander Vaden

## Opinion

[*1315] **Vaden, Judge**: On December 19, 2023, the Court issued a public slip [**2] opinion in the underlying case affirming the United States International Trade Commission's (the Commission) affirmative injury finding. *CVB, Inc. v. United States*, 47 CIT __, 2023 Ct. Intl. Trade LEXIS 189, Slip Op. 2023-184. Shortly thereafter, the Commission notified the Court it believed the public opinion contained unredacted business proprietary information. Def.'s Letter, ECF No. 90. Before the Court is the Commission's Joint Motion to Retract the Court's Public Slip Opinion and Accord Confidential Treatment to Business Proprietary Information Contained Therein (Motion to Retract), ECF No. 93. For the reasons set forth below, the Court respectfully **DENIES** the Motion.

## BACKGROUND

The underlying case involves a challenge to the Commission's final affirmative injury determination in its investigation of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. *See CVB, 675 F. Supp. 3d 1324, 2023 Ct. Intl. Trade LEXIS 189, at *1-2, SLIP OP. 2023-184.* The Slip Opinion outlined numerous errors by the Commission but found the errors were ultimately harmless and sustained the Commission's final determination. *See id. at *52.* To explain what the Court characterized as the Commission's "mathematical obfuscation and statistical chicanery[,]" the Court illustrated [*1316] how responses to various questionnaires contained in the record [**3] and a chart from the Commission's final determination showed the opposite of what the Commission claimed they did. *See id.* at *30-43.

After the Court released its opinion, the Commission contacted the Court by telephone and email to express concerns that the opinion revealed confidential business proprietary information. The next day, the Commission filed a Letter to the Court on official Commission letterhead requesting that the Court retract its opinion because the Commission "identified business proprietary information" in the opinion. Def.'s letter at 1, ECF No. 90. The Court issued a Paperless Order the same day informing the parties that a written motion was the appropriate way to raise any concerns regarding confidential or business proprietary information. ECF No. 91. After business hours on Friday, December 22, the Commission filed the Joint Motion. Motion to Retract, ECF No. 93.

## LEGAL STANDARDS

**HN1[↑]** USCIT Rule 5(g) governs filings

Page 5 of 11

681 F. Supp. 3d 1314, *1316; 2024 Ct. Intl. Trade LEXIS 1, **3

containing confidential or business proprietary information. Rule 5(g)'s mandate is as clear as it is broad: "Any paper containing confidential or business proprietary information must identify that information by enclosing it in brackets." The rule serves three purposes. First, [**4] the rule protects confidential and business proprietary information by clearly identifying it for the parties and the Court. Second, the rule promotes transparency and public access to judicial records by requiring parties to designate precisely what information is confidential. Parties cannot protect information *en masse* by stamping a label atop every page. Instead, they must excise only that information which is truly confidential, allowing the public to view everything else. *See* USCIT R. 5(g). Finally, the rule promotes judicial efficiency by providing the Court with one record it examines to adjudicate the case. Bracketing allows the Court to look at one place to see the entire record the agency considered and know what portion of that record the parties claim is confidential without having to move back and forth between different sources.

HN2[↑] The Court's rules do not define what constitutes confidential or business proprietary information. 19 U.S.C. § 1677f(b) governs the Commission's treatment of business proprietary information. Information submitted to the Commission "which is designated as proprietary by the person submitting the information shall not be disclosed to any person without the consent of the person [**5] submitting the information[.]" 19 U.S.C. § 1677f(b)(1)(A). Information is neither confidential nor business proprietary if it is publicly available. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 139 S. Ct. 2356, 2363, 204 L. Ed. 2d 742 (2019) (defining confidential information as information that is "private" or "secret") (citing Webster's Seventh New Collegiate Dictionary 174 (1963)); *see also* 19 U.S.C. § 1677f(b)(2) (the Commission

can determine a party's designation of information as proprietary is unwarranted based on the information's "nature and extent ... or its availability from public sources"). *Cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984) ("Information that is public knowledge ... cannot be a trade secret.") (internal citations omitted).

HN3[↑] Merely claiming information is confidential does not make it so. Were that true, a party could designate anything it wanted as confidential. Even when the parties agree to secrecy, courts are "duty-bound to protect public access to judicial [*1317] proceedings and records." *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 417 (5th Cir. 2021). Where the parties lack any incentive to defend the public's right of access, the Court must balance that right with the need for confidentiality. *Id.* at 419. Transparency — not secrecy — is the default rule. *Id.* at 417.

## DISCUSSION

The Motion asks the Court to retract its Slip Opinion and issue a new confidential opinion with forty-four sets of brackets in place of information [**6] contained in the original Slip Opinion. *See* Motion to Retract Attach. A, ECF No. 93. The objected-to information falls into two broad categories, company names and numerical approximations. First, the Motion to Retract objects to the Slip Opinion's naming of the companies that responded to the Commission's questionnaires. *See, e.g., id.* at 2-4 (requesting the Court remove the names of various companies). This information is not confidential because the Commission failed to abide by USCIT Rule 5(g) when designating information as confidential or business proprietary. *See id.* at 3 (admitting the cited pages "were not individually bracketed"). Second, the Motion to Retract objects to the Court's usage of approximations to summarize

Page 6 of 11

681 F. Supp. 3d 1314, *1317; 2024 Ct. Intl. Trade LEXIS 1, **6

information the Commission did properly bracket according to USCIT Rule 5(g). *See, e.g., id.* at 1-2 (objecting to various numerical approximations). This portion of the Motion fails because the information is publicly available, the Court's approximations do not "closely track" the Commission's figures as the Motion to Retract suggests, or both. *Id.* at 1. The Motion's motley approach to redaction demonstrates the importance of properly designating information as confidential under USCIT Rule 5(g) and [**7] maintaining a consistent approach to what constitutes confidential or business proprietary information. *Compare id.* at 1-2 (objecting to company names and production ratios), *with id.* at 2-3 (objecting to company names but *not* purchase ratios). The Commission can best encourage voluntary cooperation from companies and protect allegedly confidential information by following the rules. *Cf. id.* at 2-3 (explaining why protecting confidential information is important to the Commission).

## A. Company Names

The Motion to Retract asks the Court to censor the names of "non-party purchasers that voluntarily provided questionnaire responses"[1] to the Commission. *Id.* at 2. According to the Motion, the Commission views the "entirety of purchaser questionnaire responses, including the identity of those purchasers" as confidential business proprietary information. *Id.* However, the responses to the purchaser

questionnaires were not bracketed in accordance with USCIT Rule 5(g), meaning any claim to confidentiality was waived long ago.

USCIT Rule 5(g) requires that "[a]ny paper containing confidential or business proprietary information must identify that information by enclosing it in brackets." **HN4[↑]** Counsel and the parties are responsible [**8] for complying with the Court's rules and orders regarding the redaction of sensitive information. *Cf.* In re E-Government Act [*1318] of 2002 and Privacy Redaction, Admin. Order No. 08-01, at 2 (CIT May 2, 2008, amend. Nov. 25, 2008, eff. Jan. 1, 2009), https://www.cit.uscourts.gov/sites/cit/files/AO-08-01.pdf ("It is the responsibility of counsel and the parties to be sure that all filings comply with the Court's Rules, orders, or notices regarding the redaction of personal data identifiers or other sensitive information."). The Commission admits that it did not bracket the purchaser questionnaires filed with the Court. Motion to Retract Attach. A at 3, ECF No. 93. The Motion to Retract makes three excuses for this. First, it asserts that the company names were bracketed in the Commission's index to the record. *Id.* Second, it notes that the Commission stamped a "Business Proprietary" label atop the pages of the questionnaires. *Id.* Third, it makes veiled excuses about the length of the administrative record. *See id.* (describing the confidential joint appendix as "voluminous").

The Motion's first excuse is that the Commission bracketed the company names in the index it filed with the confidential joint appendix. This is half true but of no consequence. The index does contain brackets in place of the names of the companies that responded [**9] to the questionnaires; but instead of brackets around the purportedly confidential information (*e.g.,* "[company name]"), the index contains

---

[1] Although the Motion to Retract characterizes the responses as voluntary, the questionnaire itself does not. The questionnaire states a response "is mandatory and failure to reply as directed can result in a subpoena or other order to compel the submission of records or information in your firm's possession." Blank "U.S. - Purchaser" Questionnaire at 1, U.S. Int'l Trade Comm'n, https://bit.ly/3vjf04h (last visited Jan. 8, 2024). This is not the only inconsistency between what the Commission represents in the Motion to Retract and what the Commission's own questionnaires say. *See infra* note 4.

Page 7 of 11

681 F. Supp. 3d 1314, *1318; 2024 Ct. Intl. Trade LEXIS 1, **9

brackets around empty space (e.g., "[ ]"). *See, e.g.,* Confidential J.A. Index at 39-40, ECF No. 66. That is how the public version of a document should be bracketed, not the confidential version. *See* USCIT R. 5(g) ("A non-confidential version in which the confidential or business proprietary information is deleted must accompany a confidential version of a paper."). This detail is crucial because it means that, even if the Court exercised extra diligence and searched the entire confidential joint appendix to confirm a company's name was not designated as confidential anywhere, it would not locate the place where the Commission supposedly designated the company name as confidential because the blank space in place of the company name would not show up in a search. Disregarding the parties' error does them no service, as bracketing information somewhere else in the record does not magically afford protection across the entire record.

The second excuse proffered is the "business proprietary" label stamped at the top of the questionnaire pages. Motion to Retract [**10] Attach. A at 3, ECF No. 93. This label, which is often partially obscured by the stamping mechanism of the Court's e-filing system, is exactly the type of blanket designation that USCIT Rule 5(g) prohibits. **HN5[↑]** Rule 5(g) does not allow parties to designate information as confidential by labelling an entire page. Indeed, even Government officials classifying a document for national security reasons must indicate "which portions are classified ... and which portions are unclassified." Exec. Order No. 13,526, 75 Fed. Reg. 707, 710 (Dec. 29, 2009). Looking at the Commission's questionnaires, it is apparent why blanket designation is disfavored. One question asks, in essence, whether the responding company is a brick-and-mortar or online retailer. Blank "U.S. - Purchaser" Questionnaire at 9, U.S. Int'l Trade Comm'n, https://bit.ly/3vjf04h (last

visited Jan. 8, 2023).[2] Surely it is no secret whether a company has physical storefronts or whether it sells mattresses online. Allowing blanket designation like the Motion to Retract requests is incompatible with a system where public access to judicial proceedings is the default rule. *See Binh Hoa Le, 990 F.3d at 417.*

[*1319] Finally, the Commission makes numerous allusions to the length of the administrative record to justify its failure to abide by USCIT Rule 5(g). *See, e.g.,* Motion [**11] to Retract at 2, ECF No. 93 (noting the length of the confidential record); Motion to Retract Attach. A at 3, ECF No. 93 (twice describing the record as "voluminous" while explaining that the Commission "inadvertently" failed to bracket large swaths of the record it now claims contain confidential information). **HN6[↑]** Courts may not use administrative burden to justify denying public access to judicial records. *In re Leopold to Unseal Certain Elec. Surveillance Applications & Ords, 964 F.3d 1121, 1134, 448 U.S. App. D.C. 77 (D.C. Cir. 2020)* (Garland, J.). Neither can quasi-judicial agencies like the Commission.

The Commission and the other parties missed multiple opportunities to raise concerns about this information earlier. If the parties believed the company names were confidential, the parties should have bracketed that information. *See USCIT R. 5(g).* Some of the information to which the Motion to Retract objects was discussed in open court at oral argument. *See, e.g.,* Oral Arg. Tr. at 25:5-26:16, ECF No. 75 (discussing specific companies by name and their product mixes). If the parties believed this information was confidential, they should have raised that concern during oral argument or on

Page 8 of 11

681 F. Supp. 3d 1314, *1319; 2024 Ct. Intl. Trade LEXIS 1, **11

reviewing the transcript. *See* Admin. Order No. 02-01 at 8, 20 (outlining the procedures for breaches involving confidential information); [**12] Def.'s Public Req. for Redaction, *United States v. Aegis Security Ins. Co.*, No. 1:20-cv-03628 (CIT Jan. 2, 2024), ECF No. 132 (requesting redaction of allegedly confidential information in an oral argument transcript). It is strange that only now, after an opinion some may characterize as less than complimentary, does the Commission demand secrecy. If it was fine to discuss unbracketed company names in a public court session, it is fine to do the same in a written public opinion. The Commission's request to redact the names of the responding companies is therefore **DENIED**.

## B. The Court's Use of Approximations

The second category of information to which the Motion to Retract objects is the Court's use of numerical approximations to describe the general conditions of the mattress market. *See generally* Motion to Retract Attach. A at 1-2, ECF No. 93. This includes the origin of imports, relative share of imported and domestic mattresses in the market, and the segmented nature of mattress production and purchasing. *See id.*

As a preliminary matter, the Court doubts that much of the allegedly confidential information the Commission did properly bracket qualifies as confidential by the Commission's own definition[3] or by any reasonable understanding of the terms "confidential" or "business proprietary." The [**13] Commission's own questionnaires state "[t]he commercial and financial data furnished in response to this questionnaire *that reveal the individual operations of your firm* will be treated as

confidential" and that "general characterizations of numerical business proprietary information (such as discussion of trends)" will be treated as confidential information only for good cause.[4] Blank "U.S. - Purchaser" [*1320] Questionnaire at 4 (emphasis added). Yet the Motion to Retract objects to public discussion of the general market trends of declining Chinese imports and rising imports from other countries. *See* Motion to Retract Attach. A at 1, ECF No. 93. That is precisely the type of information the Commission's questionnaires acknowledge is not confidential or business proprietary. It does not reveal the individual operations of any company and is instead a general discussion of broad market trends. The same goes for the Slip Opinion's description of the respective market shares of imported and domestically produced mattresses. *See CVB, 675 F. Supp. 3d 1324, 2023 Ct. Intl. Trade LEXIS 189, at *4, *10-11, SLIP OP. 2023-184*.

Much of the information on market trends and market share is publicly available. The decline in Chinese imports and concurrent rise in imports from other countries [**14] is well documented. *See, e.g.*, David Perry, *China's Mattress Import Share Falls to 1% in August*, FURNITURE TODAY (Oct. 8, 2019), https://bit.ly/4aFKfH9 (reporting Chinese mattresses were 82 percent of imports in January 2019 and 1 percent in August 2019); David Perry, *Mattress Alliance, Petitioners Square Off Over Antidumping*, FURNITURE TODAY (Apr. 13, 2020), https://bit.ly/3H3wmVE (reporting Vietnam, Thailand, Turkey, Serbia, Malaysia, Indonesia, and Cambodia collectively account for 83.3 percent of

---

[3] The Commission's rules do not necessarily govern the Court, but information that fails to satisfy the Commission's standards for confidentiality is unlikely to satisfy the Court's standards.

[4] In the Motion to Retract, the Commission claims that it considers "the entirety of purchaser questionnaire responses" to be business confidential information. Motion to Retract Attach. A at 3, ECF No. 93. Once again, the Commission's own questionnaires are at war with its Motion. *Cf. supra* note 1.

mattress imports). Information about the relative market share of imports and the domestic industry is also available from general interest newspapers. Nathan Bomey, *Chinese 'Dumping' Has Slashed Mattress Prices, but at a Cost to the U.S. Bedding Industry*, USA TODAY (Dec. 19, 2019), https://bit.ly/47qssRn (stating Chinese imports in 2018 were "equivalent to about one-third of total mattress production capacity in the United States."). The Court will not redact information as confidential that some of the responding parties themselves have freely provided to the press. *See, e.g.*, David Perry, *Mattress Alliance, Petitioners Square Off Over Antidumping*, FURNITURE TODAY (Apr. 13, 2020), https://bit.ly/3H3wmVE [**15] (quoting Ashley Furniture Vice President Brian Adams saying imports from Vietnam, Thailand, Turkey, Serbia, Malaysia, Indonesia, and Cambodia make up "22 [percent] of the U.S. mattress market" and "83.3 [percent] of all mattress imports"). Although the parties claim that knowledge of Ashley Furniture's lopsided mattress production is "sensitive," Ashley's Vice President Brian Adams testified at the Commission's *public* hearing and stated that Ashley had shifted "almost exclusively to [boxed mattresses], both in our purchases and in our production." *Compare* Motion to Retract Attach. A at 2, ECF No. 93, *with* Statement of Brian Adams at 143:25-144:5, J.A. at 7,569, ECF No. 60, *and CVB, 2023 Ct. Intl. Trade LEXIS 189, at *36* ("Of the twelve companies that produced both mattress types in 2019, five produced virtually none of one kind" and "Ashley ... produced far less than one percent of U.S. production of one kind of mattress."). Because this information is publicly available, it fails to qualify as confidential or business proprietary information. *See Food Mktg. Inst., 139 S. Ct. at 2363*.

Even if information is confidential or business proprietary, the Court's use of approximations appropriately summarizes the information without revealing exact figures. *See* [**16] Blank "U.S. - Purchaser" Questionnaire at 4 ("general characterizations of numerical business proprietary information" will be treated as confidential only for good cause). Some of the objections raised border on frivolity. For instance, the Motion to Retract objects to the Court's use of the phrase "thousands [*1321] of percent[.]" Motion to Retract Attach. A at 1, ECF No. 93; *see also CVB, 675 F. Supp. 3d 1324, 2023 Ct. Intl. Trade LEXIS 189, at *4, SLIP OP. 2023-184*. Thousands of percent can mean anything from 2,000 percent to 999,999 percent. Such a wide range can hardly tip off a reader to anything approaching the exact number the Commission bracketed. The same goes for the term "negligible." *Compare* Motion to Retract Attach. A at 2, ECF No. 93, *with CVB, 675 F. Supp. 3d 1324, 2023 Ct. Intl. Trade LEXIS 189, at *36, SLIP OP. 2023-184*. The word negligible is comparative. *See* Webster's Second New International Dictionary 1638 (1956) (defining negligible as "that may be neglected or disregarded"); *Negligible*, Oxford English Dictionary, https://bit.ly/3NRiW2R (defining negligible as "so small or insignificant as not to be worth considering"). That a company's market share of boxed mattress production is negligible compared to its unknown share of flat-packed mattress production does not reveal the actual market share percentage for either. *Compare* Motion to Retract Attach. A at 2, ECF No. 93, *with CVB, 675 F. Supp. 3d 1324, 2023 Ct. Intl. Trade LEXIS 189, at *35-36, SLIP OP. 2023-184*.

Elsewhere, the Court similarly couches its language to avoid exactness. The Slip Opinion uses words like "roughly," "about," and "at least" to indicate that the numbers given are merely a rough approximation. *See, e.g., CVB, 675 F. Supp. 3d 1324, 2023 Ct. Intl. Trade LEXIS 189, at *4, *10, *35, *39, SLIP OP. 2023-184*. It also uses ratios to demonstrate

Page 10 of 11

681 F. Supp. 3d 1314, *1321; 2024 Ct. Intl. Trade LEXIS 1, **16

the lopsided nature of domestic mattress production without revealing the raw production figures. *Id.* at *35-37. Ballpark figures like these provide enough information for the reader to understand the case without revealing any confidential or business proprietary information. Because these general summaries do not reveal such information, they need not be redacted.

## C. The Virtues of Transparency

The American tradition of public access to judicial proceedings dates back not merely to the founding, or even to the English [**17] common law, but all the way back to Ancient Rome. *Binh Hoa Le, 990 F.3d at 418* ("The principle traces back to Roman law, where trials were *res publica* — public affairs."). **HN7**[ ↑] Legal arguments and judicial decisions are meant to be public because "American courts are not private tribunals summoned to resolve disputes confidentially at taxpayer expense." *Id.* at 421. This is especially true when the courts resolve disputes to which the Government is a party, affecting the entire citizenry. Like a student taking a math test, courts are expected to show their work. The public does not and should not accept final answers to complicated questions on faith alone. *See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 595, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)* (Brennan, J., concurring) ("Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law.").

Although the Court adjudicates the Motion to Retract based on the law and the facts currently before it, this is not the first time the Commission has taken a questionable position on transparency before the Court. The Commission took a similar tact in a high-profile case involving fertilizer imports. *See generally OCP S.A. v. United States, 658 F. Supp. 3d*

1297, SLIP OP. 2023-136 (CIT 2023). In a conference prior to oral argument, the Court noted that more than one hundred members of Congress had formally commented [**18] on the Commission's decision. Despite the public interest in the case, the Commission urged the Court to hold the entire oral argument in closed [*1322] session. Audio Recording: Conference Call Regarding Oral Argument at 24:33-50 (June 7, 2022), ECF No. 144.[5] This would bar attendance by not only the public but also all non-lawyers, including corporate officers of the parties to the case. The Commission's counsel urged this route because she believed business proprietary information "underline[d] all the aspects and all the disputes" in the case. *Id.* at 29:05-15. The Court decided to hold a public oral argument with a confidential session at the end if necessary. *Id.* at 33:00-35:00. The transcript of the eventual oral argument was 229 pages. *See* Confidential Oral Arg. Tr., ECF No. 130. The public portion comprised 192 of those pages. *See* Public Oral Arg. Tr., ECF No. 129. The opinion dispensing with the case was entirely public. *Compare* Audio Recording: Conference Call at 24:33-50 (Commission counsel claiming it would be impossible to conduct a public hearing on the matter), *with OCP S.A., 658 F. Supp. 3d at 1297-1324* (28 reporter pages of opinion, none of which are confidential).

As with OCP, the Commission's decision in this matter [**19] and in the related petitions regarding mattresses from China drew public attention. Multiple media outlets published reports or editorials about the antidumping petitions. *See, e.g.,* Derek Miller & Miles Hansen, *Will Biden 'Go to the Mattresses' on Trade Policy?* THE HILL (Feb. 23, 2021),

---

[5] The ECF Numbers in this citation and the remaining citations in this paragraph correspond to docket entries in the OCP case, not this case. The Court Number for OCP is 1:21-cv-00219.

Page 11 of 11

681 F. Supp. 3d 1314, *1322; 2024 Ct. Intl. Trade LEXIS 1, **19

https://bit.ly/3NPsHOQ. Numerous local outlets reported the petitions' potential effects on businesses. *See, e.g.*, Dennis Romboy, *Mattress Fight: Utah Firm Says 'Corporate Warfare' Threatens to Blunt Filling Critical Coronavirus Needs*, DESERET NEWS (Apr. 18, 2020), https://bit.ly/3tEcxBa. Senators on both sides of the political aisle publicly commented on the petitions and how the Commission handled them. *See, e.g.*, *id.* (Senator Mike Lee of Utah); *Brown, Blunt Applaud Trade Commission Ruling on Mattress Antidumping Investigation* (July 6, 2021), https://bit.ly/48EUdXr (Senators Sherrod Brown of Ohio and Roy Blunt of Missouri). When faced with public attention, the Commission's reflexive action appears to be to stifle public access to the judicial review of its decisions.

Although the Commission is not an elected body, it is part of the executive branch and is accountable to the people through their elected [**20] representatives. The Commission's actions, like the Court's, are not merely academic. An injury finding can make goods more expensive for consumers across the nation. A finding of no injury can close factories and destroy manufacturing jobs. Companies affected by this investigation claimed the Commission's decision could result in job losses. *See, e.g.*, Romboy, *Mattress Fight*, DESERET NEWS (Apr. 18, 2020), https://bit.ly/3tEcxBa (Mattress company Malouf claiming the petition in this case "threatens to shut down its business and leave 1,200 workers ... without jobs"). When someone loses his livelihood as a result of Government action, he has a right to know how and why the Government took that action. **HN8[↑]** Neither administrative agencies nor this Court can hide from scrutiny by censoring information. Citizens can only hold their Government accountable if they know what that Government is doing. *See Binh Hoa Le, 990 F.3d at 417* ("[B]ecause 'We the People'

are not meant to be bystanders, the default expectation is transparency — that what happens in the halls of government happens in public view."); *Matter of Krynicki, 983 F.2d 74, 75 (7th Cir. 1992)* ("What happens in the halls of government [*1323] is presumptively open to public scrutiny."). Though the Commission may be an [**21] "independent" agency, it is not immune to legal and democratic accountability. *Cf.* 19 U.S.C. §§ 1330, 1333(g). The Constitution governs all branches of the Government — even the administrative state. *See Loper Bright Enters., Inc. v. Raimondo, 45 F.4th 359, 458 U.S. App. D.C. 600 (D.C. Cir. 2022)*, *cert. granted in part sub nom. Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429, 216 L. Ed. 2d 414 (2023); *Relentless, Inc. v. Dep't of Com., 62 F.4th 621 (1st Cir.)*, *cert. granted in part sub nom. Relentless, Inc. v. Dep't of Com.*, 144 S. Ct. 325, 217 L. Ed. 2d 154 (2023).

## CONCLUSION

**HN9[↑]** Transparency is a touchstone of our judicial system. Only information that is truly confidential may be concealed from the public. Parties are expected to diligently follow the rules regarding confidentiality to promote public access to the judiciary, protection of confidential information, and judicial efficiency. Because the parties failed to abide by the Court's rules and object to statements by the Court that are not confidential, the Motion to Retract is **DENIED**.

/s/ Stephen Alexander Vaden

Stephen Alexander Vaden, Judge

Dated: January 8, 2024

New York, New York

---

2024-1566

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

In re UNITED STATES,

*Defendant-Appellant.*

Appeal from the United States Court of International Trade in
No. 1:21-cv-00288-SAV, Judge Stephen A. Vaden

## NONCONFIDENTIAL CORRECTED PRINCIPAL BRIEF OF
## DEFENDANT-APPELLANT UNITED STATES

**DOMINIC L. BIANCHI**
General Counsel
Telephone (202) 205-3061

**ANDREA C. CASSON**
Assistant General Counsel for
  Litigation
Telephone (202) 205-3061

**JANE C. DEMPSEY**
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone (202) 205-3142

Dated: December 2, 2024
CORRECTED: December 11, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF RELATED CASES .................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 2

STATEMENT OF THE ISSUE ............................................................... 3

STATEMENT OF THE CASE ................................................................. 3

STATEMENT OF THE FACTS ............................................................... 5

    I.    The Commission's Determinations ...................................... 5

        A.    Domestic Like Product and Domestic Industry .......................... 5

        B.    Conditions of Competition ........................................ 6

        C.    Volume ................................................................. 10

        D.    Price Effects ....................................................... 10

        E.    Impact ................................................................. 13

    II.    U.S. Court of International Trade Decisions ........................ 15

        A.    The CIT's Merits Decision ........................................ 15

        B.    The CIT's BPI Denial Decision ................................... 18

SUMMARY OF THE ARGUMENT ..................................................... 20

ARGUMENT ....................................................................................... 21

    I.    Standard of Review ........................................................ 21

    II.    This Court Should Reverse the CIT's BPI Denial
        Decision ....................................................................... 22

        A.    The Statute Requires the CIT to Preserve the
            Confidential Status of Information Treated as BPI
            by the Commission ............................................... 23

*i*          *
**TABLE OF CONTENTS (cont'd)**

B.    The Commission Properly Treated Questionnaire
      Response Information as BPI Throughout Its
      Administrative Proceedings ........................................................29

      1.    Individual Information from Company-
            Specific Questionnaire Responses.................................. 29

      2.    Aggregate Information Calculated from
            Questionnaire Response Data .......................................... 32

C.    The CIT Was Statutorily Required to Preserve the
      Confidential Status of the Information at Issue........................ 35

      1.    The Statute, and Not the Common Law
            Right of Public Access, Determines Whether
            Information Should or Should Not Be
            Disclosed .......................................................................... 36

      2.    The Claim to Confidentiality Was Never
            Waived................................................................................ 41

      3.    Bracketed Subject Import Volume and
            Market Share Information, Calculated Using
            Questionnaire Response Data, Were Not
            Publicly Available Information ........................................ 44

CONCLUSION ................................................................................................ 47

## CONFIDENTIAL MATERIALS OMITTED

The material bracketed within the text on pages 5-8, 10-12, and 45 describes sensitive nonpublic information regarding production operations, import and shipment information, and market share, financial, pricing, cost, and sales information from individual domestic producers and importers and was granted confidential treatment by the Commission. *See* 19 U.S.C. § 1677f(b)(1)(A); 19 C.F.R. § 201.6(a).

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A. Hirsh, Inc. v. United States,*
   657 F. Supp. 1297 (Ct. Int'l Trade 1987) ...........................................39

*Akzo N.V. v. U.S. Int'l Trade Comm'n,*
   808 F.2d 1471 (Fed. Cir. 1986) .....................................30, 31, 32, 39

*Am. Brass v. United States,*
   699 F. Supp. 934 (Ct. Int'l Trade 1988) ...........................................27

*Binh Hoa Le v. Exeter Fin. Corp.,*
   990 F.3d 410 (5th Cir. 2021) ...........................................................36

*Brown v. Ala. Dep't of Transp.,*
   597 F.3d 1160 (11th Cir. 2010) .......................................................21

*DAK Americas LLC v. United States,*
   517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ...................................11

*Depuy Synthes Prods., Inc. v. Veterinary Orthopedic Implant, Inc.,*
   990 F.3d 1364 (Fed. Cir. 2021) ......................................................21

*Food Mktg. Inst. v. Argus Leader Media,*
   588 U.S. 427 (2019)...................................................................40, 41

*Full Member Subgrp. of Am. Inst. of Steel Constr., LLC v. United*
*States,*
   547 F. Supp. 3d 1211 (Ct. Int'l Trade 2021) ...................................28

*Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce,*
   11 CIT 238 (1987) ...........................................................................32

*Isbrandtsen Co. v. Johnson,*
   343 U.S. 779 (1952)........................................................................38

*Jernberg Forgings Co. v. United States,*
   598 F. Supp. 390 (Ct. Int'l Trade 1984) ...........................................27

*Kemira Fibres Oy v. United States,*
   858 F. Supp. 229 (Ct. Int'l Trade 1994) ...........................................26

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                    **Page(s)**

*Loper Bright Enters. v. Raimondo,*
   603 U.S. ___, 144 S. Ct. 2244 (June 28, 2024) .............................................21, 22

*Marubeni Am. Corp. v. United States,*
   35 F.3d 530 (Fed. Cir. 1994) ..............................................................................21

*Matter of Krynicki,*
   983 F.2d 74 (7th Cir. 1992) ................................................................................40

*Monsanto Co. v. United States,*
   698 F. Supp. 285 (Ct. Int'l Trade 1988) ............................................................40

*Monsanto Indus. Chems. Co. v. United States,*
   6 CIT 241 (1983) ..........................................................................................39, 40

*OCP S.A. v. United States,*
   No. 21-219, Order (Ct. Int'l Trade Feb. 29, 2024) (ECF 158).......................1, 22

*Qwest Commc's Int'l Inc. v. FCC,*
   229 F.3d 1172 (D.C. Cir. 2000)..........................................................................31

*Richmond Newspapers, Inc. v. Virginia,*
   448 U.S. 555 (1980)............................................................................................40

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984)......................................................................................40, 41

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944)............................................................................................ 22

*Timex V.I., Inc. v. United States,*
   157 F.3d 879 (Fed. Cir. 1998) ...........................................................................21

*United States v. Texas,*
   507 U.S. 529 (1993)............................................................................................38

*U.S. Steel Corp. v. United States,*
   730 F.2d 1465 (Fed. Cir. 1984) .........................................................................27

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                **Page(s)**

*Wiener v. NEC Elecs., Inc.,*
  848 F. Supp. 124 (N.D. Cal. 1994) .......................................................39

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,*
  1978 WL 1333 (E.D. Pa. 1978) (unpublished) ..................................40

**Statutes**

19 U.S.C. § 1516a(b)(2)(B) ...........................................................*passim*

19 U.S.C. § 1677(7)(G)(i) ...................................................................6

19 U.S.C. § 1677e(c)(1)(A) ...............................................................38

19 U.S.C. § 1677f...............................................................................19

19 U.S.C. § 1677f(a)(4) ...........................................................23, 29, 33

19 U.S.C. § 1677f(b) ..........................................................................19

19 U.S.C. § 1677f(b)(1) ......................................................................42

19 U.S.C. § 1677f(b)(1)(A) ................................................................23

19 U.S.C. § 1677f(b)(2) ......................................................................24

19 U.S.C. § 1677f(c) ...........................................................................26

19 U.S.C. § 1677f(c)(1) ...........................................................24, 25, 26

28 U.S.C. § 1295(a)(5)..........................................................................2

28 U.S.C. § 1581(c) ..............................................................................2

**Legislative Materials**

Omnibus Trade and Competitiveness Act of 1988,
  Pub. L. No. 100-418, 102 Stat. 1107 (1988) ......................................38

Trade Agreements Act of 1979,
  Pub. L. No. 96-39, 93 Stat. 144 (1979) ........................................37, 38

## TABLE OF AUTHORITIES (cont'd)

**Legislative Materials (cont'd)**                                    **Page(s)**

H. Rep. No. 100-576 (Apr. 20, 1988) ......................................................38

S. Rep. No. 96-249 (July 17, 1979) ...................................................27, 39

S. Rep. No. 100-71 (June 12, 1987).............................................24, 26, 28, 32, 38

**Federal Regulatory Materials**

19 C.F.R. § 201.6(a)......................................................................28, 30, 45

19 C.F.R. § 201.6(g) .....................................................................28, 29

19 C.F.R. § 207.7 ..........................................................................29

**U.S. Court of International Trade Rules**

Ct. Int'l Trade Rule 5(g) ...........................................................19, 35, 42

Ct. Int'l Trade Rule 11 ................................................................22

**U.S. International Trade Commission Publications**

*An Introduction to Administrative Protective Order Practice in Import
   Injury Investigations*, USITC Pub. 5280 (5th ed. Jan. 2022) .......................33, 34

*Antidumping and Countervailing Duty Handbook*,
   USITC Pub. 4540 (14th ed. June 2015).................................................33, 34, 46

*Mattresses from China*,
   Inv. No. 731-TA-1424 (Final), USITC Pub. 5000 (Dec. 2019) .....................7, 14

## STATEMENT OF RELATED CASES

The Defendant-Appellant the United States, by and through counsel for the U.S. International Trade Commission ("Commission"), identifies the following pending case that may be directly affected by the Court's decision in the pending appeal by the Commission:

1. *OCP S.A. v. United States*, Consol. Court No. 21-219 (Ct. Int'l Trade).

# JURISDICTIONAL STATEMENT

Pursuant to Rule 28(a)(5) of the Rules of this Court, counsel for Defendant-Appellant states that this Court's jurisdiction rests upon the following bases:

(a) The U.S. Court of International Trade ("CIT") possessed jurisdiction to entertain this underlying action pursuant to 28 U.S.C. § 1581(c).

(b) The statutory basis for this Court's jurisdiction to entertain this appeal is 28 U.S.C. § 1295(a)(5).

(c) The CIT sustained the Commission's final affirmative material injury determinations on December 19, 2023 ("Merits Decision"). Subsequently, on January 8, 2024, the CIT denied the parties' joint motion to accord confidential treatment to the business proprietary information ("BPI") contained within the Merits Decision ("BPI Denial Decision").

(d) Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B), the Commission timely filed its appeal challenging the CIT's BPI Denial Decision on March 7, 2024.

## STATEMENT OF THE ISSUE

The Commission appeals the CIT's BPI Denial Decision set out in *CVB, Inc. v. United States*, 681 F. Supp. 3d 1313 (Ct. Int'l Trade 2024). Appx048-066. Although the statute, 19 U.S.C. § 1516a(b)(2)(B), required the CIT to preserve the confidential status of BPI designated as such by the Commission, the court publicly disclosed BPI in its Merits Decision and denied the parties' joint motion to redact and accord confidential treatment to such information. The Commission submits that the issue raised in its appeal is:

> Whether the CIT abused its discretion in denying the parties' joint motion to redact information submitted to the Commission under a promise of confidentiality and determined by the Commission to constitute BPI in accordance with the governing statute and regulations.

## STATEMENT OF THE CASE

In March 2020, seven domestic mattress producers and two unions representing workers at domestic mattress facilities filed a countervailing duty petition covering mattresses from China and antidumping duty petitions covering mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. Appx80000-80001. In May 2021, the Commission issued unanimous affirmative final determinations that an industry in the United States was materially injured by reason of subject imports that the Department of Commerce

-3-

("Commerce") determined were subsidized and sold in the United States at less than fair value. Appx124045-124115.[1]

CVB, Inc. ("CVB") a U.S. importer of subject merchandise, appealed the Commission's final determinations to the CIT. In December 2023, the CIT issued its Merits Decision in which it sustained the Commission's determinations. Appx001-047. In its Merits Decision, however, the CIT did not bracket any of the designated BPI. In light of the clear statutory protection afforded to BPI in trade cases, the parties jointly filed a motion respectfully requesting that the CIT retract the public opinion and accord confidential treatment to the BPI. Appx618-672. In January 2024, the CIT issued its BPI Denial Decision in which it denied the parties' joint motion in all respects. Appx052-070.

CVB's appeal of the Merits decision (which was subsequently voluntarily dismissed) and the Commission's cross-appeal of the BPI Denial Decision followed.

---

[1] The public version of the Views and Report is contained in *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam,* Inv. Nos. 701-TA-645 and 731-TA-1495-1501 (Final), USITC Pub. 5191 (May 2021).

*CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

## STATEMENT OF THE FACTS

### I.    The Commission's Determinations

As discussed above, the Commission determined that an industry in the United States was materially injured by reason of imports of mattresses from the subject countries.

### A.    Domestic Like Product and Domestic Industry

The Commission defined a single domestic like product consisting of all mattresses within the scope of the investigations, and the domestic industry as all domestic producers of that product, except for two producers [ name ] and [ name ] that were excluded pursuant to the related parties provision because their primary interests were in importation rather than domestic production. Appx124047-124067.

The Commission observed that during the January 2017-September 2020 period of investigation ("POI"), the U.S. mattress market was comprised of a large variety of mattresses, including innerspring (made of a core of densely packed rows of metal springs), non-innerspring (comprised of a single slab or multiple layers of foam), and hybrid mattresses (made of metal springs and one or more layers of foam), with all three types of mattresses packaged and shipped as flat packed mattresses ("FPMs") and packaged in a box ("MiBs"). Appx124052, Appx124080. The Commission found that notwithstanding the various mattress

*CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

types, all mattresses consisted of the same basic components: (1) a core, which

provided the main support system of the mattress; (2) upholstery material

surrounding the core; and (3) ticking, or the cover/outermost layer of fabric

enclosing the core. Appx124051.

## B.    Conditions of Competition[2]

The Commission found several distinct conditions of competition for the

U.S. mattresses market. It found that demand for mattresses, which was tied to

housing sales and economic activity, increased over the POI. Appx124077-

124079. It observed that while consumption trends differed by mattress type,

overall apparent U.S. consumption increased by [ % ] percent from 2017 to 2019,

and was [ % ] percent higher in January to September 2020 ("interim 2020") than

in January to September 2019 ("interim 2019"). The Commission further noted

that notwithstanding declining consumption for FPMs, a majority of responding

domestic producers, importers, and purchasers reported that demand for FPMs was

stable or increasing. Appx124078. In addition, FPMs continued to account for a

---

[2] As required by section 771(7)(G)(i) of the Tariff Act, the Commission cumulated mattress imports from all subject countries after determining that mattress imports from each subject country were above the applicable three percent statutory negligibility threshold and the statutory criteria for cumulation were satisfied (*i.e.*, the petitions were filed on the same day and a reasonable overlap in competition existed between subject imports and the domestic like product). Appx124067-124073.

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

larger share of apparent U.S. consumption than MiBs throughout the POI.
Appx124078.

Regarding supply, the Commission found that domestic producers and U.S.
importers supplied all types of mattresses packaged as FPMs and MiBs during the
POI. Appx124079-124080, Appx124083. While importers had an economic
incentive to primarily import MiBs rather than FPMs due to their smaller size,
which minimized ocean freight, inland transportation, and warehousing costs,
domestic firms had production facilities located across 36 states allowing them to
operate on a "just-in-time" delivery model for their mattresses.[3] Appx124079-
124080, Appx124108-124109.

The Commission additionally noted a shift in subject import supply in 2019.
It observed that in 2017 and 2018, subject imports from China accounted for over
[ % ] percent of cumulated subject imports in the U.S. market. However, between
2018 and 2019, following imposition of duties on mattresses from China under
section 301 of the Trade Act of 1974 ("section 301 duties") in 2018 and
provisional measures in *Mattresses from China*, Inv. No. 731-TA-1424 (Final),
USITC Pub. 5000 (Dec. 2019) ("*Mattresses I*"), in 2019, subject imports from

---

[3] Most domestic industry shipments (83.7 percent) were produced to order
with an average lead time of five days and most importer shipments (95.2 percent)
were sold from inventory with a similar average lead time of five days.
Appx124087.

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

China declined precipitously while imports from the other subject countries increased [ ▮ % ] percent. Appx124081-124082. This occurred as many Chinese-owned mattress producers switched their production of U.S.-bound exports to facilities in Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. Appx124081-124082.

Next, the Commission found that domestically-produced mattresses and subject imports had a moderately high degree of substitutability. It observed that most responding U.S. producers, importers, and purchasers reported that domestic and subject mattresses were always or frequently interchangeable, and most responding purchasers also reported that mattresses from domestic and subject sources were comparable with respect to all 26 purchasing factors (including with respect to packaging types and ability to ship by common carrier). Appx124083. While noting that subject imports were more often shipped as MiBs and domestic mattresses more often shipped as FPMs, the Commission found that the domestic industry shipped substantial quantities of both MiBs and FPMs, and that there were substantial volumes of subject imports of FPMs. Appx124083. In addition, domestically-produced mattresses and subject imports were sold through the same channels of distribution, primarily to retailers, including brick-and-mortar, online, and omni-channel retailers, with substantial overlap between the top ten customers reported by responding domestic producers and importers. Appx124087-124088.

-8-

The Commission found that MiBs and FPMs competed with each other in the U.S. market. Appx124083-124086. As it observed, MiBs and FPMs were produced to the same general specifications, and were functionally interchangeable once unpackaged. Appx124083-124084. Sleep studies indicated that packaging was among the least important purchasing factors for consumers, and respondents conceded that consumers cross-shopped between MiBs and FPMs. Appx124084-124085. The behavior of retailers and wholesalers who purchased directly from producers or importers reflected this consumer indifference toward mattress packaging. Eleven of 19 responding purchasers, including many of the largest purchasers, reported purchasing or importing both MiBs and FPMs. Appx124085-124086. Further, retailers displayed MiBs and FPMs side-by-side without distinction, online retailers did not offer search filters for packaging type, and only two of 19 responding purchasers ranked packaging as one of the three most important purchasing factors for mattresses. Appx124085-124086.

The Commission further found that price was an important purchasing factor for mattresses. Responding purchasers ranked price as one of the three most important purchasing factors more than any other factor except quality, and price was among the most frequently cited factors as being very important, along with factors such as availability, quality, delivery time, and reliability of supply. Appx124086-124087. Four purchasers also reported that they usually or always

**CONFIDENTIAL BUSINESS INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

purchased the lowest priced mattresses, while 16 reported that they sometimes did.
Appx124086-124087.

### C.   Volume

The Commission next found that the volume and increase in volume of
cumulated subject imports were significant, both absolutely and relative to
apparent U.S. consumption.  Subject imports increased from 5.5 million units in
2017 to 7.0 million units in 2018 and 7.8 million units in 2019; their volume was
higher in interim 2020 at 7.4 million units than in interim 2019 at 5.3 million units.
Appx124090.  As subject imports increased by 40.6 percent over the full years of
the POI, they also increased their U.S. shipments and share of apparent U.S.
consumption from [ **%** ] percent in 2017 to [ **%** ] percent in 2019.
Appx124090.  The Commission noted that the domestic industry's POI loss in
market share ([ **%** ] percentage points) was nearly equivalent to the gain in market
share by subject imports ([ **%** ] percentage points).  Appx124090.  Similarly, a
comparison of market share during the 2019 and 2020 interim periods showed that
subject imports gained [ **%** ] percentage points while the domestic industry lost
[ **%** ] percentage points.  Appx124090.

### D.   Price Effects

The Commission found that subject imports also had significant price
effects.  Examining the pricing data for eight mattress products, subject imports

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

undersold the domestic like product in [ # ] of [ # ] quarterly comparisons, or in [ % ] percent of comparisons, at margins averaging [ % ] percent.[4] The quarters with underselling accounted for [ % ] percent of the reported volume of subject imports in the pricing data. Appx124092. The Commission also collected purchase cost data for the same pricing product definitions, and these data similarly indicated that subject imports had a lower price-cost differential in [ # ] of [ # ] quarterly comparisons involving [ % ] percent of subject import units in these data, and at price-cost differentials averaging [ % ] percent.[5] Appx124092-124094.

Reiterating the moderately high substitutability between subject imports and the domestic like product and the importance of price in purchasing decisions, the Commission observed that seven purchasers reported that subject imports were lower priced than the domestic like product, and further that responding purchasers had reduced their share of purchases of the domestic like product by [ % ] percentage points while increasing their share of purchases of subject mattresses by

---

[4] The pricing products were comprised of three mattress products shipped as MiBs, four mattress products shipped as FPMs, and one mattress product that did not specify packaging. Appx124091-124092.

[5] The Commission uses the term "price data" to refer to U.S. importers' and domestic producers' sales price for shipments to unrelated customers and the term "purchase cost data" to refer to the landed duty-paid ("LDP") value of imports made by U.S. importers for their internal consumption or retail sale. *See DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2021).

CONFIDENTIAL BUSINESS INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

[ % ] percentage points between 2017 and 2019. Appx124094 (n.225). While

acknowledging that few responding purchasers confirmed switching purchases

from the domestic product to subject imports because of price, the Commission

explained that the questionnaire evidence nonetheless indicated that purchasers at

the wholesale/retail level as well as consumers found price to be an important

factor, that purchasers had shifted purchases from the domestic industry to subject

imports during the POI, and that the pricing data showed subject imports to be

lower-priced. Appx124094-124095. Based on the foregoing, the Commission

found that subject imports significantly undersold the domestic like product and

that this significant underselling contributed to subject imports gaining sales and

market share at the domestic industry's expense. Appx124094-124095.

The Commission further found that the significant and growing quantity of

low-priced subject imports depressed prices to a significant degree.[6] It noted that

for six of the eight pricing production definitions, domestic producers' prices

declined between the first and last quarters of the POI. These price declines

occurred as apparent U.S. consumption increased, nonsubject imports' share of that

consumption declined, and the domestic industry's production costs increased.

Appx124095. The Commission considered arguments that factors other than

---

[6] The Commission also considered whether subject imports had suppressed
prices for the domestic like product to a significant degree, but ultimately did not
reach a conclusion on this issue. Appx124098 (n.238).

-12-

subject imports explained domestic price declines, including declining demand for FPMs. It found this argument was inconsistent with domestic price increases for two of the four FPM pricing products and questionnaire responses indicating that purchasers did not perceive demand for FPMs to be declining. Appx124096-124097.

The Commission concluded that because cumulated subject imports significantly undersold the domestic like product leading to lost sales and significant price depression, subject imports had significant adverse price effects. Appx124098.

### E.    Impact

Finally, the Commission found that cumulated subject imports had a significant impact on the domestic industry. Appx124099-124107. Despite strong and growing demand in the U.S. market between 2017 and 2019, the domestic industry experienced declining capacity, production, capacity utilization, employment, and U.S. shipments. As significantly increasing volumes of subject imports undersold the domestic product and depressed domestic prices to a significant degree, the domestic industry experienced stagnant net sales, revenues, and gross profits, as well as declining operating income and net income. Appx124105-124106. Notwithstanding some improvement in the domestic industry's performance in 2019, its performance remained below that of 2017, and

-13-

increases in performance factors in interim 2020 compared to interim 2019 were less than would be expected during a period of strong demand growth and imposition of the *Mattresses I* antidumping duty order on mattresses from China in December 2019. Appx124106-124107. As the domestic industry continued to lose market share to subject imports, the industry's production and U.S. shipments were flat in interim 2020 compared with interim 2019, while its capacity utilization rate and employment were lower. Appx124107.

The Commission considered respondents' market segmentation arguments, including their claim that the Commission should focus its impact analysis on domestic producers of MiBs, which allegedly competed more directly with subject imports than domestic producers of FPMs. The Commission referred again to the evidence showing that MiBs were interchangeable and competed with FPMs in the U.S. market. Appx124107-124108. The Commission found that given the importance of price to purchasers, purchasers were encouraged to purchase subject imports due to their significantly lower prices instead of domestically-produced FPMs and MiBs. Appx124110-124111.

Although the Commission properly conducted an analysis of the impact of subject imports on the domestic industry as a whole, the Commission nevertheless also considered the impact of subject imports on domestic producers that exclusively produced MiBs. As the Commission found, the domestic MiB

-14-

producers' capacity utilization remained low over the POI, despite the industry's substantial investments in MiB capacity and increasing apparent U.S. consumption. Moreover, subject imports depressed domestic MiB prices to a significant degree. Thus, the Commission found that the performance of domestic MiB producers would have been stronger, with greater sales revenues and operating and net income than they achieved during the POI, but for subject import competition. Appx124111-124114.

In addition to allegations of market segmentation between MiBs and FPMs, the Commission considered the effects of demand trends, nonsubject imports, and raw material shortages on the domestic industry so as not to attribute injury from these other factors to the subject imports, but it found that none of these other alleged factors explained declines in the domestic industry's performance during the POI. Appx124112-124113 (n.308), Appx124114 -124115.

Based on all of the foregoing, the Commission determined that an industry in the United States was materially injured by reason of subject mattresses. Appx124115.

## II.    U.S. Court of International Trade Decisions

### A.    The CIT's Merits Decision

In June 2021, CVB filed its appeal to the CIT. Appx082. On December 19, 2023, the CIT issued its decision, in which it sustained the Commission's

affirmative material injury determinations. Appx001-047. In doing so, the court opined that the Commission made certain errors in its findings regarding market segmentation, but ultimately held that such errors were harmless. Appx001-042.

Specifically, the CIT, embarking on what amounted to its own fact-finding exercise, held that, contrary to the Commission's findings, the record showed that producers and purchasers were specialized in their production and purchases of MiBs and FPMs, respectively. The court dismissed the Commission's analysis as "mathematical obfuscation and statistical chicanery to make the mattress industry appear less segmented than it is." Appx024. The CIT held that the Commission erred by treating two pairs of companies that merged during the POI as two single companies that produced both MiBs and FPMs, rather than as four companies that each specialized in one or the other. The CIT further assumed that the Commission intentionally omitted information that many of the companies producing both mattress types produced more of one kind than the other. Appx024-030. According to the CIT, the Commission also failed to provide "important context" concerning its findings as to the minimal relevance of packaging in purchasers' decision, and sought to make purchasers seem less specialized than they were by not informing that almost all of the eleven purchasers of both MiBs and FPMs purchased more of one packaging type than the other. Appx030-035.

-16-

The CIT ultimately ruled, however, that the Commission's "errors" were harmless. Appx035-042. The court held that the Commission's Views provided a substantially supported analysis addressing the harm caused by subject imports to the segment of the domestic industry producing MiBs. The court thus sustained the Commission's alternative finding that domestic MiB producers would have improved their performance even more but for the subject imports displacing domestic industry shipments and depressing domestic prices to a significant degree. The CIT noted, in particular, that domestic MiB producers had excess production capacity at a time when the market for boxed mattresses grew. Appx038. Based on the Commission's discussion of the impact of subject imports on domestic producers of MiBs, the court affirmed the Commission's determination that the domestic industry was materially injured by reason of subject imports. Appx042. In doing so, the CIT further held that, as CVB itself acknowledged, the Commission was not required to conduct a market segmentation analysis. Appx042-045.

**B.    The CIT's BPI Denial Decision**

On December 19, 2023, the same day the CIT issued its Merits Decision, the

Commission contacted the court's case manager to alert that the opinion contained

extensive unredacted BPI.  The case manager, however, responded that in the

court's view, the opinion did not contain BPI and that the opinion would "remain

posted as-is."  Appx554-555.

The next day, on December 20, 2023, the Commission, with agreement from

the other parties, filed a letter with the CIT requesting that it temporarily retract the

public opinion to allow the parties the opportunity to confer and submit comments

regarding the BPI.  Appx557-558.  Instead of addressing the request, the CIT

issued a paperless order directing the parties to file a motion.  Appx092.

On December 22, 2023, the parties jointly filed a motion specifically

identifying the BPI contained in the Merits Decision and requesting that the court

accord confidential treatment to such information.  Appx559-613.  As the motion

detailed, the BPI at issue generally fell into two categories: (1) sensitive

information from individual producer and purchaser questionnaire responses that

had been submitted to, and treated by the Commission, as confidential; and (2)

subject import volume and market share information, calculated from

questionnaire response information, which was similarly treated as confidential.

Appx559-613.

-18-

On January 8, 2024, the court issued its BPI Denial Decision. Appx048-066. While recognizing that 19 U.S.C. § 1677f(b) governs the Commission's treatment of BPI, the CIT held that information from individual producer and purchaser questionnaire responses were instead public because the questionnaire responses had not been individually bracketed as required by Ct. Int'l Trade Rule 5(g).[7] Notwithstanding that each page of the questionnaire responses contained a "Business Proprietary" stamp and the questionnaire responses were filed with the court under seal as part of the confidential joint appendix, the CIT reasoned that the absence of bracketing for each individual piece of information meant that "any claim to confidentiality was waived long ago." Appx053-054. With respect to subject import volume and market share information, the court held that despite being identified by the Commission as BPI and accordingly bracketed by the Commission and the parties in their brief and other submissions, the information was nonetheless available in public sources and therefore failed to qualify as BPI. The court further held that, in any event, it had "couche{d} its language" through use of words like "roughly," "about," and "at least," such that its references to the

---

[7] Court of Int'l Trade Rule 5(g), which pertains to the serving and filing of pleadings and other papers, states that "{a}ny paper containing confidential or business proprietary information must identify that information by enclosing it in brackets."

bracketed data did not reveal the exact nature of the information.  Appx058-062.
The court thus denied the parties' joint motion in all respects.

## SUMMARY OF THE ARGUMENT

Although this Court should affirm the CIT's Merits Decision, it should
modify the final judgment for the limited purpose of reversing the CIT's BPI
Denial Decision.  During the administrative proceedings, the Commission properly
acted within its statutory and regulatory authority to assure that questionnaire
response information and other sensitive information identifiable to individual
firms would be treated as BPI.  The CIT's disclosure of such information based
upon its stance that the questionnaire responses were not individually bracketed as
required under the court's rules or that similar information was, in the court's view,
publicly available, cannot be squared with the mandatory language of the statute
requiring the court to preserve the confidential status of that information.  19
U.S.C. § 1516a(b)(2)(B).

## ARGUMENT

### I.     Standard of Review

This Court reviews the lower court's refusal to seal or redact for abuse of

discretion. *See, e.g.*, *Depuy Synthes Prods., Inc. v. Veterinary Orthopedic Implant,*

*Inc.*, 990 F.3d 1364, 1369 (Fed. Cir. 2021). A lower court abuses its discretion if its

decision rests on a legal error or a clearly erroneous finding of fact. *See id.* (citing

*Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010)). The

question of whether the lower court applied the correct legal standard is a question

of law reviewed *de novo. See, e.g., Marubeni Am. Corp. v. United State*s, 35 F.3d

530, 534 (Fed. Cir. 1994).

To determine whether the information at issue should have been treated as

BPI, the Court must consider the applicable statutory provisions. "{C}ourts use

every tool at their disposal to determine the best reading of the statute and resolve

{any} ambiguity." *Loper Bright Enters v. Raimondo*, 603 U.S. ___, ___, 144 S. Ct.

2244, 2266 (June 28, 2024). Beyond the statute's text, the tools of statutory

construction to ascertain Congress's purpose and intent include the statute's

legislative history, the statute's structure, and the canons of statutory construction.

*Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). Furthermore,

the Supreme Court continues to recognize that courts should be informed by

agencies' expertise, interpretation and experience with statutes that Congress

-21-

entrusted them to administer. *Loper Bright*, 603 U.S. at ___, 144 S. Ct. at 2263, 2267 (citing, *e.g.*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).

## II.     This Court Should Reverse the CIT's BPI Denial Decision

The CIT's Merits Decision publicly disclosed sensitive proprietary information that the Commission properly, and consistent with its statutory and regulatory obligations, treated as BPI throughout its administrative proceedings. The BPI at issue generally falls into two categories: (1) confidential questionnaire response information regarding individual U.S. producers' production operations and U.S. purchaser names; and (2) subject import volume and market share information, calculated using questionnaire response data. Appx559-613. In the proceedings before the CIT, the parties agreed that the information at issue was BPI and treated the information as such in their CIT submissions. Concerned at what they initially believed to be an oversight by the lower court, the parties jointly filed a motion identifying and requesting confidential treatment for the specific BPI discussed in the court's Merits Decision. The CIT abused its discretion in denying the parties' joint request.[8]

---

[8] Further exacerbating its error, the CIT subsequently relied upon its BPI Denial Decision to order counsel for the Commission and other counsel to appear before it in another case, *OCP S.A. v. United States*, to address the propriety of Rule 11 sanctions for what the court opined was the Commission's possible "fail{ure} to heed CVB's warning" on "the law's expectations regarding redaction of allegedly confidential information" in the remand determinations and remand

-22-

### A.   The Statute Requires the CIT to Preserve the Confidential Status of Information Treated as BPI by the Commission

Congress established a comprehensive statutory scheme regarding the collection and protection of BPI.  This scheme directs the Commission to protect BPI submitted to it during the course of its investigations and additionally requires the CIT to maintain the confidential status of BPI designated as such by the Commission in any ensuing action before the court.

Addressing the Commission's obligations, section 777f(b)(1)(A) unambiguously provides in pertinent part that:

> Except as provided in subsection (a)(4)(A) and subsection (c), information submitted to the administering authority or the Commission which is designated as proprietary by the person submitting the information ***shall not be disclosed*** to any person without the consent of the person submitting the information. . . .

19 U.S.C § 1677f(b)(1)(A) (emphasis added).  In other words, the Commission is prohibited from disclosing information designated as BPI by the submitter, except under the three following circumstances specified by the statute: (1) information that "is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person," 19 U.S.C. § 1677f(a)(4)(A); (2) it is disclosed to interested parties who are parties to a proceeding under a protective

---

record filed in that case.  Consol. No. 21-219, Order at 5 (Ct. Int'l Trade Feb. 29, 2024) (ECF 158).

order, 19 U.S.C. § 1677f(c)(1); or (3) the Commission receives consent of the person submitting the information.[9]

In protecting information designated as proprietary by submitters in the first instance, the statute further provides submitters the right to have the submitted information returned rather than disclosed to the public if the Commission determines that the request for proprietary treatment is unwarranted:

> If . . . the Commission determines, on the basis of the nature and extent of the information or its availability from public sources, that designation of any information as proprietary is unwarranted, then it shall notify the person who submitted it and ask for an explanation of the reasons for the designation. Unless that person persuades the administering authority or the Commission that the designation is warranted, or withdraws the designation, the administering authority or the Commission, as the case may be, shall return it to the party submitting it. In a case in which the administering authority or the Commission returns the information to the person submitting it, the person may thereafter submit other material concerning the subject matter of the returned information if the submission is made within the time otherwise provided for submitting such material.

19 U.S.C. § 1677f(b)(2).

---

[9] Congress acknowledged that "the bulk of the information collected by the ITC and on which it bases its decisions consists of confidential business information submitted by domestic producers, importers, and purchasers," and that the "best insurance that the ITC will be able to obtain the information it needs for its investigations is its reputation for strictly maintaining the confidentiality of information submitted to it." S. Rep. No. 100-71 at 112, 114 (June 12, 1987).

Congress established this framework to provide protection to information submitted by all sources, many of whom are not parties to the proceeding. But recognizing the due process rights of parties appearing before the Commission, the statute balanced these competing interests for disclosure and protection by providing for disclosure under a protective order:

> (A) In general
>
> Upon receipt of an application (before or after receipt of the information requested) which describes in general terms the information requested and sets forth the reasons for the request, the administering authority or the Commission shall make all business proprietary information presented to, or obtained by it, during a proceeding (except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure) available to interested parties who are parties to the proceeding under a protective order described in subparagraph (B), regardless of when the information is submitted during a proceeding....
>
> *     *     *
>
> (B) Protective order
>
> The protective order under which information is made available shall contain such requirements as the administering authority or the Commission may determine by regulation to be appropriate. The administering authority and the Commission shall provide by regulation for such sanctions as the administering authority and the Commission determine to be appropriate, including disbarment from practice before the agency.

19 U.S.C. § 1677f(c)(1)(A)-(B); *see also Kemira Fibres Oy v. United States*, 858
F. Supp. 229, 234 (Ct. Int'l Trade 1994) (the balance between Commerce's
investigatory needs and a party's need for confidentiality is achieved through
proprietary information safeguards under, *inter alia*, 1677f(c)).[10]

Importantly, the statute extends the robust protection afforded to BPI in the
Commission's proceedings to actions before the CIT.  Specifically, 19 U.S.C.
§ 1516a(b)(2)(B) requires that:

> The confidential or privileged status accorded to any
> documents, comments, or information shall be preserved
> in any action under this section.  Notwithstanding the
> preceding sentence, the court may examine, in camera, the
> confidential or privileged material, and may disclose such
> material under such terms and conditions as it may order.

Thus, the court on appeal must treat as confidential all information that was treated
as confidential in the proceedings before the Commission, unless the submitter
consents to its disclosure.  While the second sentence of the statute allows
disclosure of information under such "terms" and "conditions" as the court may
order, Congress intended that such "terms" and "conditions" are those relating to a

---

[10] Congress recognized the Commission's "legitimate concern that the
availability under protective order of domestic firms' closely guarded financial
information may have a 'chilling effect' on the willingness of some firms to supply
information voluntarily," and therefore authorized the use of "strong sanctions,"
including disbarment or suspension from practice before the Commission, against
any person found in violation of the protective order. S. Rep. No. 100-71 at 113-
14.

protective order.  S. Rep. No. 96-249 at 248 (July 17, 1979) ("Special provision would be made in subsection (b)(2)(B) for preserving the confidential or privileged status of any materials contained in this record, including, where the court determines it would be appropriate, the disclosure of the privileged or confidential material *only* under the terms of a protective order.") (emphasis added).

Consistent with this congressional intent, this Court and the CIT have applied the second sentence of 19 U.S.C. § 1516a(b)(2)(B) as a way to control access to confidential information by parties to the proceedings and within the confines of a protective order.  *See, e.g., U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984) (determining whether the CIT erred in denying in-house counsel access to confidential information under a protective order); *Am. Brass v. United States*, 699 F. Supp. 934 (Ct. Int'l Trade 1988) (deciding whether plaintiffs were entitled to access to certain proprietary information under a proper protective order); *Jernberg Forgings Co. v. United States*, 598 F. Supp. 390 (Ct. Int'l Trade 1984) (deciding plaintiffs' motion for discovery of confidential information under a judicial protective order).  Importantly, although the court may disclose BPI under such terms and conditions as it may order, such disclosure would still preserve the proprietary status of the information.

It is within this statutory framework that the Commission promulgated rules defining the information that constitutes confidential business information and

-27-

concerning the submission and protection of such information.[11]  In particular,

Commission Rule 201.6(a) defines the information that constitutes confidential

BPI.  First, the information must be:

> {I}nformation which concerns or relates to the trade
> secrets, processes, operations, style of works, or apparatus,
> or to the production, sales, shipments, purchases, transfers,
> identification of customers, inventories, or amount or
> source of any income, profits, losses or expenditures of
> any person, firm, partnership, corporation, or other
> organization, or other information of commercial
> value. . . .

19 C.F.R. § 201.6(a).  Second the disclosure of such information must be:

> {L}ikely to have the effect of either (1) "impairing the
> Commission's ability to obtain such information as is
> necessary to perform its statutory functions," or (2)
> "causing substantial harm to the competitive position of
> the person, firm, partnership, corporation, or other
> organization from which the information was obtained,"
> unless the Commission is required by law to disclose such
> information.

*Id.*  Commission Rule 201.6(g) also provides that in the event that any business

information submitted to the Commission is not entitled to confidential treatment,

the submitter is permitted to withdraw the submitted information within five days

of the denial of confidential treatment, unless the information is the subject of a

---

[11] Congress granted the Commission "broad authority to frame such regulations as are necessary to ensure maximum possible access to information without impeding the ITC's ability to complete its investigations within the tight time limits for investigation provided by statute."  S. Rep. No. 100-71 at 113.

Freedom of Information Act ("FOIA") request, or judicial discovery proceedings.[12]

19 C.F.R. § 201.6(g). In addition, Commission Rule 207.7 provides for the limited

disclosure of BPI to authorized applicants under an administrative protective order.

19 C.F.R. § 207.7.

### B. The Commission Properly Treated Questionnaire Response Information as BPI Throughout Its Administrative Proceedings

The Commission properly treated information from questionnaire responses

as BPI, and the CIT was statutorily required to preserve the confidential status of

that information. 19 U.S.C. § 1516a(b)(2)(B).

#### 1. Individual Information from Company-Specific Questionnaire Responses

The information contained in questionnaire responses submitted by domestic

producers, U.S. importers, foreign producers, and purchasers in the underlying

investigations met the statute's definition of non-disclosable BPI, *i.e.*, data

"designated as proprietary by the person submitting the information" that can be

"associated with, or otherwise be used to identify, operations of a particular

person." 19 U.S.C. § 1677f(a)(4)(A)-(B). Indeed, each page of the questionnaire

responses was stamped as containing "business proprietary" information.

Moreover, the responses were individual in nature as they were firm-specific and

---

[12] It is only if the information in question is not withdrawn in the five day
period, that it may be treated as public information. 19 C.F.R. § 201.6(g).

contained granular and detailed data spanning several years with respect to a firm's "processes, operations, style of works, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, or amount or source of any income, profits, losses, or expenditures." 19 C.F.R. § 201.6(a); *see, e.g.*, Appx89656-89699.

In addition to falling within the delineated category of non-disclosable BPI, the questionnaire response data also satisfied the needs addressed by Commission Rule 201.6(a) to protect information, the disclosure of which was likely to have the effect of "impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained." 19 C.F.R. § 201.6(a).

As this Court has recognized, the submission of sensitive company-specific data through questionnaires is an integral part of the Commission's investigative process, *see Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986), and the Commission has historically treated questionnaire information as BPI. In turn, the trade bar has understood and developed expectations, which they have relayed to their clients, about the strict protections that the Commission will

afford to such information.[13]  In these investigations, 53 domestic producers, 49

U.S. importers, 16 foreign producers, and 22 purchasers, many of which were not

parties to the investigations, voluntarily submitted questionnaire responses.

Appx124046, Appx124094.  In doing so, the responding firms certified to allowing

disclosure of the information requested *only* to authorized applicants under the

protective order.  *See, e.g.*, Appx89475, Appx89478.

Disclosure of questionnaire response information, which was submitted by

firms under the expectation that their information would be kept confidential,

therefore raises legitimate concerns that information could fall into a competitor's

hands.  Indeed, the questionnaire responses contained substantial amounts of

sensitive data with respect to the specific product being investigated.  The

disclosure of such sensitive information therefore "undoubtedly ha{s} a chilling

effect on the parties' willingness to provide the confidential information essential

to the Commission's fact finding processes."  *Akzo N.V.*, 808 F.2d at 1483.[14]

---

[13] Firms are entitled to rely on the reasonable expectation of consistent proprietary treatment.  *See Qwest Commc's Int'l Inc. v. FCC*, 229 F.3d 1172, 1184 (D.C. Cir. 2000) (in submitting certain data, the company "was entitled to rely on the {FCC}'s announced policy and precedent on how it would handle confidential audit information" and "similarly entitled to assurances that the unprecedented disclosures would be consistent with the standards that the {FCC} has set for itself").

[14] Congress also recognized the "burden imposed on the ITC by the strict investigatory deadlines, particularly in preliminary 45-day investigations," and that the "best insurance that the ITC will be able to obtain the information it needs for

Disclosure of questionnaire responses also has the likely effect of causing substantial harm to the competitive position of the firms involved. This Court discussed the potential dangers in revealing confidential material, stating that "{o}bviously, where confidential material is disclosed to . . . a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased." *Id.*; *see also Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce*, 11 CIT 238, 243 (1987) (recognizing the irreparable harm that could come from the inadvertent or advertent use of confidential information, stating that "caution must be, and is, the guidepost in dealing both with sensitive information and the sensitivities of those who obtain access to it"). Consequently, this Court had endorsed the Commission's conservative position in the "optimum shielding of business information." *Akzo*, 808 F.2d at 1483.

In light of the foregoing, the Commission properly treated the information contained in the questionnaire responses as BPI.

### 2. Aggregate Information Calculated from Questionnaire Response Data

Likewise, the Commission properly treated subject import volume and market share information, calculated using the confidential import and U.S. shipment data reported by U.S. producers and U.S. importers in their questionnaire

---

its investigations is its reputation for strictly maintaining the confidentiality of information submitted to it." S. Rep. No. 100-71 at 113-14.

responses, as BPI and appropriately bracketed such information in its Views and Staff Report. Appx124079, Appx124081-124082, Appx124228-124229, Appx124259-124260.

As discussed above, the statute prohibits the Commission from disclosing information designated as BPI by the submitter, except if it "is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person," 19 U.S.C. § 1677f(a)(4). To minimize risk of inadvertent disclosure of BPI of a particular firm, the Commission not only treats individual questionnaire response information as BPI, but it also follows its longstanding policies regarding data aggregated from information provided in the questionnaire responses. These policies are set forth in the Commission's publicly available handbooks, *Antidumping and Countervailing Duty Handbook*, USITC Pub. 4540 (14th ed. June 2015) ("AD/CVD Handbook") and *An Introduction to Administrative Protective Order Practice in Import Injury Investigations*, USITC Pub. 5280 (6th ed. Jan. 2022) ("APO Handbook").[15]

Page 13 of the Commission's APO Handbook states:

> The Commission has established criteria as to when it will treat as proprietary aggregate business information – that is, information that pertains collectively to more than one company. Aggregate business information pertaining to

---

[15] The AD/CVD Handbook and APO Handbook are available on the Commission's website at: www.usitc.gov/trade_remedy/documents/handbook.pdf and www.usitc.gov/publications/701_731/pub5280.pdf.

-33-

> fewer than three companies generally is treated as proprietary. Information pertaining to three or more companies generally is treated as publishable, unless two companies account for more than 90 percent of the data, or unless one company accounts for more than 75 percent of the data.

The Commission provides the same guidance on page II-26 of its AD/CVD Handbook. The rationale for this practice is straightforward. For data derived from the information of two firms, each of those firms would be able to back out its own information from the total shown, thereby revealing the confidential information held by their sole competitor. For information involving three or more firms, one of which is individually dominant (accounting for more than 75 percent of the data) or two of which are jointly dominant (accounting for more than 90 percent of the data), revealing the total data would enable a firm to back out its own data and deduce close estimates of commercial information about competitors.

The Commission consistently applies these guidelines across all investigations, and it did so in these underlying investigations. For at least one time period in the series of data collected, a dominant U.S. importer accounted for over 90 percent of mattress imports from nonsubject countries and several subject countries, including China. *See, e.g.*, Appx124224-124230. While the Commission publicly disclosed the total volume of cumulated subject imports, it bracketed information with respect to the volume of subject imports from China, subject imports from each of the other subject countries, and nonsubject imports.

-34-

Doing otherwise would have allowed the dominant importer of each of those datasets to back out its data and deduce information regarding its competitors. Appx124081-124082, Appx124228-124229.

For the same reasons, the Commission bracketed market share information. Appx124079, Appx124259-124260. In particular, the Commission bracketed market shares of nonsubject imports because, as noted above, one dominant importer accounted for over 90 percent of nonsubject imports. As a consequence, the Commission also had to bracket market shares of subject imports and the domestic industry because that information, had they been public, could have been subtracted from total apparent U.S. consumption to arrive at nonsubject import market shares.

### C. The CIT Was Statutorily Required to Preserve the Confidential Status of the Information at Issue

The CIT was statutorily required to preserve the confidential status of the questionnaire response information treated as BPI by the Commission. 19 U.S.C. § 1516a(b)(2)(B). In holding otherwise, the CIT erred in three ways: (1) the court relied upon the common law right of public access to judicial records rather than the clear statutory language requiring the court to preserve the confidential status of information treated as BPI by the Commission during its proceedings; (2) the court incorrectly held that because the questionnaire responses were not individually bracketed in accordance with Ct. Int'l Trade Rule 5(g), the claim to

-35-

confidentiality was waived; and (3) the court incorrectly held that bracketed information regarding subject import volume and market shares were available from public sources and did not qualify as BPI. Appx048-066.

### 1. The Statute, and Not the Common Law Right of Public Access, Determines Whether Information Should or Should Not Be Disclosed

In guiding its consideration of the joint parties' request for confidential treatment of BPI, the CIT erroneously applied the common law right of public access to judicial records articulated in *Binh Hoa Le v. Exeter Finance Corp.*, 990 F.3d 410, 417 (5th Cir. 2021). *See* Appx050-052 ("Even when the parties agree to secrecy, courts are 'duty-bound to protect public access to judicial proceedings and records.'") (quoting *Binh Hoa*).

The CIT's reliance upon *Binh Hoa*, however, is misplaced. *Binh Hoa* involved a protective order under which private parties to a breach of contract action labeled documents as confidential for "no discernable reason other than both parties wanted it that way." 990 F.3d at 417. Criticizing the district court's agreement to the parties' requested protective order, the U.S. Court of Appeals for the Fifth Circuit discussed the right of public access to judicial proceedings. That court particularly admonished the parties' failure to cite any authority for sealing the documents. *See id.* at 420. In stark contrast to the protective order in *Binh Hoa*, the administrative protective order at issue in these investigations was

-36-

implemented pursuant to clear statutory authority. As discussed, Congress developed a comprehensive scheme balancing protection of BPI with meaningful access to parties appearing before the Commission only through a protective order.

Although, as noted by the CIT, transparency is certainly an important touchstone of our judicial system, Congress clearly intended to foreclose public disclosure of information properly treated as BPI during the Commission's administrative proceedings, unless such protections are waived by the submitters of that information. Indeed, beyond the statute's provisions, the relevant legislative history regarding the release of BPI in antidumping and countervailing duty investigations underscores Congress's intent to shield BPI from disclosure except to parties under a protective order.

Congress first allowed for the release of confidential information in trade remedy investigations under a protective order in 1979. In doing so, however, the statute's language contemplated that BPI would generally not be released. Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144, 187 ("1979 Act") ("Except as provided {herein}, information submitted to . . . the Commission which is designated as confidential by the person submitting it shall not be disclosed to any other person . . . without the consent of the person submitting it."). Congress provided for only limited and discretionary release of confidential information under the protective order, stating:

-37-

> Upon receipt of an application, which describes with particularity the information requested and sets forth the reasons for the request, the administering authority and the Commission may make confidential information submitted by another other party to the investigation available under a protective order . . . .

*Id.* at 188 (codified in then-section 1677e(c)(1)(A)). In 1988, Congress, recognizing the difficulties that the failure to release confidential information created for parties to the ITC's investigation, amended this provision to broaden disclosure, but hinged on the guarantee that confidential information could only be disclosed under the cover a protective order. S. Rep. No. 100-71 at 111-112 (June 12, 1987); *see also* H. Rep. No. 100-576 at 622-623 (Apr. 20, 1988). These amendments continue to form the basis of present law, as set forth in 19 U.S.C. § 1677f. *See* Omnibus Trade and Competitiveness Act of 1988, § 1332(2), Pub. L. No. 100-418, 102 Stat. 1107, 1207-09 (1988).

Additionally, Congress intended that protection of BPI under the protective order would extend to proceedings before the court. 19 U.S.C. § 1516a(b)(2)(B) ("The confidential or privileged status accorded to any documents, comments, or information shall be preserved in any action under this section."); *see also United States v. Texas*, 507 U.S. 529, 534 (1993) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.") (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). As the CIT

-38-

explained in *A. Hirsh, Inc. v. United States*, 657 F. Supp. 1297 (Ct. Int'l Trade

1987), "Congress included in the Trade Agreements Act of 1979 . . . a '{s}pecial

provision . . . for preserving the confidential or privileged status of any materials

contained in th{e} record'" to guard against the irreparable harm caused by a

competitor obtaining an unfair business advantage through use of confidential

information during the judicial review process. *Id.* at 1300 (quoting S. Rep. No.

96-249 at 248).

Thus, "{c}onsistent with congressional concern over confidentiality, caution

is the necessary approach when ordering disclosure." *Id.* at 1300 (citing, *inter alia*,

*Akzo*, 808 F.2d at 1483 and *U.S. Steel*, 730 F.2d at 1467).  This is especially so

where the due process rights of parties to the investigation are fully addressed by

allowing their counsel to have access to all BPI under a protective order.  As one

district court noted in denying access to such BPI to a private plaintiff:

> The Department {of Commerce} and the U.S.
> International Trade Commission rely heavily on
> proprietary information submitted by both U.S. and
> foreign parties in order to conduct their antidumping duty
> investigations. Permitting private plaintiffs access to
> proprietary information and documents submitted during
> the course of those agencies' antidumping proceedings
> would create a powerful disincentive for those parties to
> provide the agencies with submitted proprietary
> information in future antidumping investigations.

*Wiener v. NEC Elecs., Inc.*, 848 F. Supp. 124, 127 (N.D. Cal. 1994) (citing

*Monsanto Indus. Chems. Co. v. United States*, 6 CIT 241, 243 (1983) ("Release of

such requested sensitive confidential documents . . . without compelling reasons surely dampens the propensity of foreign producers to divulge confidential information in future trade cases.")); *see also Monsanto Co. v. United States*, 698 F. Supp. 285, 289 (Ct. Int'l Trade 1988) (holding that "{t}here is no absolute right to a public version of questionnaire responses containing ranged numerical data for all items of information"); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 1978 WL 1333, at *3 (E.D. Pa. 1978) (rejecting private plaintiffs' request for access to confidential documents submitted by a non-party to the Commission during the Commission's antidumping investigation).

The CIT's additional reliance upon *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), as support for its BPI Denial Decision is also misplaced.[16] Appx051. These cases analyzed the protection of certain classes of information under different statutes instead of the applicable statutory scheme for trade investigations. *Food Marketing*, 588 U.S. at 430, 434-35 (addressing "commercial or financial

---

[16] The CIT also cites to *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 595 (1980), and *Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992), but those cases are not pertinent. *See* Appx062, Appx065. *Richmond Newspaper* involved defendant's request that his criminal trial for murder be closed to the public and *Krynicki* addressed the parties' request that the whole appeal – briefs, record, and oral argument – be sealed. The parties here never made any such request. Rather, their request for confidential treatment was narrowly tailored and focused only on BPI covered by the statute.

information" under FOIA); *Ruckelshaus*, 467 U.S. at 1010-13 (addressing "trade secret" under the Federal Insecticide, Fungicide, and Rodenticide Act).  In any event, *Food Marketing* supports an opposite proposition to disclosure here, holding that the class of business or commercial information entitled to statutory protection should not be construed narrowly.  Indeed, in that case, the Supreme Court rejected appellant's arguments that the "commercial or financial information" language contained in exemption 4 to FOIA should be interpreted as requiring a showing that release of information would lead to substantial competitive harm.  *See Food Marketing*, 588 U.S. at 439.  The Supreme Court held that the statute nowhere added such a limitation and  "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."  *Id.* at 439-440.  Reversing the judgment of the court of appeals, the Supreme Court ultimately held that certain data from individual grocery retailers constituted "confidential" commercial information exempt from disclosure.  *Id.*

### 2.    The Claim to Confidentiality Was Never Waived

In addition to being improperly guided by the common law right of public access to judicial records to justify its disclosure of the BPI at issue, the CIT erroneously held that the "claim to confidentiality" for producer and purchaser

-41-

questionnaire responses was waived because the questionnaire responses, which were filed with the CIT under seal as part of the confidential joint appendix, were not individually bracketed pursuant to Ct. Int'l Trade Rule 5(g). Appx053-057.

The statute makes clear that waiver occurs only when submitters of the BPI consent to the information's disclosure. 19 U.S.C § 1677f(b)(1). Here, notwithstanding that the questionnaire responses were not individually bracketed, none of the submitters of the BPI at issue ever waived their claim to the information's confidentiality. To the contrary, and pursuant to the Commission's customary and longstanding treatment of questionnaire responses as BPI, U.S. producers, importers, purchasers, and foreign producers submitted their responses in confidence, with the expectation that their information would be kept private. As previously noted, each page of the questionnaire contains a "Business Proprietary" stamp and each responding firm certified to the disclosure of BPI contained within a questionnaire response only to authorized individuals. *See, e.g.*, Appx89656-89699. Additionally the questionnaire responses were filed under seal with the CIT as part of the confidential joint appendix. Appx560.

The CIT reasons that "{s}ome of the information to which the Motion to Retract objects was discussed in open court at oral argument." Appx057. The portion of the argument transcript to which the CIT cites, however, reflects the court's discussion regarding only two U.S. producers, Elite and Leggett & Platt,

that were represented by petitioners' counsel at the hearing, and no discussion with

respect to BPI regarding the other 11 U.S. producers and 13 U.S. purchasers

disclosed in the court's Merits Decision. Appx442. And while petitioners'

counsel to Elite and Leggett & Platt could certainly consent to disclosure of their

clients' BPI, the exact nature of the information discussed at argument regarding

these companies differed significantly from the granular information contained in

the CIT's Merits Decision, and for which the parties jointly requested confidential

treatment. *Compare* Appx442 and Appx564-567.

Perplexingly, with respect to the names of responding U.S. purchasers,

which the Merits Decision disclosed within the context of information provided in

their questionnaire responses, the CIT acknowledged that the index to the

confidential joint appendix individually bracketed their names. Appx054-055.

Yet, the CIT refused to preserve their confidentiality, relying upon its flawed view

that bracketing was of "no consequence" because the index had inserted a blank

space in between the brackets as opposed to the insertion of the purchaser's name

(*i.e.*, [ __ ]). The court reasoned that the blank space in place of the company name

was "crucial" because the court would not be able to locate the place where the

Commission supposedly designated the company name as confidential. Appx054-

055. The CIT overlooks, however, that CVB rectified this inadvertent bracketing

issue after the court raised it at oral argument. After argument and pursuant to the

court's order, CVB submitted a supplemental joint appendix under seal containing

*all* U.S. purchaser questionnaire responses, properly bracketing each purchaser's

name in the confidential index, and clearly indicating on the cover and on each

following page, "Business Proprietary Information Contained Throughout Entire

Document." Appx090 (docket entry 73), Appx423-434, Appx124571-125358.

The court's reasoning, in any event, fails to appreciate that the confidentiality of

the information was never waived, and the statute itself protected this information

from being publicly disclosed.

### 3. Bracketed Subject Import Volume and Market Share Information, Calculated Using Questionnaire Response Data, Were Not Publicly Available Information

Finally, the CIT erroneously held that bracketed information regarding

subject import volumes and market shares were publicly reported by other sources

and consequently did not qualify for confidential treatment. Appx058-060. Citing

to a handful of non-record news articles, the CIT refused to "redact information as

confidential that some of the responding parties themselves have freely provided to

the press." Appx059-060.

The CIT misapprehends that unlike the "market trends and market share"

publicly reported by the cited news articles, the bracketed import volume and

market share information contained in the Commission's Views and Report were

uniquely calculated using specific BPI reported by individual U.S. producers and

*CONFIDENTIAL BUSINESS INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

U.S. importers in their questionnaire responses.  As explained above, while aggregate in nature, the Commission treated the information as BPI because there was one dominant U.S. importer that accounted for over 90 percent of mattress imports from nonsubject countries and for mattress imports from several of the subject countries, including China.  While somewhat similar information may have been publicly reported by the cited news articles, this public information did not reflect the tailored information derived from confidential questionnaire responses that constituted BPI relied upon by the Commission.

The CIT's additional explanation that "{e}ven if information is confidential or business proprietary, the Court's use of approximations appropriately summarizes the information without revealing exact figures," should also be rejected.  Appx060-062.  Some of the CIT's use of numerical characterizations to "summarize" numerical data, however, represented the same protected statistical data in alternative numeric fashion (*e.g.*, [ ▮▮fraction▮▮ ] in place of [ ▮%▮ ] percent), thereby directly revealing the protected information.  Appx564-567.  It is precisely this reason that the Commission generally does not disclose any statistical BPI, except to discuss non-numerical trends in the data.  19 C.F.R. § 201.6(a) (stating that "{n}onnumerical characterizations of numerical confidential business information (e.g., discussion of trends) will be treated as confidential business information only at the request of the submitter for good cause shown"); *see also*

AD/CVD Handbook at II-26 ("In no case will the Commission disclose individual company data, although it may discuss trends in individual company data as well."). Couching language through use of words like "roughly," "about," and "at least" to refer to the BPI, as the CIT did, also does not alter the fact that the alternative numerical figures utilized by the CIT disclosed the confidential information bracketed by the Commission. Appx061-062. In sum, none of the CIT's explanations justifies disclosure of the BPI at issue.

To be clear, the Commission has an interest in presenting information and argument in a public manner. It holds a public hearing to receive testimony and argument, independently researches publicly available information concerning the product, producers, and market trends that it adds to the public record, and releases public versions of its Staff Report and Views. The Commission, however, must safeguard confidential BPI as required by the statute, and the CIT must preserve the confidential status of that information. The CIT abused its discretion in denying the parties' joint motion to accord confidential treatment to the BPI at issue. In addition to impacting the Commission's ability to collect questionnaire responses, the nonconsensual disclosure of questionnaire response information that was understood to be BPI deprived the submitters of information of protections afforded by Congress, including the ability to have that information returned rather than disclosed. The CIT's BPI Denial Decision should therefore be reversed.

-46-

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this

Court modify the CIT's final judgment for the limited purpose of reversing the

CIT's BPI Denial Decision.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Jane C. Dempsey*
Jane C. Dempsey
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Tel: (202) 205-3142
Jane.Dempsey@usitc.gov

*Counsel for Defendant-Appellant*
*United States*

December 2, 2024
Corrected: December 11, 2024

-47-

## CERTIFICATE OF COMPLIANCE WITH CONFIDENTIALITY REQUIREMENTS

This brief complies with the limitations and requirements related to

confidential information set forth in Fed. Cir. R. 28(d). This brief contains

25 words (including numbers) marked as confidential, as identified and

described in the Table of Contents.

/s/ Jane C. Dempsey
Jane C. Dempsey
Attorney for Defendant-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov

December 2, 2024
Corrected: December 11, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(b). The brief contains 9,926 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

                                        */s/ Jane C. Dempsey*
                                        Jane C. Dempsey
                                        Attorney for Defendant-Appellant
                                        United States

                                        Office of General Counsel
                                        U.S. International Trade Commission
                                        500 E Street, SW, Suite 707
                                        Washington, DC  20436
                                        tel. (202) 205-3142
                                        fax (202) 205-3111
                                        Jane.Dempsey@usitc.gov

December 2, 2024
Corrected: December 11, 2024

## CERTIFICATE OF SERVICE

I, Jane C. Dempsey, hereby certify on this 11th day of December 2024 that

true and correct copies of the attached **CONFIDENTIAL CORRECTED**

**PRINCIPAL BRIEF OF DEFENDANT-APPELLANT UNITED STATES**

were served upon the following via secure electronic transfer to counsel of record.

_/s/ Jane C. Dempsey_
Jane C. Dempsey
Attorney for Defendant-Appellant
United States

Office of General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC 20436
tel. (202) 205-3142
fax (202) 205-3111
Jane.Dempsey@usitc.gov

**Nos. 24-1504, 24-1566**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**CVB, INC.,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Cross-Appellant,*

**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**
*Defendants-Appellees.*

Appeal from the United States Court of International Trade
Case No. 1:21-cv-00288-SAV, Hon. Stephen A. Vaden

**CORRECTED BRIEF OF *AMICUS CURIAE* THE INTERNATIONAL TRADE COMMISSION TRIAL LAWYERS ASSOCIATION IN SUPPORT OF DEFENDANT-CROSS-APPELLANT UNITED STATES AND REVERSAL OF THE COURT OF INTERNATIONAL TRADE ORDER DENYING THE JOINT MOTION TO RETRACT THE COURT'S PUBLIC SLIP OPINION AND ACCORD CONFIDENTIAL TREATMENT TO ALLEGED BUSINESS PROPRIETARY INFORMATION CONTAINED THEREIN**

David H. Hollander
Mintz, Levin, Cohn, Ferris, Glovsky
and Popeo, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
(202) 434-7300

George C. Summerfield
K&L Gates LLP
70 West Madison Street
Chicago, Illinois 60602
(312) 807-4376

Attorneys for *Amicus Curiae*
International Trade Commission Trial Lawyers Association

Dated: October 16, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**  24-1504, 24-1566

**Short Case Caption**  CVB, Inc. v. US

**Filing Party/Entity**  International Trade Commission Trial Lawyers Association

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/16/2024

Signature:  /s/ George C. Summerfield

Name:  George C. Summerfield

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| International Trade Commission Trial Lawyers Association | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)   ☐  No   ☑  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

## TABLE OF CONTENTS

STATEMENT OF THE IDENTITY OF *AMICUS CURIAE*, ITS INTEREST IN THE CASE, AND THE SOURCE OF ITS AUTHORITY TO FILE ..................1

ARGUMENT...........................................................................................................3

I.    Procedural Background............................................................................3

II.   The Importance of Confidential Information to ITC Proceedings........4

III.  The Established Treatment of Confidential Information in Section 337 Proceedings..........................................................................................................5

IV.  Making Public Information Designated as Confidential .....................8

V.    Conclusion.............................................................................................11

## TABLE OF AUTHORITIES

**Cases**

*Certain Liquid Coolers for Electronic Components in Computers, Components
Thereof, Devices for Controlling Same, and Products Containing Same,*
   Inv. No. 337-TA-1394, Order No. 1 (U.S.I.T.C. March 21, 2024).........................7

*Certain L-Lysine Feed Products, Their Methods of Production and Genetic
Constructs Production,*
   Inv. No. 337-TA-571, Order No. 4 (July 7, 2006) ........................................... 4, 10

*CVB, Inc. v. United States,*
   675 F. Supp.3d 1324 (C.I.T. Dec. 19, 2023)............................................ 3, 8, 9, 10

*TCVB, Inc. v. United States,*
   681 F.Supp.3d 1313 (C.I.T. 2024) ..........................................................................3

**Statutes**

19 C.F.R. § 201.6(a)(1) .............................................................................................8
19 C.F.R. § 201.6(d).................................................................................................6
19 C.F.R. § 201.6(e)(1) ............................................................................................6
19 C.F.R. § 201.6(f)(1)..............................................................................................6
19 C.F.R. § 201.6(g).................................................................................................6
19 C.F.R. § 210.34(a)(7) ..........................................................................................6
19 U.S.C. § 1337(n)(1) .............................................................................................6
Court Int'l Trade R. 73.2(c) ...................................................................................11

## STATEMENT OF THE IDENTITY OF *AMICUS CURIAE*, ITS INTEREST IN THE CASE[1], AND THE SOURCE OF ITS AUTHORITY TO FILE[2]

A nonprofit, nonpartisan educational organization founded in 1984, the International Trade Commission Trial Lawyers Association ("ITCTLA") is an association of private practice, corporate, and government lawyers concerned with practice under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"). It has over 250 members worldwide. As its website explains, "[t]he ITCTLA is dedicated to improving the administration of Section 337 and informing attorneys, international trade officials, and legislators about practice before the ITC." https://itctla.org/. "ITCTLA members confer regularly to review developments affecting Section 337 practice."

The issue addressed herein is the need for a clear and predictable method for declassifying confidential information produced by parties to proceedings before administrative agencies, such as the United States International Trade Commission ("ITC"). Given their involvement in Section 337 litigation, the ITCTLA membership is particularly sensitive to the need to ensure the protection of confidential information. In virtually every case brought before the ITC under Section 337, parties – and particularly parties located overseas – are asked to produce

---

[1] No government employee who is a member of the U.S. International Trade Commission Trial Lawyers' Association participated in the preparation of this *Amicus* brief.

[2] The ITCTLA requested and received consent from the parties to file the instant brief.

1

their confidential information. Their legal representatives must convince them that the ITC is committed to ensuring that such information is protected, and that there are set procedures for ensuring that protection. As such, the ITCTLA is particularly suited to weighing in on this issue of how confidential information is treated in matters pending before an administrative proceeding.

## ARGUMENT

### I.    Procedural Background

This matter ultimately comes to this Court by way of a petition for issuance of antidumping and countervailing duties filed with the ITC. *CVB, Inc. v. United States*, 675 F. Supp.3d 1324, 1329 (C.I.T. Dec. 19, 2023). The ITC issued its final decision finding injury to a domestic industry, and the appellant in the instant appeal filed a complaint with the Court of International Trade ("CIT"). *See id.* at 1333. The CIT sustained the ITC's injury determination. *Id.* at 1347.

After the CIT issued its decision, the ITC expressed "concerns that the opinion revealed confidential business proprietary information" of third parties. *Id.* at 1316. The ITC then filed a motion asking the CIT to "issue a new confidential opinion with forty-four sets of brackets in place of information contained in the original" opinion. *Id.* at 1317. Judge Vaden denied the ITC's request for two reasons: 1) the ITC had failed to abide by the controlling rule in designating information as public, and therefore the "information is not confidential;" and 2) the subject information was purportedly "publicly available." *See id.* The CIT then added the notion of "transparency" as a reason for denying confidential treatment for the subject information and disclosing it publicly. *Id.* at 1321-23.

After the CIT issued its ruling, the ITC moved the CIT to accord confidential treatment to the business proprietary information contained in that ruling. *See TCVB, Inc. v. United States*, 681 F.Supp.3d 1313, 1315 (C.I.T. 2024). In denying

3

the motion Judge Vaden reiterated his reasons for having declassified the subject information in the first place. *See id.* at 1318-23.

The result is that Judge Vaden, of his own volition, and without the input of the producing third parties, publicized information produced by such parties under a claim of confidentiality, despite a request from the ITC not to do so, and despite there having been no request from any party to such proceedings to do so.

**II.     The Importance of Confidential Information to ITC Proceedings**

While it should not be controversial proposition, it is important to reiterate in this context that the ITC's ability to maintain the confidentiality of a party's information designated as such is essential to the ITC's ability to carry out its adjudicative function. *See, e.g., Certain L-Lysine Feed Products, Their Methods of Production and Genetic Constructs Production*, Order No. 4 (July 7, 2006) ("*L-Lysine Feed Products*") at 4 ("effective resolution of Section 337 investigation requires the voluntary submission of highly sensitive business information and the importance of maintaining the confidentiality of the information sought").

Equally important to the process is the adherence to procedures governing the maintenance of information in confidence to provide comfort to a producing party that such information will not be published by the ITC – or courts – willy-nilly. *See* USITC, *An Introduction to Administrative Protective Order Practice in Import Injury Investigations* (4th ed. March 2005) (available at https://www.usitc.gov/secretary/ apo/pub3755.pdf) at 1 (the ITC holds confidential

4

information "in strict confidence and does not publish such information in ways that would reveal the operations of individual firms without the consent of the submitter"); *id.* (access to confidential information is "permitted subject to an administrative protective order" the process for which is "governed by statute and the [ITC's] rules").

With all of that said, the ITCTLA takes no position on whether the information at issue below was, in fact, confidential. Rather, the ITCTLA seeks to make known its position that information designated as confidential by a producing party to any action before the ITC cannot later be made public *sua sponte* by an adjudicative officer without following the process to receive and consider input from the producing party. As explained below, to alleviate a producing party's concerns, established procedures for handling confidential information, and specifically the disclosure and declassification of such information, must be followed.

## III. The Established Treatment of Confidential Information in Section 337 Proceedings

Congress, cognizant of the importance of the treatment of confidential information, specified in the statute itself that:

> Information submitted to the Commission or exchanged among the parties in connection with proceedings under this section which is properly designated as confidential pursuant to Commission rules may not be disclosed (except under a protective order issued under regulations of the Commission which authorizes limited disclosure of such information) to any person (other than a person described in paragraph (2)) without the consent of the person submitting it.

19 U.S.C. § 1337(n)(1).

The ITC, for its part, has propounded a regulation applicable to all of its proceedings providing that "[a]pproval or denial of requests" for confidential treatment of submissions "shall be made only by the Secretary or Acting Secretary" of the ITC. 19 C.F.R. § 201.6(d). "For good cause shown," the full Commission "may grant an appeal from a denial by the Secretary of a request for confidential treatment of a submission." 19 C.F.R. § 201.6(e)(1). Conversely, "the Commission may grant an appeal from an approval by the Secretary of a request for confidential treatment of a submission." 19 C.F.R. § 201.6(f)(1). In either case, "[i]n the event that any business information submitted to the Commission is not entitled to confidential treatment, the submitter will be permitted to withdraw the tender within five days of its denial of confidential treatment." 19 C.F.R. § 201.6(g).

Separately, Rule 210.34(a)(7) provides for the issuance of protective orders providing "[t]hat a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." 19 C.F.R. § 210.34(a)(7). Pursuant to this rule, a presiding ALJ will promulgate a protective order in a Section 337 investigation, usually as the very first administrative order issued within days of assignment of such investigation to the ALJ. *See, e.g., Certain Liquid Coolers for Electronic Components in Computers, Components Thereof, Devices for Controlling Same, and Products Containing Same,* Inv. No. 337-TA-1394, Order No. 1 (U.S.I.T.C. March 21, 2024) (Cheney, Chief

ALJ). Protective orders will typically contain a definition of "confidential business information," and example of which calls out, *inter alia*, information:

> [T]he disclosure of which is likely to have the effect of either (i) ***impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions***; or (ii) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained . . .

*Id.* at 1, ¶ 1 (emphasis added).

While a protective order may provide that the ALJ or Commission can rule that information is not confidential, the producing party will be afforded an opportunity "to argue its confidentiality prior to the time of such ruling." *Id.* at 2, ¶ 2(b). Otherwise, a protective order will typically provide that, except for specific categories of individuals involved in an investigation, "[i]n the absence of written permission from the supplier or an order by the Commission or the Administrative Law Judge, any confidential documents or business information . . . shall not be disclosed to any person," or some similar provision. *See id.* at 2, ¶ 3.

There is nothing in Section 337 itself, the regulations associated with that statute, or the typical Section 337 protective order that allows for an ALJ or the full Commission to rule that information is not confidential without providing an opportunity to the producing party to weigh in on the confidential nature of the subject information or withdraw such information. Only by allowing a producing party to have a substantial say in how its confidential information is to be treated can the ITC ensure that information necessary to the effective adjudication of Section

7

337 investigations will be produced. The *sua sponte* declassification of information by the CIT in the proceeding below, if allowed to occur in Section 337 proceedings, would risk undermining such effective adjudication.

## IV.    Making Public Information Designated as Confidential

As noted above, the CIT rejected a request by the ITC to treat information publicized in his opinion as confidential. The first reason he gave was that the ITC had failed to designate confidential information properly, concluding that, as a result, such information was not confidential.[3] *CVB,* 675 F. Supp.3d at 1317. This dubious proposition presupposes that confidential information cannot be inadvertently mis-designated. That presupposition is inconsistent with the regulatory definition of "confidential business information," which focuses entirely upon the nature of such information, *e.g.,* likely to have the effect of "impairing the Commission's ability to obtain" confidential information, as opposed to whether the information is expressly marked as "confidential." *See* 19 C.F.R. § 201.6(a)(1). In any event, according to the ruling below, confidential information without a technically complete designation is automatically made public without any ability by the producing party to redress the situation.

---

[3] While the ITC apparently misapplied brackets designating information as confidential, it had affixed a "business proprietary" label to the pages containing such information. *CVB,* 675 F. Supp.3d at 1318. Judge Vaden ruled that such a blanket designation could not save the subject information from being publicized.

The second basis for Judge Vaden's ruling was that, in his opinion, the information was public. *CVB,* 675 F. Supp.3d at 1317. His conclusion was based upon his own search of the Internet to determine what among the purported confidential information was available there. *Id.* at 1320. Again, the actual producing parties had no ability to weigh in on whether the information obtained in a vacuum from the Internet was the same as the purported confidential information produced in the ITC proceeding, or whether its confidential nature was dependent on the context of the dispute and related confidential information on the record.

The ruling below, if it is allowed to stand, risks the ITC's ability to obtain confidential information from parties. Given that ruling, the inadvertent omission of a bracket specifically identifying the confidential information on a page of text otherwise designated "confidential" risks the publication of that party's most confidential information, even if it is someone other than the producing party that omits that designation. Further, even if designated in a complete and full way, the Court below would find unilaterally that such information may be publicized if a decision maker determines that the information is somehow publicly available.

In light of the decision below, a producing party may legitimately feel that it loses all control over its confidential information once it is produced in an ITC proceeding. That loss of control is irrespective of the ITC's afore-referenced express regulatory provisions for a producing party's opportunity to be heard on the issue of confidentiality, and for a producing party's ability to withdraw information that is

9

denied confidential treatment. This loss of control may well risk the ITC's ability to perform its adjudicative function, which depends upon the production of confidential information. *See, e.g., L-Lysine Feed Products* at 4.

And that brings us to the final point made by the CIT regarding the virtues of transparency. *See CVB*, 675 F. Supp.3d at 1321-22. The CIT extols the benefits of making legal proceedings public, analogizing such publicity to students taking a math test being "expected to show their work." *See id.* at 1321. There is absolutely no merit to this comparison. In the first instance, ITC proceedings are, in fact, public, and the ITC's reasoning is apparent in its determinations. Only sensitive aspects of the proceedings are confidential. And of course, unlike parties in an ITC proceeding claiming confidentiality for certain information, students do not risk severe economic consequences from disclosing their math test answers.

If producing parties become concerned about the publication of their most well-guarded information in the name of transparency, they will inevitably resist producing that information. Risking the ITC's adjudicative capability for vague "transparency" reasons throws the baby out with the bath water. At the very least, even if transparency mandates making public as much information as possible, the decision of where to draw that line *must* be made with input from the producing party, which inevitably is in the best position to explain the basis for any claimed confidentiality.

Finally, the ITCTLA is cognizant of the fact that the CIT operates under its own set of rules. Those rules provide, in relevant part, that "any document, comment, or information that is accorded confidential or privileged status by the agency whose action is being contested and that is required to be filed with the clerk of the court, *must* be filed under seal." Court Int'l Trade R. 73.2(c) (emphasis added). There is no provision for the CIT second-guessing the confidential designation conferred by an agency, particularly based solely upon an Internet search conducted by a judge *sua sponte*. And, given the mandatory nature of Rule 73.2(c), the appropriate remedy for an ineffective confidentiality designation is to correct the designation, rather than to deem the information public, as Judge Vaden did.

## V.    Conclusion

A recurring theme herein is that the ITC's ability to perform its adjudicative function pursuant to Section 337 depends upon its ability to obtain confidential information from private parties. That ability turns on the producing parties' confidence that such information will remain confidential, or, at the very least, that they will have an opportunity to be heard prior to any publication of such information. Once that confidence is destroyed, so is the ITC's adjudicative capability under Section 337. The *CVB* decision, even though related to antidumping and countervailing duties, risks that confidence and that ability, as it sets a precedent allowing a judge to declassify *sua sponte* information produced in connection with an ITC proceeding without regard to what the producing party has

11

to say on the matter. The decision should therefore be vacated and remanded, with an instruction to conduct further proceedings consistent with such *vacatur*.

Dated: October 16, 2024

Respectfully submitted,

*/s/ George C. Summerfield*
George C. Summerfield
K&L Gates LLP
70 West Madison Street
Chicago, Illinois 60602
(312) 807-4376

David H. Hollander
Mintz, Levin, Cohn, Ferris, Glovsky
and Popeo, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
(202) 434-7300

Attorneys for *Amicus Curiae*
International Trade Commission
Trial Lawyers Association

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**   24-1504, 24-1566

**Short Case Caption:**  CVB, Inc. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓]   the filing has been prepared using a proportionally-spaced typeface and includes 2,564_____ words.

[ ]   the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ]   the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/16/2024_____     Signature:   /s/ George C. Summerfield

                                Name:        George C. Summerfield

Save for Filing

2024-1504, 2024-1566

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CVB, INC.,

*Plaintiff-Appellant*

v.

UNITED STATES,

*Defendant - Cross-Appellant*

BROOKLYN BEDDING, LLC, CORSICANA MATTRESS CO., ELITE
COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT
ENTERPRISES, INC., LEGGETT & PLATT, INC., INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, UNITED STEEL, PAPER AND
FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,
AFL-CIO,

*Defendants - Appellees*

Appeal from the United States Court of International Trade in
Case No. 1:21-cv-00288-SAV, Judge Stephen A. Vaden

CORRECTED BRIEF OF *AMICUS CURIAE*
CUSTOMS AND INTERNATIONAL TRADE BAR ASSOCIATION
IN SUPPORT OF DEFENDANT – CROSS-APPELLANT UNITED STATES
AND REVERSAL OF THE COURT OF INTERNATIONAL TRADE
ORDER DENYING THE JOINT MOTION TO RETRACT THE COURT'S
PUBLIC SLIP OPINION AND ACCORD CONFIDENTIAL TREATMENT
TO ALLEGED BUSINESS PROPRIETARY INFORMATION CONTAINED
THEREIN

DEANNA TANNER OKUN
TREASURER
CUSTOMS AND INTERNATIONAL
TRADE BAR ASSOCIATION
Polsinelli PC
1401 Eye Street NW
Washington, DC 20005
Telephone: (202) 626-8329

BROOKE RINGEL
CO-CHAIR, MEMBERSHIP
COMMITTEE
CUSTOMS AND INTERNATIONAL
TRADE BAR ASSOCIATION
Kelley Drye & Warren LLP
3050 K Street NW
Washington, DC 20007
Telephone: (202) 342-8516

*Counsel for Amicus Curiae Customs and International Trade Bar Association*

October 25, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1504 & 24-1566

**Short Case Caption** CVB, Inc. v. United States, et al.

**Filing Party/Entity** The Customs and International Trade Bar Association ("CITBA")

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/07/2024          Signature:  /s/ Deanna Tanner Okun

                          Name:       Deanna Tanner Okun

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| The Customs and International Trade Bar Association ("CITBA") | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☑  Additional pages attached

| See Attachment A | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Attachment A

## Attachment A to Certificate of Interest

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

*Appearing before this Court:*     **POLSINELLI PC**
Deanna Tanner Okun, Shareholder

**Kelley Drye & Warren LLP**
Brooke Ringel, Partner

**FedEx Corporation**
Emily Beline

# TABLE OF CONTENTS

STATEMENT OF INTEREST................................................................1

INTRODUCTION ...............................................................................2

ARGUMENT ......................................................................................6

  I.  THE LEGAL FRAMEWORK FOR THE PROTECTION OF
CONFIDENTIAL INFORMATION BALANCES TRANSPARENCY AND
PARTICIPATING ENTITIES' INTERESTS UNDER THE TRADE
REMEDIES STATUTE ...................................................................6

    A.  The Statutory and Regulatory Regime........................................6

    B.  Congress Intended for the Confidentiality Provisions of the Statute to Cure
a Lack of Transparency in Commission Proceedings ................................11

  II.  COUNSEL RELY ON THE STATUTE'S CONSENT REQUIREMENT TO
OBTAIN INFORMATION FROM COMPANIES THAT WOULD
OTHERWISE NOT PROVIDE SUCH INFORMATION............................17

  III. INPUT FROM THE SUBMITTER ON THE NATURE AND CONTEXT
OF THE INFORMATION IS CRITICAL TO ASSESSING
CONFIDENTIALITY ...................................................................24

CONCLUSION.................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Akzo N.V. v. U.S. Int'l Trade Comm'n,*
  808 F.2d 1471 (Fed. Cir. 1986) ...............................................................18

*CVB, Inc. v. United States,*
  681 F. Supp. 3d 1313 (Ct. Int'l Trade 2024) ............................................2

*Hebei Golden Bird Trading Co. v. United States,*
  2017 WL 3017099 (Ct. Int'l Trade July 17, 2017).................................19

*Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce,*
  11 CIT 238 (1987) ...................................................................................18

*Kemira Fibres Oy v. United States,*
  858 F. Supp. 229 (Ct. Int'l Trade 1994) .................................................17

*U.S. Int'l Trade Comm'n v. Tenneco West,*
  822 F.2d 73 (D.C. Cir. 1987).................................................................21

*United States Steel Corp. v. United States,*
  730 F.2d 1465 (Fed. Cir. 1984) .............................................................14

**Statutes**

19 C.F.R. § 201.6 ................................................................................ 17, 30

19 C.F.R. § 201.6(a)(1) ...............................................................................8

19 C.F.R. § 201.6(b) ...................................................................................8

19 C.F.R. § 201.6(d) .................................................................................20

19 C.F.R. § 201.6(g) ................................................................... 8, 19, 21

19 C.F.R. § 207.7(g)(2), (4)......................................................................22

ii

19 U.S.C. § 1333(a) ..............................................................................6

19 U.S.C. § 1516a(b)(2)(B) ................................................................16

19 U.S.C. § 1677f................................................................................13

19 U.S.C. § 1677f(a)(4)(A)...................................................................4

19 U.S.C. § 1677f(b)(1)(A)............................................................ 7, 19

19 U.S.C. § 1677f(b)(2) ............................................................ 8, 21, 22

19 U.S.C. § 1677f(c)(1) .........................................................................4

19 U.S.C. § 1677f(c)(1)(B) ................................................................20

28 U.S.C. § 2635(b)(1)(A)-(B) ..........................................................21

**Other Authorities**

*A Centennial History of the United States International Trade Commission,*
    USITC Pub. 4744 (Nov. 2017) ......................................................12

*Antidumping and Countervailing Duty Handbook,*
    USITC Pub. 4540 (June 2015).................................................. 9, 10

*Omnibus Trade and Competitiveness Act of 1988,*
    H.R. Rep. No. 100-576 (1988) ............................................... 14, 15

H.R. Rep. No. 96-317 (1979)..............................................................14

*Omnibus Trade Act of 1987*
    S. Rep. No. 100-71 (June 11, 1987) ............................... 7, 14, 15, 16

*Trade Agreements Act of 1979,*
    S. Rep. No. 96-249 (1979)................................................. 11, 14, 16, 17

*Trade Agreements Act of 1979,*

Pub. L. No. 96-39 (1979) ..............................................................................................13

*Trade Remedy Laws Administered by USITC,*
    United States International Trade Commission,
    https://www.usitc.gov/trade_remedy_laws.htm ......................................................6

**Rules**

Fed Cir. R. 25.1(d)(1)..................................................................................................23

Fed. Cir. R. 11(b)(2).....................................................................................................23

Fed. Cir. R. 17(d)(2)....................................................................................................23

Fed. Cir. R. 25.1(c)(1)..................................................................................................23

Fed. Cir. R. 25.1(c)(2)..................................................................................................23

Fed. Cir. R. 29(a)(2)......................................................................................................1

iv

**STATEMENT OF INTEREST**[1]

The Customs and International Trade Bar Association ("CITBA") was founded in 1917 and incorporated in 1926. Today, CITBA's nearly 300 non-government attorney members represent domestic industries, importers, purchasers, international companies and customs brokers in regulatory and administrative proceedings before the U.S. International Trade Commission, the Department of Commerce, the United States Trade Representative, Customs and Border Protection, the Court of International Trade, and the Court of Appeals for the Federal Circuit. CITBA, therefore, on behalf of its members, has a direct interest in the rules and practices governing the protection of confidential business information provided by their clients to administrative agencies and the courts.

CITBA agrees with the U.S. International Trade Commission that the Court of International Trade erred in rejecting the Joint Motion to Retract the Court's

---

[1] Timely notice of intent to file this brief was provided, and all parties have consented to its filing. Pursuant to Fed. Cir. R. 29(a)(2), no part of this brief was authored by counsel for any party, and no person or entity has made a monetary contribution to its preparation or submission other than the amicus curiae, its members, or its counsel. Additionally, while CITBA includes U.S. Government lawyers, government attorneys did not participate in the decision to file or in the preparation of this brief nor did CITBA board members whose firms have an interest in the proceeding vote or participate in the preparation of this brief.

Slip Opinion and Accord Confidential Treatment to Business Proprietary

Information Contained Therein.[2]

## INTRODUCTION

In the decision below, the court extols the "virtues of transparency" and the

importance of public access to information in judicial and investigative

proceedings by the Commission. *See CVB, Inc. v. United States*, 681 F. Supp. 3d

1313, 1321-23 (Ct. Int'l Trade 2024). CITBA agrees with these principles. As

practitioners before the Commission and the Court, CITBA recognizes and

supports the public dissemination of information that is not confidential. Such

transparency is important for the companies that the members of this bar represent

in Commission proceedings; for the promotion of knowledge and understanding

relating to the area of trade law; and for members of the general public that may

have economic, commercial, legal, academic, journalistic, or other interests in a

particular case. With respect to client representation, greater disclosure allows

counsel to have more informed and productive discussions with clients regarding

the meaningful issues in the case. Counsel also rely on prior, public Commission

determinations and staff reports in conducting legal research to support their

arguments; thus, having more information publicly available – including specific

---

[2] Nonconfidential Principal and Response Brief of Defendant-Cross-Appellant
United States, *CVB, Inc. v. United States*, No. 2024-2504, 2024-2566 (Fed. Cir.
Sept. 30, 2024).

2

industry and market data – allows counsel to better assess past cases that may be analogous or instructive to a current proceeding.

Shared interests in disclosure, however, must be weighed against the importance of developing as comprehensive a record as possible. The Commission and entities participating in an investigation[3] depend on a comprehensive and accessible factual record. Full participation by companies that possess the factual information necessary for interested participating entities to advocate for their respective legal positions, and for the Commission to reach a decision based on a robust investigation, is critical. Such information and data, however, are often closely held by the entity that would be submitting the information to the Commission. Thus, the value of the confidentiality procedures in place at the

---

[3] Although the relevant statutory language and legislative history typically refers to "parties" in a trade remedy investigation, the statute and Congress explicitly recognized that non-parties also play a key role in those investigations. Accordingly, CITBA generally uses the term "participating entities" to refer to all private participants in an investigation at the agency level – both parties and non-parties – to avoid unintended exclusionary inferences regarding the term "parties" where all participating entities share an interest in safeguarding confidential information. Note, however, that the term "participating entities" is intended to be construed narrowly in the context of disclosure of confidential information under a protective order, as the Commission's Administrative Protective Order ("APO") procedures effectuate legislative intent by allowing the disclosure of confidential information only to *counsel* for interested parties that have signed on to the protective order to prevent the disclosure of competitively sensitive information to company representatives. All uses of the term "parties" in quoted language have been retained as in the original.

Commission to incentivize submission of, and subsequently protect, sensitive information cannot be overstated.

Pursuant to its statutory obligations, the Commission is only permitted to disclose information designated as proprietary by the submitter in three specific circumstances, namely, where it can be done so in a manner that does not reveal the individual operations of a firm; where the information is disclosed to interested parties under a protective order;[4] or where the Commission receives the consent of the person submitting the information. *See* 19 U.S.C. § 1677f(a)(4)(A); 19 U.S.C. § 1677f(c)(1). Counsel rely on the agency's confidentiality procedures to solicit sensitive information from companies, including both clients and other market participants such as other producers, importers, or purchasers. Throughout the stages of a proceeding – from domestic industry coalition-building and petition development, to the submission of questionnaire responses, to supporting and rebutting claims through briefing – companies share business proprietary information in reliance on the Commission's confidentiality rules, practices, and procedures as explained by their counsel.

Ultimately, more information is better for interested parties seeking to prosecute or defend against a request for trade remedies, but reliable treatment of

---

[4] *See supra*, note 3 (discussing how the Commission's APO procedures limiting the disclosure of confidential information to counsel for interested parties effectuate legislative intent).

confidential information is necessary to achieve that goal. Confidence in the effectiveness of the Commission's confidentiality rules is especially critical for companies that may have differing motivations or degrees of interest in the case. Parties that are seeking or objecting to trade remedies have built-in incentives to participate in these cases and the confidentiality provisions bolster their participation. Yet purchasers of subject product – which are not treated as "interested parties" with access to the confidential record under the relevant statute and the Commission's APO procedures – often lack the same level of motivation to respond to questionnaires absent equally strong confidence that their participation (*i.e.*, names) and responses will be protected from disclosure. At the same time, purchasers' questionnaire responses often prove to be among the most important evidence of the conditions of competition and/or the causal relationship between imports and the domestic industry's alleged material injury or threat thereof. The removal or degradation of the confidentiality assurances, therefore, would gravely imperil the willingness of purchasers to respond to the Commission's questionnaire.

**ARGUMENT**

I. **THE LEGAL FRAMEWORK FOR THE PROTECTION OF CONFIDENTIAL INFORMATION BALANCES TRANSPARENCY AND PARTICIPATING ENTITIES' INTERESTS UNDER THE TRADE REMEDIES STATUTE**

A. **The Statutory and Regulatory Regime**

In setting forth the statutory authority and responsibilities of the U.S. International Trade Commission ("the Commission"), Congress tasked the Commission with administering trade remedy laws and adjudicating whether a domestic industry is materially injured or threatened with material injury by reason of imports that are sold in the United States at less than fair value or that benefit from countervailable subsidies provided through foreign government subsidies.[5] Congress recognized that this is a fact-intensive inquiry and gave the Commission broad authority, including subpoena power, to collect and manage "any document, paper, or record, pertinent to the subject matter under investigation," in the possession of any entity engaged in the production, importation, or distribution of any article under investigation, and necessary to carry out such statutory functions under 19 U.S.C. § 1333(a).

Congress established a framework to provide robust protection to business proprietary information ("BPI") but balanced such protection with the due process

---

[5] Trade Remedy Laws Administered by USITC, United States International Trade Commission, https://www.usitc.gov/trade_remedy_laws.htm.

rights of participating entities appearing before the Commission. In recognition of these competing interests, the statute provides that the Commission shall not publicly disclose any proprietary information except in the three specific above-mentioned circumstances (*i.e.*, anonymity, under a protective order, or with consent). Importantly, the statute even requires the Commission, if it determines that a person's designation of information as proprietary is unwarranted, to return the information to the submitter. 19 U.S.C. § 1677f(b)(1)(A).

The legislative intent of 19 U.S.C. § 1677f was to help the Commission "complete its investigations within the tight time limits for investigation provided by statute" by granting "broad authority to frame such regulations as are necessary to ensure maximum possible access to information . . . ." S. Rep. No. 100-71 at 112 (June 11, 1987). Congress recognized the need for this broad authority because "in an injury investigation conducted by the ITC pertinent information is derived from a variety of sources, many of whom are not parties to the proceeding." *Id.* This point is true for all market participants from whom information is sought, including those such as purchasers who are not eligible to be "interested parties," but who nonetheless possess data valuable to the case.

Consistent with the legislative intent, in adopting regulations to meet its statutory obligations, the Commission defined categories of confidential business information:

> the disclosure of which is likely to have the effect of either impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information.

19 C.F.R. § 201.6(a)(1).

Importantly, the Commission does not automatically guarantee and grant the confidential status of submissions. Rather, to discern whether information being submitted should be treated as BPI, the Commission also established a procedure for submitting business information in confidence and asking the Commission to treat the information as BPI. *See generally* 19 C.F.R. § 201.6(b). Under Commission Rules, the submitter must provide various information such as the nature of the subject information, a justification for the request for its confidential treatment, and a certification in writing under oath that substantially identical information is not available to the public. *Id.* (b)(3). If the Commission determines that confidential treatment of the information is not warranted, the Commission is required to *return* the information to the submitter. 19 U.S.C. § 1677f(b)(2); 19 C.F.R. § 201.6(g); *see also* Section II, *infra.* Participating entities may also appeal the Commission's approval or denial of the submitter's requests for confidential treatment within certain timeframes. *See generally id.* (e)-(f).

8

The Commission upholds the statutory regime balancing the public interest in transparency with the parallel interest in protecting participating parties' confidential information in a number of ways. The Commission holds public hearings in trade remedy cases, thereby allowing any interested entities to witness the hearing and participate, if desired. The public hearing in a trade remedy investigation serves as a fact-finding forum: "its purpose is to allow interested parties to express their views and to permit Commissioners to ask questions and solicit information that will be useful to them in reaching a determination."[6]

In addition to holding public hearings, the Commission supports transparency in trade remedy investigations by independently researching publicly available information regarding market dynamics of the particular products subject to investigation and publishing public versions of its Staff Report and Views. The public versions of these publications provide insight into the Commission's legal reasoning as they apply the provisions of the statute and incorporate as much statistical data as possible without compromising the confidentiality of submitted information.[7] To achieve this balance, the Commission generally provides data in

---

[6] *Antidumping and Countervailing Duty Handbook*, USITC Pub. 4540 (June 2015) at II-19 (hereinafter, "AD/CVD Handbook").

[7] *Id.* at II-11. The AD/CVD Handbook notes that "disaggregated data may be presented where appropriate," *id.*, further supporting the Commission's efforts to balance transparency with its statutory duty to safeguard confidential information.

aggregate form, but treats that aggregate data as confidential "if they include only one or two companies, or if the they include three or more companies and one company accounts for at least 75 percent of the total or two account for at least 90 percent of the total."[8]

The publication of public versions of both the Staff Reports and Commission Views in trade remedy investigations provides transparency into the Commission's decision-making and facilitates the trade bar's research to support their legal arguments in trade remedy investigations, while the use of aggregated data in those documents allows practitioners to utilize the data from past investigations to shape their legal strategy to provide the strongest representation for participating entities.

Consequently, the statutory and regulatory framework that protects confidential information submitted in a trade remedy investigation balances the public desire for transparency in the Commission's legal decision-making and participating entities' interests in maintaining the confidential status of information.

---

[8] *Id.* at II-26.

10

**B.**    **Congress Intended for the Confidentiality Provisions of the Statute to Cure a Lack of Transparency in Commission Proceedings**

**1.**    **The Absence of Protections for Confidential Information Encroached on Participating Entities' Rights**

Prior to the Trade Agreements Act of 1979, the only information the Commission was required to make available to counsel to parties was non-confidential information to the extent required by the Freedom of Information Act. S. Rep. No. 96-249, at 98-99 (1979). The limited access to information hampered the ability of counsel for both petitioners and respondents to understand the entirety of the record before the Commission, to rebut, correct, or clarify information submitted by other participating entities, and to effectively advocate for their clients' positions. Practitioners' lack of access to confidential information also deprived the Commission itself of a more robust factual record developed by the participating entities and more informed arguments and analysis.

An attorney for respondents explained how difficult it was to practice without access to confidential information in a 2017 publication celebrating the centennial of the Commission:

> At that time counsel did not have access to a Commission staff report or, initially, to responses from questionnaires. Representing Japanese respondents, "we handled the economic issues in a very primitive, pragmatic way. We would get the statistics that were available from the Census Bureau, and we made a big use of Dun &

11

> Bradstreet reports. Unreliable as they notoriously were
> …."[9]

A petitioners' attorney had similar views:

> Trade remedy proceedings … before 1980 were characterized by relatively truncated decisions by the Commission, limited access to information of record, and very limited judicial review …. the biggest improvement for practitioners was access to all information of record …. This permitted counsel for parties to make more informed arguments, to identify potential issues of importance for the Commission and Commission staff, and to improve generally the level of advocacy before the Commission.[10]

Congress established the present system giving counsel for interested parties access to confidential information with protections from unauthorized disclosure in direct response to these concerns. The system that was created has greatly benefitted practitioners and their clients, including domestic producers, foreign producers, importers, and foreign governments. Access to confidential information has improved the transparency of Commission proceedings and decisions, allowed counsel for interested parties to more meaningfully advocate for and protect their interests, and led to more robust injury determinations.

---

[9] *A Centennial History of the United States International Trade Commission*, USITC Pub. 4744 (Nov. 2017) at 294 (oral history as told by Noel Hemmendinger).

[10] *Id.* at 301-302 (oral history as told by Terence P. Stewart).

12

### 2.    Congress Recognized That Parties' Interests Are Served by Strong and Reliable Protections for Confidential Information

By enacting the Trade Agreements Act of 1979,[11] which added new Section 777 ("Access to Information") to the Trade Act of 1930, Congress recognized the importance of developing rules for the treatment and disclosure of confidential information precisely so that companies would be best positioned to participate and advocate for their interests in antidumping and countervailing duty proceedings. At the time, as the Senate Report on the bill explained, the *absence* of a confidentiality regime in trade remedy proceedings limited the ability of interested parties to fully exercise their rights:

> Section 777 provides the maximum availability of information to interested parties consistent with the need to provide adequate protection for information accorded confidential treatment. *Petitioners under the antidumping and countervailing duty laws have long contended that their ability to obtain relief has been impaired by its lack of access to the information presented by the exporters and foreign manufacturers. By the same token, importers, exporters, and other respondents in such cases have complained of lack of access to information supplied by the domestic parties to such cases, particularly with respect to the economic health of the domestic industry involved.* Access to information at the administrative level is even more imperative under the bill, which provides that the standard of judicial review of most administrative

---

[11] Trade Agreements Act of 1979, Pub. L. No. 96-39, § 101, 93 Stat. 144, 187 (1979) (codified as amended at 19 U.S.C. § 1677f).

> actions in countervailing duty and antidumping duty
> proceedings is one of review on the administrative record.

S. Rep. No. 96-249, at 99-100 (1979) (emphasis added); *see also* H.R. Rep. No.

96-317, at 77 (1979).

Several years later, the Omnibus Trade and Competitiveness Act of 1988

amended the confidentiality provisions of Section 777 further to *require* the

Commission to issue protective orders and to release all confidential information

(subject to certain limitations) under such orders. *See* S. Rep. No. 100-71, at 111

(1987). Both expanding the scope of the statutory provision and mandating the use

of protective orders to require disclosure of *all* confidential information to

"authorized representatives"[12] were identified as necessary actions to further

promote interested parties' rights in a proceeding:

> The Committee is concerned that the ITC's practice
> creates difficulties for parties to ITC investigations. In
> most investigations, the bulk of the information collected
> by the ITC and on which it bases its decisions consists of
> confidential business information submitted by domestic
> producers, importers, and purchasers of the allegedly

---

[12] "Authorized representatives include outside legal counsel for interested parties, and consultants or other experts if either (a) such individuals are under the control and advice of legal counsel and legal counsel has signed on their behalf or if (b) such individuals regularly appear before Commerce or the ITC (and the agency thus has effective sanctions to be applied against them) or (c) in other instances in which the agency has effective sanctions to be applied against the individuals. In determining whether in-house counsel may properly be given access, Commerce and the ITC should be guided by the factors enumerated in *United States Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984)." H.R. Rep. No. 100-576, at 623 (1988) (Conf. Rep.).

14

dumped or subsidized articles under investigation. Only aggregate data that cannot reveal the proprietary information of individual companies are released to the parties and the public. *Because the ITC does not allow representatives of the parties access to the more detailed information in the record, they typically lack the very data that are essential for them to present their cases effectively.* Moreover, on occasion the ITC commits an error in the presentation or interpretation of the data that counsel for the parties could bring to the ITC's attention before it makes a determination on the merits of the case if counsel were allowed to review the data. . . . The Committee believes that the administrative process would be greatly improved if parties to an investigation who request protective order access be given it in a timely manner that enables them to use the information effectively.

*Id.* at 112 (emphasis added).

Congress also determined that it was critical to balance the decision to broaden access to confidential information under protective order with assurances that such information would be protected from unauthorized disclosure. The level of confidence in such protections would be promoted by "effective enforcement" through "effective sanctions against violations" of such protections. H.R. Rep. No. 100-576, at 623 (1988) (Conf. Rep.). Reliance on the protection of confidential information, in turn, would foster participation and enhance the Commission's ability to collect necessary information:

Finally, *the best insurance that the ITC will be able to obtain the information it needs for its investigations is its reputation for strictly maintaining the confidentiality of information submitted to it.* The Committee endorses the

> ITC's protecting that reputation through the threat and, if necessary, use of strong sanctions under section 1677f(c)(1)(B) against any person found in violation of an administrative protective order . . . .

S. Rep. No. 100-71 at 114 (emphasis added). In seeking to promote interested parties' rights to "present their cases effectively," Congress understood that an effective mechanism for protecting confidential information was necessary to achieve a potent administrative process.

The congressional intent to preserve the confidentiality of BPI explicitly extended to judicial review of the Commission's determinations in trade remedy proceedings. 19 U.S.C. §1516a(b)(2)(B) provides that:

> *The confidential or privileged status accorded to any documents, comments, or other information shall be preserved in any action under this section.* Notwithstanding the preceding sentence, the court may examine, in camera, the confidential or privileged material, and may disclose such material under such terms and conditions as it may order.

19 U.S.C. § 1516a(b)(2)(B) (emphasis added). Congress elaborated on this statutory provision by stating that "[s]pecial provision would be made in (b)(2)(B) for preserving the confidential or privileged status of any materials contained in the record, including, where the court determines it would be appropriate, the disclosure of privileged or confidential material only under the terms of a protective order." S. Rep. No. 96-249 at 248. Further, "the lack of a determination during the administrative proceedings concerning confidentiality or privileged with

16

respect to documents, comments, or information *will not preclude* a party from seeking protection for such material from the court." *Id.*

The CIT's disclosure in its opinion of information in the administrative record designated as BPI after the administrative record was closed and without the consent of the party submitting BPI is therefore directly contrary to the statutory and regulatory framework as well as the CIT's historic recognition that proprietary information safeguards serve to balance the Commission's investigatory needs and participating entities' needs to protect confidential information. *See Kemira Fibres Oy v. United States*, 858 F. Supp. 229, 234 (Ct. Int'l Trade 1994). If there is a risk that the information might be publicly disclosed in subsequent litigation, participating entities will inevitably be less willing to provide detailed sensitive information about their operations in questionnaire responses and other written submissions. Such consequences of disclosure of BPI will significantly undermine the Commission's ability to fulfill its statutory functions in accordance with 19 C.F.R. § 201.6 and effectively administer trade remedy laws in accordance with congressional intent.

## II. COUNSEL RELY ON THE STATUTE'S CONSENT REQUIREMENT TO OBTAIN INFORMATION FROM COMPANIES THAT WOULD OTHERWISE NOT PROVIDE SUCH INFORMATION

Counsel rely on the Commission's confidentiality procedures to solicit and obtain confidential information from companies that they would otherwise not

provide due to concerns regarding the potential disclosure of information significant to competitive business interests. As both Congress and this Court have recognized, the provision of company-specific data provided through questionnaires and other submissions described further below in Section III is an integral part of the Commission's investigative process and essential to the fulfillment of its statutory obligations. *See supra*, Section I.B.2; *see also Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482 (Fed. Cir. 1986).

Questionnaire data submitted to the Commission in trade remedy investigations commonly includes substantial information related to a company's market activity – as a producer, importer, or purchaser – with regard to the specific product being investigated. This detailed, product-specific information is unlikely to be found in a company's public statements regarding general market trends or even statements regarding company profitability or investment plans. Accordingly, both this Court and the CIT have recognized that disclosure of questionnaire responses may cause irreparable harm to the competitive interests of the companies that provided the information and inadvertently result in the provision of undue business advantage to a competitor. *Id.*; *see also Hyundai Pipe Co., Ltd. v. U.S. Dep't of Commerce*, 11 CIT 238, 243 (1987).

The only reason that companies agree to submit confidential information to the Commission is because counsel – or, when not represented by or working with

18

counsel, the Commission directly through written or other means – informs them that such information will not be disclosed without their consent. These procedures are essential for developing the record on which interested parties can make their case.

Pursuant to the statute, once confidential treatment is granted, the Commission cannot disclose confidential information without the consent of the submitter of the information:

> Except as provided in subsection (a)(4)(A) and subsection (c), information submitted to the administering authority or the Commission which is designated as proprietary by the person submitting the information shall not be disclosed to any person without the consent of the person submitting the information. . . .

19 U.S.C. § 1677f(b)(1)(A); *Hebei Golden Bird Trading Co. v. United States*, 2017 WL 3017099, at *5 (Ct. Int'l Trade July 17, 2017); *see* 19 C.F.R. § 201.6(g) (2024) ("Any business information submitted in confidence and determined to be entitled to confidential treatment shall be maintained in confidence by the Commission and not disclosed except as required by law.").

The statutory consent requirement ensures the balancing of public and private interests by providing the companies submitting confidential information with the final decision regarding potential disclosure of that information. When faced with potential Commission disclosure of information, the submitting company can either acquiesce or withdraw the information at issue.

19

Counsel rely on this requirement for "the consent of the person submitting the information" because this assures *all* submitters of sensitive information (whether interested parties or other participants like purchasers) that entities other than the Commission cannot second-guess confidential treatment claims. Any decision as to whether their sensitive information will remain protected from disclosure resides with the Commission, subject to the rights of the submitting company. *See, e.g.*, 19 C.F.R. § 201.6(d) (2024) (providing that approvals or denials of requests for confidential treatment "shall be made only by the Secretary or Acting Secretary"); *id.* § 201.19 (establishing that the Commission will not disclose information designated as confidential pursuant to a Freedom of Information Act request unless certain notice and objection opportunity requirements are met).

Indeed, when companies permit counsel to submit to the Commission information that is not susceptible to disclosure other than under a protective order, they do so aware of and relying on the Commission's legal obligation to impose significant sanctions, including criminal penalties, if counsel or Commission employees with access to the information fail to comply with the Commission's APO. *See* 19 U.S.C. § 1677f(c)(1)(B); 19 C.F.R. § 207.7(d) (2024); 18 U.S.C. § 1905.

20

Even when the Commission's determination in a proceeding is appealed to the U.S. Court of International Trade, the Commission remains the guardian of the record documents. *See* 28 U.S.C. § 2635(b)(1)(A)-(B) (providing that the Commission provides the court with the record of a contested action under 19 U.S.C. § 1516a containing a "copy" of the Commission's gathered information); *U.S. Int'l Trade Comm'n v. Tenneco West*, 822 F.2d 73, 75 n.1 (D.C. Cir. 1987).

Submitters' confidence in the security of their information is also supported by the procedures that apply when a question arises about affording confidential treatment. Under the statute, if the Commission suspects that confidential treatment of certain information might be unwarranted, the Commission is directed to notify the submitter of the information:

> If the administering authority or the Commission determines, on the basis of the nature and extent of the information or its availability from public sources, that designation of any information as proprietary is unwarranted, then it shall notify the person who submitted it and ask for an explanation of the reasons for the designation. Unless that person persuades the administering authority or the Commission that the designation is warranted, or withdraws the designation, the administering authority or the Commission, as the case may be, shall return it to the party submitting it. . . .

19 U.S.C. § 1677f(b)(2). At that point, the Commission will either return the information to the submitter, or the submitter may consent to the public disclosure of such information. *Id.*; *see* 19 C.F.R. § 201.6(g) (2024); *see also* 19 C.F.R.

21

§ 207.7(g)(2), (4) (2024) (similarly instructing the Commission to return

information to its submitter upon declining a request for exemption from disclosure

under APO). This choice by the submitter of information to disclose or accept the

return of the information is fundamental to counsel's ability to support companies

in making informed decisions about how sensitive commercial information is used.

If, on appeal, the Court intends to disclose information previously treated as

confidential because it is deemed to be publicly available or for another reason

under the balancing of interests, counsel must have the opportunity to provide

justification for continuing confidential treatment, consistent with statutory

protections at the administrative level. The statute states that the Commission

"shall" notify the submitter of the information and solicit an explanation for

confidential treatment, meaning that step is mandatory when confidentiality is

called into question. 19 U.S.C. § 1677f(b)(2). A submitter's opportunity to

explain why confidential treatment is warranted is the sole action prescribed in the

statute when such treatment is called into question. *Id.* That unqualified right to

an opportunity to advocate for continuing confidential treatment is necessary to

inducing the submission of sensitive information to the Commission in the first

instance.

This Court's rules also support the preservation of confidential record data

while simultaneously balancing the public interest in judicial transparency. The

22

rules establish word limitations on redactions in legal arguments, but those redaction limitations "do not apply to appendices; attachments; exhibits; and addenda to motions, petitions, responses, replies, or briefs"[13] – the very locations where proprietary information is likely to be provided. In addition, the rules provide that, "[i]n general, any portion of the record that was subject to a protective order in the trial court or agency *must* remain subject to that order on appeal or review."[14]

The rules also provide that "[a] party or counsel for a party must be permitted to inspect and copy material contained in the record governed by a protective order of an agency in accordance with that order"[15] and, in cases where a party to the appellate litigation wishes to remove the confidential status of some portion of the record, "that party must seek an agreement with the other parties."[16]

Companies submitting sensitive information to the Commission rely on an opportunity to be heard prior to disclosure of sensitive information and on the ability to withdraw such information if confidential treatment is denied. Counsel must also be able to assure companies that the choice between disclosure of the confidential

---

[13] Fed. Cir. R. 25.1(d)(1).

[14] Fed. Cir. R. 25.1(c)(1) (emphasis added). This Court may, *sua sponte*, direct parties to show cause why a protective order should not be modified, *id.*, but the rules do not contemplate unilateral disclosure of confidential material by the court.

[15] Fed. Cir. R. 17(d)(2); *see also* Fed. Cir. R. 11(b)(2).

[16] Fed. Cir. R. 25.1(c)(2) (emphasis added).

information versus withdrawal of that information from the record is not lost on appeal.

If there is even *a risk* that unilateral decisions will be made by the Court in subsequent litigation that information treated as confidential by the Commission should be publicly disclosed, companies will be less willing to provide detailed sensitive information about their operations and business in their written submissions. That would have a profound chilling effect on the ability to present or defend a case under the trade laws, to the detriment of the companies' interests and the Commission's investigative function. The choice between disclosure or withdrawal of the information lies solely with the company to which the confidential information belongs – not the Court and not the Commission. These statutory rights should not disappear between the administrative proceeding and the judicial proceeding.

## III.   INPUT FROM THE SUBMITTER ON THE NATURE AND CONTEXT OF THE INFORMATION IS CRITICAL TO ASSESSING CONFIDENTIALITY

The business proprietary nature of information submitted under protective order is highly contextual, and may not be evident based on a review of other publicly available information alone, thus highlighting why procedural protections for confidential information must remain in place on appeal. Input from the submitter of the information regarding both the nature and the context of the

24

information is critical to permit an informed assessment as to the confidentiality of the data.

Companies' submissions to the Commission may include questionnaire responses, declarations, paid subscription data, customer communications, internal presentations and strategy, market analyses and forecasts – all of which typically contain highly confidential and proprietary information. These submissions may include data and descriptions of the domestic industry's capacity utilization, production metrics, shipments, financial indicators (including operating income, profitability, and employment), pricing, and market share. Companies may also disclose specific customers and potential customers (for producers) or suppliers (for purchasers), as well as communications with those customers or suppliers (including specific bids and offers).

Petitioners are typically an association or coalition of domestic manufacturers who agree to share confidential information with the Commission and others under a protective order for purposes of bringing a trade case. U.S. importers, foreign producers/exporters, and purchasers likewise share their confidential information under protective order to help build the record and, in many instances, develop their defense strategy. These companies, however, compete with one another in the marketplace and closely guard their proprietary information from one another, their customers, and their competitors. Each

company may be unwilling to share information equally with competitors or with customers, or among different customers. For instance, a domestic manufacturer may use a specific pricing structure, implement a surcharge, or offer discounts for certain customers but not others. Similarly, a single purchaser can have both domestic and foreign suppliers and would not want to disclose its particular supply chains to its vendors.

Counsel also rely on the ability to help their clients (and non-clients that are providing support) prepare declarations to be submitted to the Commission that typically include first-hand correspondence, sales notes, call notes, and other evidence of customer or supplier negotiations. Such primary source documents, combined with a narrative declaration that explains the company declarant's understanding of the meaning, context, and market dynamics surrounding the primary documentation, are vital for the Commission to gain insight into the competitive conditions of the market under investigation. The ability to provide such sensitive information related to the customer/supplier relationship is also critical for companies to make and rebut claims regarding commercial transactions that go directly to the Commission's assessment of the statutory factors of volume effects, price effects, and adverse impact by reason of subject imports in trade remedy proceedings.

Further, information provided to the Commission (for example, capacity utilization, production, specifications, or financial data) necessarily relates to the specific domestic like product or subject import at issue, and thus often does not align with broader information publicly disclosed on company websites, in investor reports, or in regulatory filings. A company's public earnings report may disclose the profitability of the business as a whole, but the profitability of a specific product line produced in the United States, would remain confidential. Similarly, a company may include public information about the manufacturing process of its product on its website, but keep certain aspects of that production process – such as specific measurements, inputs, required equipment, or production steps – proprietary. It may be generally known which producer has the largest share of the U.S. market among numerous members of a domestic industry, but the relative market shares of other, smaller producers may not be as well-known, or may change over time. In such cases, disclosure of approximations or rankings of data such as market shares, even if specific numbers are not used, can release information that is not, in fact, publicly available but for the provision of product-, period-, and facility-specific shipment data to the Commission.

Moreover, companies develop market intelligence and forecasts through their own experience, relationships, and analysis, even if seemingly similar statements are made by other organizations (for example, industry consultants).

27

Companies also rely on paid subscription information,[17] such as pricing data,

market share, and foreign industry data, among other sources of information, to

gain an understanding of their competition and the marketplace. Submitting

companies use these internal assessments and paid subscription data in responding

to the Commission's questions and requests. Much like an attorney's compilation,

analysis, and presentation of otherwise public information for purposes of advising

a client is protected by privilege, a company's internal use and development of

otherwise public (or fee-based) information for its own competitive purposes can

be – and often is – imbued with commercial sensitivity. Such information is

shared with outside counsel pursuant to that privileged relationship, and is

submitted to the Commission during the course of a proceeding with a request for

confidential treatment and the due process protections such a request affords. *See*

*supra,* Section I.

Finally, certain documents that may be facially publicly available may need

to be kept confidential because the context of their disclosure would lead the reader

to conclude other information that would remain confidential but for that

disclosure. Such documents, like a news article, when read in context may allow

---

[17]    This paid subscription data is closely held for compliance with copyright and
use restrictions, and only shared with counsel and the Commission with the
understanding it will not be publicly disclosed – even if another company could
pay for the same data.

the reader to "connect the dots" with respect to a suspected commercial relationship or transaction that is otherwise confidential. These nuances are common and understood by the Commission in its careful analysis of what should and should not remain confidential.

Context, therefore, is key, and the submitter of the information is best positioned to explain why the information is commercially sensitive and should be treated confidentially. The fact that certain types of information are disclosed publicly by a company, or could be obtained from other sources, does not necessarily render a company's proprietary information public. The sensitivity of companies' data only increases when there are fewer companies in an industry or a smaller customer base, such that even aggregated data could indicate relative market positions and other competitive information.

Regardless of the number of companies in an industry, the mere addition of words such as "approximately," "about," or "roughly" does not provide sufficient safeguards to protect sensitive information in accordance with the statutory mandate governing trade remedy investigations. Moreover, the disclosure of record data, even when presented in a different format than as originally provided, directly contravenes the statutory protections afforded to proprietary information that submitters rely on when providing such information to the Commission.

29

Without confidence in the opportunity to be heard while retaining the confidential nature of information for the entire time that information remains part of the Commission record, including on appeal, companies will be reticent to submit confidential information in the first place, thereby harming both public and private interests in the strong and fair enforcement of U.S. trade laws.

## CONCLUSION

CITBA urges the Court to reverse the Court of International Trade Order rejecting the Joint Motion to Retract the Court's Slip Opinion and Accord Confidential Treatment to Business Proprietary Information Contained Therein because not only is the disclosure of confidential information without consent contrary to the statute in trade remedy matters, such disclosure also will have a profound chilling effect on the willingness of companies to provide confidential information in trade remedy investigations and thus impair the Commission's ability in future investigations to obtain such information as is necessary to perform its statutory functions in accordance with 19 C.F.R. § 201.6.

The Commission's record and submitters' interests are served by the carefully crafted formula balancing the importance of creating a comprehensive record – and the confidentiality protections, including the consent requirement, that enable that – with the importance of public dissemination of information and the body of trade law to which the public record contributes.  Companies, however,

30

will be far less willing to provide detailed information about the market, their business, and their operations that *they* deem sensitive if there is a risk that the information might be publicly disclosed in subsequent litigation, regardless of the Commission's statutory responsibility to protect such information at the administrative level (or permit its withdrawal).

Both Congress and the courts recognize the important role that limiting disclosure of sensitive proprietary information plays in balancing the public and private interests in trade remedy cases. Without confidence that the statutorily provided procedural protections for confidential information, such as a notice and consent requirement, will extend from agency proceedings to the court on appeal, companies will decline to share confidential information with the Commission, severely impairing the ability of interested parties to present or defend a case and diminishing the Commission's ability to fulfill its statutory obligations.

Dated: October 25, 2024

/s/ *Deanna Tanner Okun*
Deanna Tanner Okun
**POLSINELLI PC**
1401 Eye Street NW, Suite 800
Washington, DC 20005
Email: dtokun@polsinelli.com
Telephone: (202) 626-8329

Brooke M. Ringel
**KELLEY DRYE & WARREN LLP**
Washington Harbour, Suite 400
3050 K Street, NW

31

Washington, DC 20007
Email: bringel@kelleydrye.com
Telephone: (202) 342-8516

32

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(b). The brief contains 6,820 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Times New Roman font.

/s/ *Deanna Tanner Okun*
Deanna Tanner Okun
**POLSINELLI PC**
1401 Eye Street NW, Suite 800
Washington, DC 20005
(202) 626-8329
dtokun@polsinelli.com

*Counsel for Customs and International
Trade Bar Association*

Dated: October 25, 2024



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.